## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ABQ UPTOWN, LLC,
a Delaware Limited Liability Company,

    Plaintiff,

vs.               No. CIV 13-0416 JB/KK

DAVIDE ENTERPRISES, LLC,
a New Mexico Limited Liability Company;
DAWN DAVIDE; and
CHRISTOPHER LUTTRELL,

    Defendants.

## MEMORANDUM OPINION[1]

  **THIS MATTER** comes before the Court on Plaintiff ABQ Uptown, LLC's Motion for

Partial Summary Judgment on Counts I, II, and IV of Plaintiff's Complaint, filed February 5,

2015 (Doc. 60)("MSJ").  The Court held a hearing on the MSJ on April 22, 2015 and an

evidentiary Mark V[2] hearing on May 29, 2015.  The primary issues are: (i) whether Section 19.1

of the Shopping Center Lease by and Between Hunt Uptown, LLC, a New Mexico limited

liability company, Landlord, and Davide Enterprises, LLC, Tenant (dated March 17, 2010), filed

May 3, 2013 (Doc. 1-2)(the "Second Lease"), is ambiguous; (ii) if Section 19.1 is not

ambiguous, what its meaning as a matter of law is; (iii) whether the Court should grant the MSJ

---

[1]The Court issued an Order, filed September 30, 2015 (Doc. 78)("Order"), granting in part and denying in part Plaintiff ABQ Uptown, LLC's Motion for Partial Summary Judgment on Counts I, II, and IV of Plaintiff's Complaint, filed February 5, 2015 (Doc. 60), stating that the Court would "at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

[2]According to the Supreme Court of New Mexico in Mark V. Inc. v. Mellekas, 1993-NMSC-001, 845 P.3d 1232, a district court may take extrinsic evidence to determine whether a contract is ambiguous.  See 1993-NMSC-001, ¶¶ 11-12, 845 P.3d at 1235-36.

on Plaintiff ABQ Uptown LLC's breach-of-contract claim (Count I) against the Defendants for Davide Enterprises' removal of various permanent improvements, improvements, and/or fixtures from the Premises in violation of Section 19.1 of the Second Lease; (iv) whether the Court should grant the MSJ on ABQ Uptown's implied covenant of good-faith-and-fair-dealing claim (Count II) against Defendants Davide Enterprises, Dawn Davide, and Christopher Luttrell for Davide Enterprises' denial of ABQ Uptown's right to receive the benefits provided under the Second Lease; and (v) whether the Court should grant the MSJ on ABQ Uptown's unjust enrichment claim (Count IV) against the Defendants for Davide Enterprises' unjust and wrongful acts, including their breach of the Second Lease, which benefited them at ABQ Uptown's expense.  The Court will grant in part and deny in part the MSJ.  The Court concludes that Section 19.1 of the Second Lease is not ambiguous as a matter of law, because the provision is not reasonably and fairly susceptible of different constructions.  Because Section 19.1's language, viewed in light of the extrinsic evidence that the parties presented at the <u>Mark V</u> hearing, is not fairly susceptible to conflicting inferences, the Court can determine the meaning of the Second Lease as a matter of law, and grants ABQ Uptown's MSJ on their breach-of-contract claim (Count I) against the Defendants[3] as to some of the articles or items that Davide

---

[3]The Court recognizes that ABQ Uptown and Davide Enterprises entered into the Second Lease.  It is not disputed, however, that on March 17, 2010, concurrent with the execution of the Second Lease, Defendants Dawn Davide and David Luttrell executed a Guaranty in favor of Hunt Uptown, which was duly notarized.  <u>See</u> Guaranty by Dawn Davide and Christopher Lee Luttrell, wife and husband (together, "Guarantor"), in favor of Hunt Uptown, LLC, a New Mexico limited liability company ("Landlord")(dated March 17, 2010), filed May 13, 2014 (Doc. 43-2)(the "Guaranty").  <u>See also</u> Amended Complaint ¶¶ 31-38, at 7-9, filed May 13, 2014 (Doc. 43)("Complaint")(setting forth this fact).  The Second Lease also identifies Davide and Luttrell as Guarantors.  <u>See</u> Second Lease ¶ 1.3, at 1.  In their Answer, the Defendants admit "that there was a guaranty attached as part of the [Second Lease]," although they contend that they cannot read it.  Answer to Amended Complaint ¶ 10, at 2, filed June 16, 2014 (Doc. 45)("Answer").  The Court concludes the Guaranty is legible and because the Defendants do not dispute that the

Guaranty exists or that it is genuine, concludes that it is valid as a matter of law.  Among other things, the Guaranty, in pertinent parts, states:

> 1. <u>Unconditional Guaranty.</u>  Guarantor unconditionally and irrevocably guarantees to Landlord and the successors and assigns of the Landlord the full and punctual payment, performance and observance by tenant of all the terms, covenants and conditions in the Lease to be kept, performed or observed by Tenant.  Without limiting the foregoing, Guarantor guarantees the performance or payment of any liability of Tenant to landlord accruing under the Lease for any period preceding as well as any period following the term of the Lease.  If, at any time, Tenant defaults in the performance or observance of any of the terms, covenants, or conditions in the Lease to be kept, performed or observed by Tenant, including, without limitation, the payment of any Base Rent, Tenant's Proportionate Share, or other charge, Guarantor will keep, perform and observe the same, as the case may be, in Tenant's place and stead.

> . . . .

> If Landlord transfers its interest in the Lease (other than as collateral assignment for security, until the holder thereof exercises its rights thereunder), "Landlord", as used in this Guaranty, shall thereupon mean Landlord's successors and assigns

> . . . .

> 4. <u>Joinder; Statute of Limitations.</u>  Guarantor agrees that Guarantor may be joined in any action against Tenant in connection with the obligations of Tenant under the Lease as covered by this Guaranty and recovery may be had against Guarantor in any such action, or Landlord may enforce the Obligations of Guarantor hereunder without first taking any action whatsoever against Tenant or its successors and assigns, and landlord may pursue any other remedy or apply any security it may hold.  Guarantor hereby waives all rights to assert or plead at any time any statute of limitations as relating to the Lease, the obligations of Guarantor hereunder, and any and all surety defenses or other defenses in the nature thereof.

> 9. <u>Joint and Several Liability.</u>  If more than one person signs below as Guarantor, the term "Guarantor", as used herein, shall include all of the undersigned and each and every provision of this Guaranty shall be binding on each and every one of the undersigned jointly and severally and Landlord shall have the right to join one or all of them in any proceeding or to proceed against them in any order.

Guaranty ¶¶ 1, 3, 4, 9, at 1-2.

The Court is granting in part and denying in part ABQ Uptown's MSJ on their breach-of-contract claim (Count I) against the Defendants.  Davide Enterprises is liable for breach of

Enterprises removed from the Premises in violation of Section 19.1 of the Second Lease.  The

Court denies, however, the MSJ on ABQ Uptown's implied covenant of good-faith-and-fair-

dealing claim (Count II) against the Defendants, because ABQ Uptown has not sufficiently

shown that the Defendants breached the Second Lease in bad faith.  Further, the Court will deny

the MSJ on ABQ Uptown's unjust enrichment claim (Count IV) against the Defendants, for

---

contract under the Second Lease for violating Section 19.1.  See Second Lease ¶ 19.1, at 15.  The
judgment also runs, however, against Defendants Davide and Luttrell by virtue of the Guaranty,
which they executed in favor of Hunt Uptown, and which was duly notarized.  In other words,
while Davide and Luttrell did not breach the Second Lease, they are liable under the Guaranty.

Additionally, the Court recognizes that ABQ Uptown has moved for partial summary
judgment on three counts: (i) its breach-of-contract claim (Count I), (ii) its breach-of-the-
covenant-of-good-faith-and-fair-dealing claim (Count II), and (iii) its unjust enrichment claim
(Count IV).  In its Complaint, regarding its breach-of-contract claim (Count I), ABQ Uptown
asserted that the Defendants breached the Second Lease in three distinct ways:

> 41.  Tenant breached the Lease by failing to pay Landlord Gross Rent (at
> minimum) for the months of November and December 2012.
>
> . . . .
>
> 43.  Tenant breached Section 19.1 of the Lease by failing to surrender the
> Premises in a clean undamaged condition.
>
> 44.  Tenant breached Section 19.1 of the Lease by removing from the Premises (at
> minimum) the permanent improvements, improvements and/or fixtures described
> in this Complaint.

Complaint ¶¶ 41-44, at 9.  The Court, however, construes ABQ Uptown's motion for partial
summary judgment under Count I as moving only for summary judgment on its claim that the
Defendants "breached the Lease by removing from the Premises . . . the permanent
improvements, improvements and/or fixtures."  Complaint ¶ 44, at 9.  ABQ Uptown's MSJ on
Count I focuses entirely on the Defendants' breach of the fixtures portion of Section 19.1 of the
Second Lease, and does not anywhere mention the Defendants' failure to surrender the Premises
in a clean undamaged condition, or their failure to pay ABQ Uptown gross rent for the months of
November and December 2012.  This opinion does not affect, therefore, the breach-of-contract-
claim set forth in paragraphs 41 and 43 of the Complaint.

where a contractual relationship exists, New Mexico law bars such claims.  The Court should not

grant ABQ Uptown equitable relief when it has adequate remedy at law for its claims.

## FACTUAL BACKGROUND

The Court will provide two factual sections, which are set forth below.  The Court will

first present its findings of fact based on the Mark V hearing it held on May 29, 2015.  See

Transcript of Hearing at 2-58 (taken May 29, 2015)("May 29 Tr.").[4]  Second, the Court will set

forth the undisputed material facts for purposes of deciding the MSJ.

### 1.    The Court's Findings of Fact Based on the Mark V Hearing.[5]

Pursuant to the Supreme Court of New Mexico's decision in Mark V. Inc. v. Mellekas,

1993-NMSC-001, 845 P.2d 1232, the Court makes the following findings of fact:

1.    Defendant Davide Enterprises, LLC ("Davide Enterprises") entered into two lease

agreements with Hunt Uptown, LLC for real property located in Building 12 of the ABQ

Uptown Shopping Center at 2201 Uptown Loop, Albuquerque, New Mexico, 87110

("Premises").[6]  May 29 Tr. at 37:6-18; Amended Complaint ¶ 6, at 2, filed May 13, 2014 (Doc.

---

[4]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

[5]While the parties did not present evidence at the Mark V hearing supporting every fact that the Court sets forth in its findings of fact, they did not dispute them in their briefing on the MSJ or elsewhere.  The Court, therefore, treats the facts contained in these paragraphs as undisputed and necessary to tell a coherent story.

[6]Davide Enterprises occupied space at the Premises under both the First Lease and the Second Lease.  The Court recognizes that the address of the Premises did not change between the leases, but that Davide Enterprises did change floors.  Under the First Lease, Davide Enterprises occupied the first floor, while under the Second Lease they occupied the second floor.  In this opinion, when the Court mentions the Premises in reference to the First Lease, it is referring to the space located on the first floor while when it mentions the Premises in reference to the Second Lease, it is referring to the space located on the second floor of the Premises.

43)("Complaint"); Answer to Amended Complaint ¶ 2, at 1, filed June 16, 2014 (Doc. 45)("Answer").[7]

2.       The first lease entered into between Davide Enterprises and Hunt Uptown was executed in 2006 (the "First Lease"), and Davide Enterprises thereafter operated a retail salon and spa at the Premises under the trade name of "La Bella" or "La Bella Spa Uptown."  May 29 Tr. at 37:13-18; Complaint ¶¶ 6-7, at 2; Answer ¶ 2, at 1; Affidavit of Dawn Davide ¶¶ 11-12, at 2 (dated February 18, 2015), filed February 19, 2015 (Doc. 61-2)(the "Davide Aff.").

3.       Davide Enterprises subsequently terminated the First Lease after Davide gave birth to twins, one of whom had health challenges.  See May 29 Tr. at 31:21-25; Complaint ¶ 7, at 2; Answer ¶ 2, at 1.

4.       After Davide terminated the First Lease, she was preoccupied with her child's health and did not focus on the removal of her fixtures and other things from the Premises.  See May 29 Tr. at 32:20-33:3.

5.       Hunt Uptown was understanding of Davide's family situation and permitted her to keep some of her fixtures and other things at the Premises, while one of Davide's family members kept a key to the space.  See May 29 Tr. at 32:22-33:11.

6.       Some items, including rolled-up carpet, were never removed from the Premises. See May 29 Tr. at 32:20-33:11.

---

[7]The Court recognizes that the Defendants dispute that Davide Enterprises had a trade name of "LaBella ABQ Uptown."  See Answer ¶ 2, at 1.  The Defendants, however, do not appear to dispute that Davide Enterprises had a trade name of "La Bella" or "La Bella Spa Uptown."  See Affidavit of Dawn Davide ¶¶ 11-12, at 2 (dated February 18, 2015), filed February 19, 2015 (Doc. 61-2)(the "Davide Aff.").

7.      After Davide Enterprises' departure, Hunt Uptown had difficulty leasing the Premises to a new tenant and subsequently invited Davide Enterprises to return.  See May 29 Tr. at 31:25-32:8.

8.      On March 17, 2010, Davide Enterprises entered into a second lease with Hunt Uptown in connection with the operation of its retail salon and spa at the Premises (the "Second Lease") on the second floor.  See Complaint ¶ 6, at 2; May 29 Tr. at 32:3-8.

9.      Davide did not read the Second Lease line by line before signing it, trusting her attorney to look over it.  See May 29 Tr. at 31:25-32:8.

10.     Section 19.1 of the Second Lease provides as follows:

19.1 Surrender.  Upon the expiration or termination of this Lease or of Tenant's right to possession, Tenant shall surrender the Premises in a clean undamaged condition.  Tenant shall not remove permanent improvements that were provided by Landlord at the commencement of this Lease and shall not remove permanent improvements later installed by Tenant unless directed to do so by Landlord.  All fixtures or improvements constructed or installed by Tenant at the Premises except Tenant's trade fixtures and equipment shall be the property of the Landlord.  All light fixtures and HVAC equipment,[8] plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes and other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of this Lease without compensation, allowance or credit to Tenant.  Tenant shall promptly remove Tenant's trade fixtures and equipment and repair any damage to the Premises caused by such removal.  If Tenant fails to perform any repairs or restoration or fails to remove any items from the Premises as required hereunder, Landlord may do so, and Tenant shall pay Landlord the cost thereof upon demand.  All property removed from the Premises by Landlord hereunder may be handled, discarded or stored by Landlord at Tenant's expense, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof.  All such property, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord.  If Landlord arranges

---

[8]Heating, Ventilating, and Air Conditioning (HVAC) equipment "perform[s] heating and/or cooling for residential, commercial or industrial buildings."  HVAC Systems, FLORIDA SOLAR            ENERGY            CENTER,            available            at http://www.fsec.ucf.edu/en/consumer/buildings/commercial/hvac.htm (last visited Oct. 17, 2015).

> for storage of any such property, Landlord shall have a lien against such property
> for costs incurred in removing and storing the same.

Second Lease ¶ 19.1, at 15.

11.     Before signing the Second Lease with Hunt Uptown, Davide did not have any discussions with Hunt Uptown about what items would be considered the landlord's property and what items would be considered the tenant's property in the event that the Second Lease was terminated.  See May 29 Tr. at 32:9-13.

12.     Before signing the Second Lease, Davide did not inquire whether Hunt Uptown would enforce Section 19.1.  See May 29 Tr. at 39:9-41:13.

13.     Upon entering into the Second Lease with Hunt Uptown in 2010, Davide Enterprises re-occupied the Premises, and resumed operating its retail spa and salon business. See Complaint ¶ 8, at 3; Answer ¶ 2, at 1.

14.     While under the First Lease, Davide Enterprises occupied the first floor of the Premises; under the Second Lease, they moved to the second floor.  See May 29 Tr. at 32:15-23.

15.     The items that Davide put into the Premises the second time were primarily the same items that she had removed the first time.  See May 29 Tr. at 32:14-17.

16.     Because the space on the Premises' second floor was smaller, however, there was no room for some of the items that Davide had removed following the First Lease's termination. See May 29 Tr. at 33:24-34:5.

17.     When Davide did not bring some of the items that she had removed the first time around into the Premises to begin operating under the Second Lease, Hunt Uptown did not make an issue about the items belonging to them.  See May 29 Tr. at 333:24-34:5.

18.     During the course of the Second Lease, on July 15, 2011, ABQ Uptown purchased the shopping center, and succeeded in interest to Hunt Uptown as the landlord and owner of the premises.  See Complaint ¶ 11, at 3; May 29 Tr. at 37:19-23.

19.     On September 25, 2012, Davide received a letter from ABQ Uptown providing notice of termination of the Second Lease, see Letter Re: Le Bella Day Spa, Suite 12F, ABQ Uptown, Albuquerque, New Mexico (dated September 25, 2012), filed May 3, 2013 (Doc. 1-3)("September 25, 2012, Letter").  See May 29 Tr. at 41:13-42:6.

20.     The September 25, 2012, Letter provided that the tenant must vacate the premises and surrender possession thereof to the landlord in the condition that Section 19.1 of the Second Lease requires on or before the termination date.  See May 29 Tr. at 41:13-42:6 (discussing September 25, 2012, Letter).

21.     Before receiving the September 25, 2012, Letter, Davide had never terminated a lease with ABQ Uptown nor had a lease that ABQ Uptown terminated.  See May 29 Tr. at 38:6-11.

22.     Davide had no indication that ABQ Uptown intended to waive the provisions of Section 19.1 of the Second Lease.  See May 29 Tr. at 39:9-40:23.

23.     Davide never sought permission from ABQ Uptown to be released from the provisions of Section 19.1 of the Second Lease.  See May 29 Tr. at 44:10-13.

24.     Davide never obtained permission from ABQ Uptown to remove any of the improvements that she made to the leased premises.  See May 29 Tr. at 44:14-18.

25.     On December 28, 2012, Davide received a second letter from ABQ Uptown reminding her of the December 31, 2012, deadline to vacate the premises, see Letter Re: Le Bella Spa at ABQ Uptown, Albuquerque, New Mexico (dated December 28, 2012), filed May 3,

2013 (Doc. 1-4)("December 28, 2012, Letter"), and also reminding her of her obligations under

Section 19.1 of the Second Lease, see December 28, 2012 Letter at 1.  See May 29 Tr. at 42:17-

43:7 (discussing December 28, 2012, Letter).

26.     Davide admits that, upon vacating the Premises, she removed many of the items

that she had installed, including:

> a.      door handles, see May 29 Tr. at 5:19-21 (discussing item A2-101 in La
>
> Bella Uptown Reconstruction Valuation Investigation Report Fixture
>
> Table at 19 (dated November 15, 2013), filed February 5, 2015 (Doc. 60-
>
> 3)("Alba Expert Report" or "Fixture Table"))[9];
>
> b.      cash-wrap[10] counter top (two total), see May 29 Tr. at 6:3-18 (discussing
>
> Fixture Table items B1-101; B2-101, see Fixture Table at 19);

---

[9]When referring to items contained in the Fixture Table, see Alba Expert Report at 19-22, which is an appendix of the Alba Expert Report, the Court will simply cite to "Fixture Table." When referring to information located in other parts of the Alba Expert Report, however, the Court will cite to "Alba Expert Report."

The Alba Expert Report was attached to the Complaint and to the MSJ, and therefore, has two docket numbers -- Doc. 43-1 and Doc. 60-3.  The Alba Expert Report Fixture Table was also admitted at the Mark V hearing, and Davide had it in front of her while she was testifying.  See May 29 Tr. at 4:23-5:17.  In sum, the Alba Expert Report and its Fixture Table have been central to this dispute.

The Alba Expert Report attached to the MSJ also included an affidavit from Christopher CV Alba, the author of the report, certifying that the report was based upon his personal knowledge and opinions.  See Affidavit of Christopher C.V. Alba, NCARB at 1-2 (dated February 3, 2015), filed February 5, 2015 (Doc. 60-3)(the "Alba Aff.").  Because the Alba Expert Report attached to the MSJ included the Alba Aff., it is lengthier and therefore has different page numbers from the Alba Expert Report attached to the Complaint.  When citing to the Alba Expert Report or the Fixture Table in this opinion, the Court will use the page numbers from the Alba Expert Report attached to the MSJ as Doc. 43-1 because that version of the report includes the Alba Aff.

[10]The term "cash-wrap" refers to the front counter or check-out areas of a store or retail merchandising unit that houses the cash register and wrapping section.  See, e.g., Cash Wrap, ICSC DICTIONARY OF SHOPPING CENTER TERMS 25 (2005).

c.       pedicure sink, <u>see</u> May 29 Tr. at 7:5-7 (discussing Fixture Table item C1-202, <u>see</u> Fixture Table at 19);

d.       stainless steel sinks and faucets, <u>see</u> May 29 Tr. at 7:18-8:3 (discussing Fixture Table item C2-205, <u>see</u> Fixture Table at 19);

e.       shower door, <u>see</u> May 29 Tr. at 8:4-7 (discussing Fixture Table item D1-205, <u>see</u> Fixture Table at 19);

f.       steam room door, <u>see</u> May 29 Tr. at 8:10-12 (discussing Fixture Table item D2-205, <u>see</u> Fixture Table at 19);

g.       towel warmer (four total), <u>see</u> May 29 Tr. at 10:9-18; 13:2-4; 16:20-22; 19:23-24 (discussing Fixture Table items C3-205; C3-207; C3-220A; C3-237, <u>see</u> Fixture Table at 19);

h.       toilet paper holders (four total), <u>see</u> May 29 Tr. at 10:19-21; 17:3-4; 18:6-11; 20:3-4 (discussing Fixture Table items C4-205; C4-22A; C4-235; C4-237, <u>see</u> Fixture Table at 19);

i.       shower fixtures, <u>see</u> May 29 Tr. at 10:24-11:3 (discussing Fixture Table item C5-205, <u>see</u> Fixture Table at 19);

j.       Dornbracht[11] toilets (4 total), <u>see</u> May 29 Tr. at 11:4-20; 17:5-8; 18:10-11; 20:10-12 (discussing Fixture Table items C6-205; C6-220A; C6-235; C6-237, <u>see</u> Fixture Table at 19);

---

[11]Dornbracht is a manufacturer of designer fittings and accessories for the bathroom, including bathtubs, washstands, showers/tubs, and toilets.  <u>Company</u>, DORNBRACHT, http://www.dornbracht.com/en-us/company/ (last visited October 9, 2015).  It is a medium-sized company and is headquartered in Iserlohn, Germany.  <u>Company</u>, DORNBRACHT, http://www.dornbracht.com/en-us/company/ (last visited October 9, 2015).

k.      women's lounge lockers, <u>see</u> May 29 Tr. at 11:21-12:4 (discussing Fixture Table item B3-205, <u>see</u> Fixture Table at 19);

l.      women's lounge cabinetry and countertops, <u>see</u> May 29 Tr. at 12:20-24 (discussing Fixture Table item B4-205, <u>see</u> Fixture Table at 19);

m.     cabinetry and countertops from the treatment room, <u>see</u> May 29 Tr. at 13:9-16 (discussing Fixture Table item B5-17ea., <u>see</u> Fixture Table at 19);

n.      treatment room oval sinks and faucets, <u>see</u> May 29 Tr. at 13:17-20 (discussing Fixture Table item C7-17ea., <u>see</u> Fixture Table at 20);

o.      dispensary[12] cabinetry, counter tops, sinks, and faucets, <u>see</u> May 29 Tr. at 14:7-19 (discussing Fixture Table items B6-210; C8-210, <u>see</u> Fixture Table at 20);

p.      one-way office glass, <u>see</u> May 29 Tr. at 14:24-15:6 (discussing Fixture Table item G2-212, <u>see</u> Fixture Table at 20);

q.      therapy shower in the therapy room, <u>see</u> May 29 Tr. at 15:7-19 (discussing Fixture Table item E3-216, <u>see</u> Fixture Table at 20);

r.      couples lounge shower fixtures and surround, <u>see</u> May 29 Tr. at 15:23-16:7 (discussing Fixture Table items C10-219-2210; G3 219-220, <u>see</u> Fixture Table at 20);

s.      couples lounge tub (one total), <u>see</u> May 29 Tr. at 16:5-19 (discussing Fixture Table item C9-219-220, <u>see</u> Fixture Table at 20);

---

[12]A dispensary is a place where medicine or minor medical treatment is given.  <u>See</u> <u>Dispensary</u>, MERRIAM-WEBSTER ONLINE DICTIONARY (2015).

t.  shower bench, see May 29 Tr. at 16:23-24 (discussing Fixture Table item B7-220A, see Fixture Table at 20);

u.  couples lounge cabinetry, counter tops, sinks, and faucets, see May 29 Tr. at 17:9-15 (discussing Fixture Table items B8-220A; C7-220A, see Fixture Table at 20);

v.  trough sink,[13] see May 29 Tr. at 17:16-18:2 (discussing Fixture Table item C11-226, see Fixture Table at 20);

w.  color bar[14] cabinetry and counter top, see May 29 Tr. at 18:3-5 (discussing Fixture Table item B14-226, see Fixture Table at 20);

x.  cabinetry, counter top, sink, and faucet, see May 29 Tr. at 18:12-16 (discussing Fixture Table items C2-235; B9-235, see Fixture Table at 20);

y.  men's lounge shower door, see May 29 Tr. at 18:20-22 (discussing Fixture Table item D1-237, see Fixture Table at 20);

z.  two steam room doors and one sauna room door, see May 29 Tr. at 18:25-19:4 (discussing Fixture Table items D1-237; D2-237, see Fixture Table at 20);

---

[13]A trough sink is a long rectangular sink that is often used in areas that are often used by more than one person at the same time.  With multiple tabs, spaced evenly apart, multiple people can use the sink at the same time.  Following the Industrial Revolution, the "trough sink became largely relegated to the bath space and was the sink style of choice for communal bath spaces like hospitals, stadiums, dormitories, and schools. . . . In this was the trough sink inherited its utilitarian reputation, traveling from field to farmhouse kitchen to humble wash-up station to the kitchen and bath spaces of today."  The History of the Trough Sink, NATIVE TRAILS, available at http://www.nativetrails.net/blog/the-history-of-the-trough-sink/ (last visited Oct. 17, 2015).  The trough sink has since reentered onto the contemporary sink scene.  See The History of the Trough Sink, NATIVE TRAILS, available at http://www.nativetrails.net/blog/the-history-of-the-trough-sink/ (last visited Oct. 17, 2015).

[14]A "color bar" is the location in a salon where guests sit to have their hair colored.

aa.     additional shower fixtures from the men's lounge, <u>see</u> May 29 Tr. at 20:5-6 (discussing Fixture Table item C5-237, <u>see</u> Fixture Table at 20);

bb.     men's locker room lockers, cabinetry, counter tops, sinks, and faucets, <u>see</u> May 29 Tr. at 20:13-21 (discussing Fixture Table items B11-237; C2-237, <u>see</u> Fixture Table at 21);

cc.     wall sconce[15] light fixtures (16 total), <u>see</u> May 29 Tr. at 24:3-6; <u>id.</u> at 27:10-12 (discussing Fixture Table items H1-101; H1-101D; H1-201; H1-206, H1-226, <u>see</u> Fixture Table at 21);

dd.     chandelier light fixture, <u>see</u> May 29 Tr. at 22:19-23:21 (discussing Fixture Table item H3-101, <u>see</u> Fixture Table at 21);

ee.     vertex 9" pendant[16] (3 total), <u>see</u> May 29 Tr. at 24:10-15 (discussing Fixture Table item H5-201, <u>see</u> Fixture Table at 21);

ff.     wall hanging,[17] <u>see</u> May 29 Tr. at 25:2-7 (discussing Fixture Table item B15-202, <u>see</u> Fixture Table at 21);

gg.     couples lounge chandelier light fixture, <u>see</u> May 29 Tr. at 26:7-10 (discussing Fixture Table item H11-219-220, <u>see</u> Fixture Table at 21);

---

[15]The NEW OXFORD AMERICAN DICTIONARY defines "sconce" as "a candle holder, or a holder of another light source that is attached to a wall with an ornamental bracket." <u>Sconce</u>, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

[16]The NEW OXFORD AMERICAN DICTIONARY defines "pendant" as "a light designed to hang from the ceiling." <u>Pendant</u>, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).

[17]The Fixture Table refers to item B15-202 as a "drapery" in the "pedicure room." Fixture Table at 21.  At the May 29, 2015, evidentiary hearing, however, when asked about Fixture Table item B15-202, Davide stated that she did not remove a drapery.  <u>See</u> May 29 Tr. at 25:2-7.  Rather, Davide stated that she removed a "drape piece of art in a frame," that was a wall hanging.  <u>See</u> May 29 Tr. at 25:2-7.  The Court finds that Davide removed a drape piece of art in a frame from the pedicure room.

hh.    roman shades in the couples lounge (3 total),[18] see May 29 Tr. at 25:19-23; id. at 26:21-24 (discussing Fixture Table item B16-219-220, see Fixture Table at 21-22).

ii.    light fixtures over the massage table in each treatment room,[19] see May 29 Tr. at 27:2-9 (discussing Fixture Table item H6-17ea., see Fixture Table at 22);

jj.    wall covering in the men's lounge,[20] see May 29 Tr. at 28:13-15 (discussing Fixture Table item G4-237, see Fixture Table at 22);

---

[18]The Fixture Table refers to item B17-205 as a "window covering" located in the "women's lounge." Fixture Table at 21. At the May 29, 2015, Mark V evidentiary hearing, however, when asked about Fixture Table item B17-205, Davide stated that she took the "three Roman shades in the couples lounge." See May 29 Tr. at 25:19-23. Later during the hearing, Davide was asked about Fixture Table item B16-219-220, see May 29 Tr. at 26:21-24, which the Fixture Table lists as a "window covering" in the "couples lounge room," see Fixture Table at 22. Davide responded that she took the window covering.

    Based on this evidence, the Court finds that Davide removed three Roman shades, Fixture table item B16-219-220. Further, while the Fixture Table lists that six couples lounge window coverings were removed, see Fixture Table at 20, at the hearing, Davide admitted to removing only three. The Court finds that three Roman shades were removed from the couples lounge.

[19]The Fixture Table refers to item H6-17ea. as "flush mount ceiling" lights in the "treatment room." Fixture Table at 22. At the May 29, 2015, hearing, however, when asked about Fixture Table item H6-17ea., Davide stated that "[i]n the treatment rooms . . . there were fixtures that were over the massage table, custom" that she removed, but they were not "flush mount." May 29 Tr. at 27:5-9. The Court finds that Davide removed custom fixtures, which were installed over the massage table in each of the treatment rooms.

[20]The Fixture Table refers to Fixture Table item G4-237 as a "wall covering" in the "men's lounge." Fixture Table at 22. At the Mark V hearing, however, when asked about Fixture Table item G4-237, Davide stated that she did not remove a wall covering from the men's lounge, but that she did remove the one piece of "quilted art" which hung there. See May 29 Tr. at 28:13-15. The Court finds that Davide removed from the men's lounge a piece of "quilted art."

kk.     one television with mounting brackets in the men's lounge and one in the color bar, see May 29 Tr. at 29:23-30:15 (discussing Fixture Table items B20-226; B20-237, see Fixture Table at 22);

ll.     a commercial washer and gas dryer,[21] see May 29 Tr. at 27:21-24; May 29 Tr. at 30:5-13 (discussing Fixture Table items I1-236; B21-W, see Fixture Table at 22).

27.     On January 15, 2012, Davide received a third letter from ABQ stating that she was in violation of the Second Lease for back rent owed in the amount of $24,821.08, as well as for violating Section 19.1 for removing permanent improvements, light fixtures, plumbing fixtures, fire suppression systems, wall coverings, and other fixtures, see Letter Re: Lease dated March 17, 2010 ("Lease") by and between Davide Enterprises, LLC ("Tenant") and ABQ Uptown, LLC, as successor in interest to Hunt Uptown, LLC ("Landlord") for the retail premises known as Suite 12F ("Premises") at the ABQ Uptown shopping center ("Shopping Center")(dated Jan. 15, 2013), filed May 3, 2013 (Doc. 1-6)("January 15, 2012, Letter). See May 29 Tr. at 43:8-44:8.

28.     Davide admits that she owes Simon Properties $24,821.00 in back rent. See May 29 Tr. at 43:12-15.

---

[21]During the May 29, 2015, hearing, Davide discussed a washer and dryer on two different occasions. First, when asked about Fixture Table item I1-236, "washer mixing valves," Davide responded that she "remove[d] the washer and dryer" in the laundry room. See May 29 Tr. at 27:21-24. Second, she was specifically asked about Fixture Table item B21-W, see May 29 Tr. at 30:5-13, which is listed in the Fixture Table as "linen washer & gas dryer" in the laundry room, see Fixture Table at 22. In response, Davide stated that she removed a commercial "washer and dryer." See May 29 Tr. at 30:5-13. Based on this evidence, the Court finds that Davide removed a single washer and dryer from the laundry room.

2.      **Undisputed Material Facts**.

Many facts on which the MSJ focuses are undisputed. "On March 17, 2010, Davide Enterprises entered into the [Second Lease] with Hunt Uptown, LLC in connection with the operation of a retail salon and spa at the Premises . . . having the trade name 'La Bella ABQ Uptown.'" MSJ ¶ 1, at 2 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). Before entering into the Second Lease, Davide Enterprises had previously occupied the Premises, and operated its retail spa and salon business under the First Lease with Hunt Uptown. See MSJ ¶ 2, at 2 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). "Davide Enterprises had vacated the premises and ceased operations under the prior lease agreement." MSJ ¶ 2, at 2 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). "[W]hen [Davide Enterprises] terminated the [First Lease], in 2009, the landlord (Hunt) allowed La Bella to remove everything it wanted from the leased [P]remises." Response ¶ E, at 3 (setting forth this fact).[22] Later, in 2010, Hunt Uptown asked Davide Enterprises to reoccupy

---

[22]D.N.M.LR-Civ. 56.1(b) provides:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b). Here, in compliance with the local rules, the Defendants have set forth additional facts in paragraph E of the Response, other than those contained in ABQ Uptown's MSJ, which they contend are material to the resolution of the MSJ. Further, these facts are lettered and refer with particularity to the attached Davide Aff., regarding her understanding of the Second Lease and the circumstances surrounding the First Lease's termination. See Response at 3; Davide Aff. at 2. In their Reply, ABQ Uptown does not address the facts asserted

the space.  See Response ¶ F, at 3 (setting forth this fact).[23]  Upon entering into the Second Lease

that is the subject of this lawsuit, "Davide Enterprises re-occupied the premises and resumed

operating its retail spa and salon business."  MSJ ¶ 3, at 3 (setting forth this fact).[24]  "In 2010,

when Hunt asked [Davide Enterprises] to reoccupy the space, [Davide Enterprises] moved the

items it had taken out in 2009 back [sic] and that there was no disagreement that everything that

--------------------------------

in paragraph E of the Response by admitting them or disputing them.  See D.N.M.LR-Civ.
56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response
which the movant disputes or to which the movant asserts an objection.").  The Court, therefore,
deems paragraph E of the Response undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts
set forth in the Response will be deemed undisputed unless specifically controverted.").

    [23]Paragraph F of the Defendants' Response complies with D.N.M.LR-Civ. 56.1(b).  The
Defendants have set forth additional facts in paragraph F, in addition to those contained in ABQ
Uptown's MSJ, which they contend are material to the resolution of the MSJ.  Further, these
facts are lettered and refer with particularity to the Davide Aff., in which Davide discusses her
understanding of the Second Lease and the circumstances surrounding the First Lease's
termination.  In their Reply, ABQ Uptown does not address the facts that paragraph F of the
Response asserts by admitting them or disputing them.  See D.N.M.LR-Civ. 56.1(b)("The Reply
must contain a concise statement of those facts set forth in the Response which the movant
disputes or to which the movant asserts an objection.").  The Court, therefore, deems paragraph F
of the Response undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the
Response will be deemed undisputed unless specifically controverted.").

    [24]In paragraph B of their Response, the Defendants state that they dispute paragraph 3 of
ABQ Uptown's MSJ.  See Response ¶ B, at 2.  The Defendants, however, do not explain why
they dispute paragraph 3 nor do they set forth evidence supporting their allegation that Davide
Enterprises did not re-occupy the premises and resume operating a retail spa and salon business
upon entering into the Second Lease with Hunt Uptown.  In Quality Time, Inc. v. West Bend
Mut. Ins. Co., 2013 WL 474289, at *1 (D. Kan. 2013), the United States District Court for the
District of Kansas explained: "In resisting a motion for summary judgment, the opposing party
may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the
nonmoving party must come forward with probative evidence supporting the allegation."  2013
WL 474289, at *1 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Because
the Defendants have relied only upon an allegation in their brief to dispute paragraph 3 of the
MSJ, the Court deems it undisputed that Davide Enterprises re-occupied the Premises after
executing the Second Lease.

went into the space in 2010 belonged to [Davide Enterprises]."  Response ¶ F, at 3 (setting forth this fact).[25]

"On July 15, 2011, ABQ Uptown, LLC succeeded in interest to Hunt Uptown, LLC with respect to Hunt Uptown, LLC's rights and duties under the Lease, and Hunt Uptown, LLC's rights under the Guaranty."  MSJ ¶ 4, at 3 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).  The Second Lease "provided for termination by Landlord on a ninety (90) day notice to Tenant at Landlord's sole discretion after Lease Year 1."  MSJ ¶ 5, at 3 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).  It also contained the following provision in Section 19.1:

> Upon the expiration or termination of this Lease or of Tenant's right to possession, Tenant shall surrender the Premises in a clean undamaged condition. Tenant shall not remove permanent improvements that were provided by Landlord at the commencement of this Lease and shall not remove permanent improvements later installed by Tenant unless directed to do so by Landlord.  All fixtures or improvements constructed or installed by Tenant at the Premises except Tenant's trade fixtures and equipment shall be the property of the Landlord.  All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes and other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of this Lease without compensation, allowance or credit to Tenant.  Tenant shall promptly remove Tenant's trade fixtures and equipment and repair any damage to the Premises caused by such removal.  If Tenant fails to perform any repairs or restoration or fails to remove any items from the Premises as required hereunder, Landlord may do so, and

_____

[25]Paragraph F of the Defendants' Response complies with D.N.M.LR-Civ. 56.1(b).  The Defendants have set forth additional facts in paragraph F, other than those contained in ABQ Uptown's MSJ, which they contend are material to the resolution of the MSJ.  Further, these facts are lettered and refer with particularity to the Davide Aff., in which Davide discusses her understanding of the Second Lease and the circumstances surrounding the First Lease's termination.  In their Reply, ABQ Uptown does not address the facts asserted in paragraph F of the Response by admitting them or disputing them.  See D.N.M.L.R-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.").  The Court, therefore, deems paragraph F of the Response undisputed.  See D.N.M.L.R-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Tenant shall pay Landlord the cost thereof upon demand.  All property removed from the Premises by Landlord hereunder may be handled, discarded or stored by Landlord at Tenant's expense, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof.  All such property, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord.  If Landlord arranges for storage of any such property, Landlord shall have a lien against such property for costs incurred in removing and storing the same.

MSJ ¶ 10, at 4 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).

"On September 25, 2012, [ABQ Uptown] sent [Davide Enterprises] a Notice of Termination of Lease and Demand to Vacate by December 31, 2012."  MSJ ¶ 6, at 3 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).  The September 25, 2012 letter "was clear that [Davide Enterprises] was required to comply with the surrender provisions provided for by the [Second] Lease."  MSJ ¶ 7, at 3 (setting forth this fact).[26]  In late December 2012, Davide removed many articles or items from the Premises.  See MSJ ¶ 8, at 3 (setting forth this fact).  See Defendants' Answer to Interrogatory No. 1, filed February 19, 2015 (Doc. 61-1)("Defendants' Answer to Interrogatory No. 1")(not disputing this fact).[27]  On December 28,

_____

[26]The Defendants' Response does not admit or dispute the facts set forth in paragraph 7 of the MSJ.  The United States Court of Appeals for the Tenth Circuit has held: "Without a specific reference, [the court] will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury."  E.g., Chaves v. New Mexico, 397 F.3d 826, 839 (10th Cir. 1992).  The Court, in its review of the record, does not know of any evidence that disputes ABQ Uptown's factual assertion.  The Court, therefore, deems paragraph 7 of the MSJ undisputed because the Defendants have not come forth with allegations or evidence disputing it.

[27]Paragraph 8 of the MSJ states that, "[i]n late December 2012, Tenant removed permanent improvements, improvements and/or fixtures from the Premises."  MSJ ¶ 8, at 3.  The Defendants dispute this factual assertion in their Response, see Response ¶ B, at 2, stating:

Paragraph[] 8 . . . of Plaintiff's undisputed facts interpret[s] what was a permanent improvement as anything that was mechanically or chemically attached to the premises.  This interpretation conflates the manner of attachment with La Bella's intent when items were installed.  As Ms. Davide explains, the manner in which any given item is attached to the floor or wall is determined by various

2012, ABQ Uptown notified Davide Enterprises in writing of their specific obligations under Section 19.1 of the Second Lease. See MSJ ¶ 9, at 3 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). "[The December 28, 2012 letter] specifically directed [Davide Enterprises] to Section 19.1 of the Lease." MSJ ¶ 10, at 4 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact).

The Second Lease, which ABQ Uptown and Davide Enterprises signed, "is the controlling document regarding what items could be removed from the premises by defendant." MSJ ¶ 11, at 4 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). "Ms. Davide made the determination as to what she was allowed to take from the premises, though she consulted with an attorney." MSJ ¶ 12, at 4 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact). "Ms. Davide planned to stay in the building forever when she designed the space." MSJ ¶ 13, at 5 (setting forth this fact). See Response ¶ A, at 2 (not disputing this fact).[28]

_____

considerations which have nothing to do with her intent to keep and protect her brand.

Response ¶ G, at 3. The Court agrees with the Defendants in so far as Paragraph 8 of the MSJ contains legal conclusions regarding whether articles or items that Davide removed from the Premises qualify as being "permanent improvements, improvements and/or fixtures." While there is no dispute that Davide removed many articles or items from the Premises, whether such articles or items qualify as "permanent improvements, improvements and/or fixtures" is a question of law for the Court. The Court, therefore, has modified ABQ Uptown's asserted statement of fact to state that Davide removed many articles or items from the Premises.

[28]In their Response, the Defendants do not dispute that "Ms. Davide planned to stay in the building forever when she designed the space." Response ¶ A, at 2 (not disputing this fact). They, however, submit the Davide Aff., in which Davide discusses her understanding of the Second Lease and the circumstances surrounding the First Lease's termination. See Davide Aff. In the Davide Aff., Davide states:

11. At no time during my involvement with La Bella Spa Salon Uptown did I intend to leave anything that was designed and/or selected by me behind. La Bella competes in a very aggressive business and everything associated with the

"Many of the items were not designed to be easily removed."  MSJ ¶ 14, at 5 (setting forth this fact).  See Response ¶ (not disputing this fact).[29]  "Ms. Davide estimated that around twenty-five percent of the items removed from the premises were glued in, plastered in, screwed in or nailed in to the property."  MSJ ¶ 15, at 5 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).  "Ms. Davide understood 'everything that's above and beyond what a standard would be' in the space to be a trade fixture."  MSJ ¶ 16, at 5 (setting forth this fact).  See Response ¶ A, at 2 (not disputing this fact).  It is undisputed that Davide removed the following articles or items from the Premises in late December, 2012, which she had previously installed[30]:

_____

> build out of La Bella was designed as part of a signature and brand oriented experience and atmosphere.  I designed and selected everything, to the smallest detail, to reflect and impress our brand on our quests.

Davide Aff. ¶ 11, at 2 (emphasis added).  Paragraph 11 of the Davide Aff. does not directly dispute ABQ Uptown's asserted fact that, when Davide designed the Premises, "she planned to stay there forever."  To the extent, however, that paragraph 11 could be construed as a statement of fact regarding Davide's intent to leave behind any of the articles or things which she installed at the Premises, paragraph 11 of the Davide Aff. would appear to dispute such a statement.

[29]Paragraph 14 of the MSJ states that "[m]any of the items were not designed to be easily removed because of her intent to stay in the space."  MSJ ¶ 14, at 5.  In their Response, the Defendants argue that Paragraph 14

> interpret[s] what was a permanent improvement as anything that was mechanically or chemically attached to the premises.  This interpretation conflates the manner of attachment with La Bella's intent when the items were installed.  As Ms. Davide explains, the manner in which any given item is attached to the floor or wall is determined by various considerations that have nothing to do with her intent to keep and protect her brand.

Response ¶ G, at 3.  The parties, therefore, do not dispute that many of the items were not designed to be easily removed; however, they remain in dispute as to why they were not designed to be easily removed.

[30]Paragraph 17 of the MSJ states that "[p]ermanent improvements, improvements and/or fixtures were wrongly removed" from the Premises by Davide in breach of the Second Lease.  In their Response, the Defendants argue that this statement is a conclusion of law based on ABQ

     1.  A2-101: four (4) door entry handles in the ground floor entry that SF Metal Design manufactured and that cost $350.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table[31] at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 2 (not disputing this fact)[32].

---

Uptown's interpretation of Section 19.1.  See Response ¶ C, at 2.  The Court agrees with the Defendants that whether the many articles or items that Davide removed from the Premises qualify as permanent improvements, improvements, or fixtures within the meaning of Section 19.1, is a question of law for the Court to decide.  It is not in dispute, however, that Davide removed many articles or items from the Premises in late December, 2012, as reflected in the Court's statement of undisputed material facts.

     Further, paragraphs 17 through 22 of the MSJ discuss the report that ABQ Uptown's expert, Christopher CV Alba, produced regarding the status of the items removed from the Premises:

     18.  Plaintiff's expert classified the removed items into four categories: 1) permanent fixtures; 2) furniture, furnishings, and equipment; 3) lease provision fixtures; and 4) trade fixtures.

     19. Permanent fixtures and lease provision fixtures should be considered part of the building.

     20.  Permanent fixtures include "appliance[s], construction[s], or item[s] permanently 1) merged into, 2) affixed, or 3) attached to the building.  A permanent fixture is also any part or component of a larger permanent fixture, an example of which is a countertop on top of a cabinet."

     21. Lease provision fixtures include "depreciable item[s], trade fixture[s], or FF&E [Furniture, Furnishings and Equipment], normally not considered a permanent fixture, but made a permanent fixture through a provision in the lease."

MSJ ¶¶ 17-21, at 5.  In their Response, the Defendants assert that these "undisputed facts" are not facts at all but are conclusions of law based on ABQ Uptown's interpretation of Section 19.1 of the Second Lease.  Response ¶ c, at 2.   The Court agrees that these are not facts, but conclusions of law regarding the status of various items and articles, which Davide Enterprises removed from the Premises.  The characterization of the removed items and whether their removal violated Section 19.1 of the Second Lease is a question of law for the Court.  It is undisputed that Davide Enterprises removed many of the articles or items that Alba identified.  The Court will determine the legal categorization of these items and whether their removal violated Section 19.1 of the Second Lease in the analysis section of this opinion.

     [31]In the Defendants' Response to the MSJ, they object to ABQ Uptown's submission of the Alba Expert Report, which includes the Fixture Table.  See Response at 2.  The Defendants argue:

> His report is based on hearsay; he never actually saw any of the items in La Bella. He has based his report on photos which are not part of the record and put a price on items which he did not accurately identify, and which Defendants claim were never in La Bella. His report is pure speculation.

Response at 2. ABQ Uptown correctly notes, however, that, under rule 703 of the Federal Rules of Evidence, Christopher Alba "is permitted to rely upon evidence that he has never personally seen and is not part of the record." Reply at 8. Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be admissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added). Indeed, the Tenth Circuit has observed that "the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions." Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991). Further, an expert's reliance upon facts or data pursuant to Rule 703 does not require that the expert also conduct independent tests before offering an expert opinion based upon the facts or data upon which the expert relies. Instead, rule 703 contemplates an "opinion" and not merely a recitation of the facts observed from independent testing.

Alba properly rendered an opinion based upon items that he did not personally see and which are not part of the record. ABQ Uptown notes:

> In fact, Mr. Alba could not personally view many of the items after Defendants removed them because they were either relocated or sold at the Davis Kitchen's warehouse shortly after the move out. The information upon which Mr. Alba relies, such as the move-out inventory that was prepared by Daniel Bunch (Operations Supervisor for ABQ Uptown), was utilized during the on-site inspection by Mr. Alba, and is the type of information that a registered architect would reasonably rely upon in forming an opinion about the value of the items that were removed, as is contemplated by Fed. R. Evid. 703.

The Court requires two actions, however, from ABQ Uptown and Alba. First, in his affidavit, Alba states: "Following my inspection and interviews, I subsequently drafted a report of my findings (*see report attached hereto as 'Exhibit 1'*)." Alba Aff. ¶ 4, at 2. The Court assumes that Alba intended for the Court to use his report as admissible evidence -- i.e. as an affidavit -- but the Court wants to make certain. His affidavit comes close, but he needs to close the gap for the Court to fully rely on the statements in the report. He needs to file an affidavit clearly stating that he avers, under penalty of perjury, that all the statements that he makes in the report are true and accurate, also under penalty of perjury. In other words, Alba needs to swear under oath and

penalty to the statements made in the Alba Expert Report.  Second, Alba needs to swear under oath and penalty that, for the Alba Expert Report's cost calculations portion, in making the calculations of cost and opinions about cost, he relied upon information that experts in his field would reasonably rely.  While he states something similar in his report, see Alba Aff. ¶¶ 3-4, at 2 ("Following my inspection and interviews, I subsequently drafted a report of my findings (*see report attached hereto as 'Exhibit 1'*). . . . I certify that the foregoing is a true statement based upon my personal knowledge and opinions."), he needs to specifically track Rule 703 in his affidavit.  If ABQ Uptown complies with these two requirements, the Court will overrule the Defendants' evidentiary objection to ABQ Uptown's submission of the Alba Expert Report, because the report will not be hearsay itself and because it will be clear that his opinions are based on proper facts and data.

[32]The local rules of civil procedure for the United States District Court for the District of New Mexico provide:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).   The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).

In its MSJ, ABQ Uptown asserts that Davide Enterprises removed many articles or items from the Premises, see MSJ ¶ 17, at 5 (citing Fixture Table at 19-22).  Fixture Table item A2-101 is listed as being four (4) "door entry handles" that SF Metal Design manufactured.  See Fixture Table at 19.  In their Response, the Defendants do not directly address the items listed in the Fixture Table, but they attach Defendants' Answer to Interrogatory No. 1, in which Davide Enterprises addresses the Fixture Table.  The Defendants first answered the question: "Do you contend that the Keyplan's and Fixture Table's identification of items removed by Defendant (or Defendant's agents) when Defendant vacated the Premises in December 2012 is inaccurate or incorrect in any way, whether as to item type, price, quantity, or location(s) from which the item(s) was/were removed?"  Defendants' Answer to Interrogatory No. 1, at 1.  The Defendants responded that "[t]he fixture table (Exhibit B) prepared by Plaintiff's expert is a complete fiction. It totally misrepresents the items that were in the space and therefore has no factual relation to what was removed."  Defendants' Answer to Interrogatory No. 1, at 2.  This statement, however, does not "specifically controvert[]" ABQ Uptown's assertion that Davide removed many items that are set forth in the Fixture Table.  See MSJ ¶ 17, at 5 (citing Fixture Table 19-22).  The Court will therefore, turn to the Defendants' line-by-line response to ABQ Uptown's Fixture Table in order to determine whether there are disputes over what Davide Enterprises removed from the Premises.  Defendants' Answer to Interrogatory No. 1, at 2-6.

_____

Regarding Fixture Table item A2-101, Defendants' Answer to Interrogatory No. 1 states "A2 101-took my SIGNATURE Custom made handles and replaced with standard." Defendants' Answer to Interrogatory No. 1, at 2. The Defendants, therefore, do not dispute that Davide removed item A2-101 "door entry handles." Further, the Defendants do not "specifically controvert" ABQ Uptown's assertion that four (4) such handles were removed, as required by D.N.M.LR-Civ. 56.1(b). In addition, they do not "specifically controvert" that the handles were manufactured by SF Metal Design. They state that the handles were "SIGNATURE Custom made," Defendants' Answer to Interrogatory No. 1, at 2, but that assertion does not address whether the handles were nonetheless manufactured by SF Metal Design. In paragraph C, the Defendants also make the blanket statement that "Dawn Davide designed, selected or purchased every item that was removed." Defendants' Answer to Interrogatory No. 1, at 2. That statement also does not "specifically controvert" that item A2-101 was manufactured or made by SF Metal Design. Further, the Court concludes that the Defendants' blanket statement that "Dawn Davide designed, selected or purchased every item that was removed" does not specifically controvert the brand or make of any of the items set forth in the Fixture Table. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed A2-101, four (4) door entry handles in the ground floor entry that SF Metal Design manufactured. The Court will deem the brand or make of any item listed in the Fixture Table to be undisputed unless the Defendants specifically controverted it in their line-by-line analysis contained in their Answer to Interrogatory No. 1 or in the Mark V hearing. While in deciding a motion for summary judgment, the Court is not required to consider the evidence presented at a Mark V hearing, in fairness to the Defendants, the Court will consider it in this case.

Finally, regarding price, the Defendants state generally that "[t]here is no way to put a price on individual items as the items were purchased between 1988 and 2007." Defendants' Answer to Interrogatory No. 1, at 2. In the Davide Aff., Davide also states that "Mr. Alba's estimate of the value of things taken out of La Bella is grossly overstated." Davide Aff. ¶ 20, at 4. Under D.N.M.LR-Civ. 56.1(b), however, these blanket statements do not "specifically controvert" any of the prices set forth in the Fixture Table. The Court, therefore, will deem undisputed the prices set forth in the Fixture Table for items that were indisputably removed, unless such prices are "specifically" controverted in the Defendants' supplemental line-by-line answer, see Defendants' Answer to Interrogatory No. 1, at 2-6. The Court, however, notes that price is different from value or damages. For example, the Defendants do not "specifically controvert" that each door entry handle manufactured by SF Metal Design costs $350.00. See Defendants' Answer to Interrogatory No. 1, at 2. The Court, therefore, deems it undisputed that Davide Enterprises removed A2-101, four (4) door entry handles in the ground floor entry that SF Metal Design manufactured and that cost $350.00 each. At trial, the Defendants cannot dispute that each of the removed SF Metal Design door handles costs $350.00. The Defendants can, however, offer evidence regarding damages as to the door handles. For example, the Defendants could present evidence that when the door handles were removed, they were used items, or that they were replaced with alternative low-cost door handles.

2.  B1-101: one (1) cashwrap and countertop in the ground floor entry that costs $5,772.50.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[33]

3.  B2-201: one (1) boutique cashwrap and countertop in the reception that Foxwood manufactured and that costs $11,511.90.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[34]

4.  C1-202: three (3) pedicure sinks in the pedicure room that cost $1,903.41 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[35]

---

[33]The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  In its MSJ, ABQ Uptown factually asserts that Davide removed Fixture Table item B1-101, listed as being one (1) cashwrap and countertop in the ground floor entry that Foxwood manufactured.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19).  In their Response, the Defendants do not dispute that Davide Enterprises removed item B1-101, nor do they "specifically controvert" ABQ Uptown's factual assertion that item B1-101 costs $5,772.50.  Regarding the manufacturer of item B1-101, in their Response, the Defendants state: "I took my custom signature cashwrap desk."  Defendants' Answer to Interrogatory No. 1, at 2.  At the Mark V hearing, however, Davide disputed that Foxwood manufactured item B1-101.  See May 29 Tr. at 6:3-18 (discussing Fixture Table item B1-101).  Specifically, she stated that item B1-101 was "a piece of furniture that [she] made, and it was like a piece of furniture in [the] entry."  See May 29 Tr. at 6:3-18 (discussing Fixture Table item B1-101).  The parties, therefore, remain in dispute as to the manufacturer of item B1-101.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B1-101, one (1) cashwrap and countertop in the ground floor entry that costs $5,772.00.

[34]The Court incorporates the legal analysis from footnote 32 and applies it to ABQ Uptown's factual assertion that Davide Enterprises removed item B2-201, one (1) boutique cashwrap and countertop in the reception room that Foxwood manufactured.  The Defendants do not "specifically controvert" that Foxwood manufactured item B2-201, nor do they "specifically controvert" that item B2-201 costs $11,511.90.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B2-201, one (1) boutique cashwrap and countertop in the reception room that Foxwood manufactured and that costs $11,511.90.

[35]The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  In their MSJ, ABQ Uptown asserts that Davide Enterprises removed Fixture Table item C1-202, listed as being three (3) pedicure sinks.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19).  In its Response, the Defendants state regarding item C1-202: "C1-202 custom trade fixtures pedicure station."  Defendants' Answer to Interrogatory No. 1, at 3.  The Court construes the Defendants' factual

5. C2-205: three (3) SS[36] sinks and faucets in the women's lounge that Dornbracht manufactured and that cost $2,202.55 each. See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[37]

6. D1-205: two (2) shower doors in the women's lounge that cost $1,000.00 each. See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[38]

---

assertion as stating that they do not dispute that Davide Enterprises removed item C1-202. Further, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that there were three (3) pedicure sinks, nor do they "specifically controvert" ABQ Uptown's factual assertion that each pedicure sink costs $1,903.41. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item C1-202, three (3) pedicure sinks in the pedicure room that cost $1,903.41 each.

[36]As far as the Court can discern, SS refers to "stainless steel."

[37]The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted. D.N.M.LR-Civ. 56.1(b). In their MSJ, ABQ Uptown asserts that Davide Enterprises removed Fixture Table item C2-205, listed as three (3) SS sinks and faucets. See MSJ ¶ 17, at 5 (citing Fixture Table at 19). In their Response, the Defendants state regarding this item: "C2 205 women's lounge – Dornbracht fixtures purchased in Germany specifically for spa." Defendants' Answer to Interrogatory No. 1, at 3.

The Defendants, therefore, admit that they removed item C2-205, and they do not specifically controvert that three (3) such items were removed. They also do not "specifically controvert" ABQ Uptown's factual assertion that item C2-205 costs $2,202.55 each. The Defendants dispute, however, that Kohler/Dornbracht manufactured item C2-205; contending that Dornbracht made it instead. See Defendants' Answer to Interrogatory No. 1, at 3. ABQ Uptown did not dispute the Defendants' factual assertion in their Reply. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C2-205, three (3) SS sinks and faucets in the women's lounge that Dornbracht manufactured and that cost $2,202.55 each.

[38]The Defendants admit that Davide Enterprises removed item D1-205 from the Premises, while they do not "specifically controvert" that Davide Enterprises removed two (2) such items. They also do not dispute ABQ Uptown's factual assertion that item D1-205 costs $1,000.00 each. The Defendants dispute, however, that CLR manufactured item D1-205; maintaining that Southwest Glass manufactured it instead. See Defendants' Answer to Interrogatory No. 1, at 3. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item D1-205, two (2) shower doors in the women's lounge that cost $1,000.00 each.

7. D2-205: one (1) steam room door in the women's lounge that costs $680.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[39]

8. D3-205: one (1) sauna room door in the women's lounge that a framer made in hand-picked cedar and that costs $802.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[40]

9. Steam rocks and custom buckets in the women's lounge sauna unit. See May 29 Tr. at 9:6-25 (discussing Fixture Table item E1-205).[41]

---

[39]The Defendants do not dispute that Davide Enterprises removed item D2-205 from the Premises, nor do they "specifically controvert" the asserted cost of the item. They do dispute, however, that the item was manufactured by CRL, instead, maintaining that it was custom made by mister stream/IAB mechanical. See Defendants' Answer to Interrogatory No. 1, at 3. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item D2-205, one (1) steam room door in the women's lounge that costs $680.00.

[40]The Defendants do not dispute that Davide Enterprises removed item D3-205 from the Premises, nor do they "specifically controvert" the asserted cost of item D3-205. The Fixture Table does not list a manufacturer for the item, but consistent with D.N.M.LR-Civ. 56.1(b), the Defendants state in their Response that a framer made it in hand-picked cedar. See Defendants' Answer to Interrogatory No. 1, at 3. ABQ Uptown does not dispute this factual assertion in their Reply. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item D3-205, one (1) sauna room door in the women's lounge custom that a framer made in hand-picked cedar and that costs $802.00.

[41]In the Fixture Table, ABQ Uptown asserts that Davide Enterprises removed E1-205, which is identified as one (1) sauna unit in the women' lounge that costs $685.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)). In their Response, the Defendants do not dispute that Davide Enterprises removed item E1-205. At the Mark V hearing, however, Davide testified that she did not remove the sauna unit. See May 29 Tr. at 9:6-25 (discussing Fixture Table item E1-205). She further stated:

> [t]he sauna unit was something that was -- well, let me be clear. The fixture things like the units and things that were part of the electric plumbing were left. The stuff that was removable, I removed. . . . Part of the sauna, which was the inside, some of the steam rocks and things like, that that sat in the custom buckets and stuff - - that was removed.

See May 29 Tr. at 9:6-25 (discussing Fixture Table item E-205). Davide later reiterated that she removed the custom bucket and the rocks from the sauna unit. See May 29 Tr. at 9:18-20 (discussing Fixture Table item E1-205). The parties, therefore, are in dispute as to whether

10. Steam rocks and custom buckets in the women's lounge steam unit.  See May 29 Tr. at 10:1-3 (discussing Fixture Table item E2-205).[42]

11. C3-205: two (2) hydronic towel warmers in the women's lounge that Salmon manufactured.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[43]  The towel warmers were attached to the wall.  See Alba Expert Report at 10 (setting forth this fact); May 29 Tr. at 10:11-18 (not disputing this fact).

12. C4-205: two (2) toilet paper holders in the women's lounge that Ginger manufactured and that cost $148.00 each.  See MSJ ¶ 17, at 5 (citing Fixture

_____

Davide Enterprises removed the sauna unit in the women's lounge, though the Defendants admit that Davide Enterprises removed the steam rocks and custom bucks from inside the sauna unit.

[42]In the Fixture Table, ABQ Uptown factually asserts that Davide Enterprises removed E2-205, which is identified as one (1) steam unit in the women's lounge that Mr. Steam manufactured and that costs $11,250.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)).  In their Response, the Defendants do not dispute that Davide Enterprises removed item E2-205.  At the Mark V hearing, however, Davide testified that she did not remove the steam unit, but that she removed the same things that she took from the sauna unit in the women's lounge.  See May 29 Tr. at 10:1-3 (discussing Fixture Table item E2-205).  Regarding the sauna unit, Davide had stated: "[t]he sauna unit was something that was -- well, let me be clear.  The fixture things like the units and things that were part of the electric plumbing were left.  The stuff that was removable, I removed. . . . Part of the sauna, which was the inside, some of the steam rocks and things like, that that sat in the custom buckets and stuff - - that was removed."  See May 29 Tr. at 9:6-25 (discussing Fixture Table item E2-205).  Davide later reiterated that she removed the custom bucket and the rocks from the sauna unit.  See May 29 Tr. at 9:18-20 (discussing Fixture Table item E2-205).  The parties, therefore, are in dispute as to whether Davide Enterprises removed the steam unit in the women's lounge, though the Defendants admit that Davide Enterprises removed the steam rocks and custom bucks from inside the steam unit.

[43]The Defendants do not specifically controvert the quantity or manufacturer of item C3-205, while admitting that Davide Enterprises removed the item from the Premises.  In their Response, they also do not "specifically controvert" ABQ Uptown's factual assertion that item C3-207 costs $4,073.  At the Mark V hearing, however, Davide testified that the towel warmers that she removed from the Premises cost between $400.00 and $600.00.  See May 29 Tr. at 13:5-8 (discussing the hydronic towel warmers that she removed from the Premises).  The parties, therefore, remain in dispute regarding the cost of the hydronic towel warmers, including item C3-205.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C3-205, two (2) hydronic towel warmers in the women's lounge that Salmon manufactured.

Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[44]

13. C5-205: two (2) shower fixtures in the women's lounge that cost $983.40 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[45]

14. C6-205: two (2) WCs in the women's lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact)[46].  The WCs were not easily

---

[44]The Defendants do not dispute that Davide Enterprises removed item C4-205 from the Premises, nor do they specifically controvert that two such items were removed.  Further, the Defendants do not "specifically controvert" the asserted cost of item C4-205.  It is unclear, however, whether the Defendants dispute that Ginger manufactured the item.  Regarding item C4-205, the Defendants state: "C4 205 custom made by tradesmen in Ca specifically for La Bella (have in all facilities)."  Defendants' Answer to Interrogatory No. 1, at 3.  The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  The Defendants' factual assertion regarding the make of item C4-205 does not address whether the two toilet paper holders were nonetheless manufactured by Ginger.  In other words, the Defendants' Response does not specifically controvert ABQ Uptown's assertion that Ginger manufactured item C4-205; the referenced "tradesmen in Ca" could be synonymous with Ginger.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item C4-205, two (2) toilet paper holders in the women's lounge that Ginger manufactured and that cost $148.00 each.

[45]The Defendants do not dispute that Davide Enterprises removed item C5-205 from the Premises, nor do they specifically controvert that two such items were removed.  They also do not "specifically controvert" the asserted cost of item C5-205.  The Defendants dispute, however, that Hansgrohe/Kohler manufactured the shower fixtures, instead maintaining that Dornbracht made them.  See Defendants' Answer to Interrogatory No. 1, at 3.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C5-205, two (2) shower fixtures in the women's lounge that cost $983.40 each.

[46]The Defendants do not dispute that Davide Enterprises removed item C6-205 from the Premises, nor do they "specifically controvert" that two such items were removed.  See D.N.M.LR-Civ. 56.1(b).  In their Response, the Defendants also do not dispute that Toto manufactured the WCs.  In the Mark V hearing, however, Davide testified that item C6-205 was not a Toto, but was instead a Dornbracht.  See May 29 Tr. at 11:4-16 (discussing Fixture Table item C6-205).  Davide further testified at the Mark V hearing that the Dornbracht WCs cost $1,800.00.  See May 29 Tr. at 11:16-20 (discussing Fixture Table item C6-205).  The parties are in dispute, therefore, regarding the manufacturer and the cost of item C6-205.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C6-205, two (2) WCs in the women's lounge.

demountable.  See Alba Expert Report at 10 (setting forth this fact); Response (not disputing this fact).  The WCs were not easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 10 (setting forth this fact); Response (not disputing this fact).

15. B3-205: one (1) locker in the women's lounge that costs $17,000.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[47]  The locker was attached to the wall and was not easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 9 (setting forth this fact); Response (not disputing this fact).

16. B4-205: one (1) cabinetry and countertop in the women's lounge that costs $1,516.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (not disputing this fact).[48]

17. C3-207: one (1) hydronic towel warmer in the vichy room that Salmon manufactured.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this

---

[47]The Defendants do not dispute that Davide Enterprises removed item B3-205 from the Premises nor do they "specifically controvert" the asserted cost of item B3-205.  They do appear to dispute, however, that Foxwood manufactured the lockers, instead maintaining that a Finnish trim carpenter made them.  See Defendants' Answer to Interrogatory No. 1, at 3.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B3-205, one (1) locker in the women's lounge that costs $17,000.00.

[48]The Defendants do not dispute that Davide Enterprises removed item B4-205 from the Premises, nor do they "specifically controvert" the asserted cost of item B4-205.  It is unclear, however, whether the Defendants dispute that Foxwood manufactured the item.  They state that item B4-205 was "brought in from Dallas and hand cut by RMS."  See Defendants' Answer to Interrogatory No. 1, at 3.  The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  The Defendants' factual assertion regarding the make of item B4-205 does not address whether the item was nonetheless manufactured by Foxwood.  In other words, the Defendants' Response does not specifically controvert ABQ Uptown's assertion that Foxwood manufactured item B4-205; the fact that the item was "brought in from Dallas" does not controvert that Foxwood manufactured the item.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B4-205, one (1) cabinetry and countertop in the women's lounge that Foxwood manufactured that costs $1,516.00.

fact)[49].  The towel warmers were attached to the wall.  <u>See</u> Alba Expert Report at 10 (setting forth this fact); May 29 Tr. at 10:11-18 (not disputing this fact).

18. B5-17ea.: seventeen (17) cabinetry and countertops in the treatment rooms that cost $836.89 each.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[50].

19. C7-17ea.: seventeen (17) oval sinks and faucets in the treatment rooms that cost $795.43 each.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[51].

---

[49]The Defendants do not "specifically controvert" that Davide Enterprises removed Fixture Table item C3-207.  In Defendants' Answer to Interrogatory No. 1, in reference to item C3-207, the Defendants states "C3 207 was not towel warmer/Vichy shower bar made by."  Defendants' Answer to Interrogatory No. 1, at 4.  The Court has examined this response and does not understand it.  If the Court cannot understand it, the Defendants' have not "specifically controverted" ABQ Uptown's asserted that Davide Enterprises removed it.  Further, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that Salmon manufactured item C3-207.  In their Response, the Defendants also do not "specifically controvert" ABQ Uptown's factual assertion that item C3-207 costs $4,073.  At the <u>Mark V</u> hearing, however, Davide testified that the towel warmers that she removed from the Premises cost between $400.00 and $600.00.  <u>See</u> May 29 Tr. at 13:5-8 (discussing the hydronic towel warmers that she removed from the Premises including item C3-207).  The parties, therefore, remain in dispute regarding the cost of the hydronic towel warmers, including item C3-207.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C3-207, one (1) hydronic towel warmer that Salmon manufactured.

[50]The Defendants do not dispute that Davide Enterprises removed item B5-17ea. from the Premises, nor do they "specifically controvert" that seventeen such items were removed.  Further, the Defendants do not "specifically controvert" the asserted cost of item B5-17ea.  They dispute, however, that Foxwood manufactured the items; maintaining that the California firm Randy Gallop made them instead.  <u>See</u> Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B5-17ea., seventeen (17) cabinetry and countertops in the treatment rooms that cost $836.89.

[51]The Defendants do not dispute that Davide Enterprises removed item C17-ea. from the Premises, nor do they specifically controvert that seventeen such items were removed.  Further, the Defendants do not "specifically controvert" the asserted cost of item C17-ea.  They dispute, however, that Ronbow/Hansgrohe manufactured the sinks and faucets.  Instead, they maintain that Randy Gallop made them.  <u>See</u> Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C17-ea., seventeen (17) oval sinks and faucets in the treatment rooms that cost $795.43 each.

20. B6-210: one (1) cabinetry and countertop in the dispensary that costs $5,181.75.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[52].

21. C8-210: one (1) sink and faucet in the dispensary that costs $413.45.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[53].

22. G2-212: two (2) pieces of glass in the office that cost $644.18 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[54].  The glass was part of a wall partition.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 11 (setting forth this fact); Response (not disputing this fact).

---

[52]The Defendants do not dispute that Davide Enterprises removed item B6-210 from the Premises, nor do they dispute the asserted cost of item B6-210.  They dispute, however, that Xactimate manufactured the item, instead maintaining that Vaugn made it.  See Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B6-210, one (1) cabinetry and countertop in the dispensary that costs $5,181.75.

[53]The Defendants do not dispute that Davide Enterprises removed item C8-210 from the Premises, nor do they "specifically controvert" the asserted cost of item C8-210.  They dispute, however, that Xactimate manufactured the item, instead maintaining that Randy Gallop made it.  See Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C8-210, one (1) sink and faucet in the dispensary that costs $413.45.

[54]ABQ Uptown asserts that Davide Enterprises removed item G2-212, two "one-way glass" from the office, manufactured by CRL.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20).  The Defendants do not dispute that Davide removed a glass, although they refer to it as a "two-way glass."  While the parties may dispute whether it was a one-way or two-way glass, it is undisputed that Davide removed a glass.  The Court will modify undisputed material fact twenty-one to reflect this.  Further, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that there were two such pieces of glass removed from the office, as required by D.N.M.LR-Civ. 56.1(b).  They also do not "specifically controvert" the asserted cost of item G2-212.  The Defendants dispute, however, that CRL manufactured the glass, instead maintaining that Dwight's Glass made it.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item G2-212, two (2) pieces of glass from the office that cost $644.18 each.

23. E3-216: one (1) therapy shower in the therapy room that costs $11,068.63. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[55].

24. C9-(219-220): one (1) spa tub in the couples lounge room that costs $14,960.65. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[56]. The spa tub was not easily demountable. See MSJ ¶ 17, at 5 (citing Alba Expert Report at 9 (setting forth this fact); Response (not disputing this fact).

25. C10-(219-220): one (1) shower fixtures in the couples lounge room that cost $4,882.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[57].

26. G3-(219-220): one (1) shower surround in the couples lounge room that costs $1,166.45. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this

---

[55]The Defendants do not dispute that Davide Enterprises removed item E3-216, therapy shower in the therapy room. Further, they do not "specifically controvert" the asserted cost of item E3-216. They dispute, however, ABQ Uptown's factual assertion that Lacava manufactured the therapy shower, instead maintaining that Kohler made it. See Defendants' Answer to Interrogatory No. 1, at 4. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item E3-216: one (1) therapy shower in the therapy room that costs $11,068.63.

[56]The Defendants do not dispute that Davide Enterprises removed item C9-(219-220), spa tub in the couples lounge room. Further, the Defendants do not dispute the asserted cost of item C9-(219-220). They dispute, however, ABQ Uptown's factual assertion that Kohler manufactured the spa tub, instead maintaining that MTI made it. See Defendants' Answer to Interrogatory No. 1, at 4. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C9-(219-220): one (1) spa tub in the couples lounge that costs $14,960.65.

[57]The Defendants do not dispute that Davide Enterprises removed item C10-(219-220), nor do they "specifically controvert" the asserted cost of item C10-(219-220). They dispute, however, ABQ Uptown's factual assertion that Kohler manufactured the shower fixtures, instead maintaining that Dornbracht made them. See Defendants' Answer to Interrogatory No. 1, at 4. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C10-(219-220): one (1) shower fixtures in the couples lounge that cost $4,882.00.

fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[58].

27. C3-220A: one (1) hydronic towel warmer in the couples lounge bath. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[59]. The towel warmers were attached to the wall. See Alba Expert Report at 10 (setting forth this fact); May 29 Tr. at 10:11-18 (not disputing this fact).

28. B7-220A: one (1) shower bench in the couples lounge bath that Xactimate manufactured and that costs $424.92. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[60].

29. C4-220A: one (1) toilet paper holder in the couples lounge bath that costs $148.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this

---

[58]The Defendants do not dispute that Davide Enterprises removed item G3-(219-220), nor do they "specifically controvert" the asserted cost of the item. They dispute, however, ABQ Uptown's factual assertion that Xactimate manufactured the shower surround, instead maintaining that August Glass made it. See Defendants' Answer to Interrogatory No. 1, at 4. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item G3-(219-220), one (1) shower surround in the couples lounge room that costs $1,166.45.

[59]The Defendants do not dispute that Davide Enterprises removed item C3-220A. They dispute, however, ABQ Uptown's factual assertion that Salmon manufactured item C3-22A; maintaining that Greg Hanley manufactured it instead. See Defendants' Answer to Interrogatory No. 1, at 4. In their Response, the Defendants also do not "specifically controvert" ABQ Uptown's factual assertion that item C3-220A costs $4,073. At the Mark V hearing, however, Davide testified that the towel warmers that she removed from the Premises cost between $400.00 and $600.00. See May 29 Tr. at 13:5-8 (discussing the hydronic towel warmers that she removed from the Premises). The parties, therefore, remain in dispute regarding the cost of the hydronic towel warmers, including item C3-220A. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C3-220A, one (1) hydronic towel warmer in the couples lounge bath.

[60]The Defendants do not dispute that Davide Enterprises removed item B7-220A, nor do they "specifically controvert" the asserted cost of the item. It is unclear, however, whether the Defendants dispute that Xactimate manufactured the item. They state that item B7-220A was "custom made." See Defendants' Answer to Interrogatory No. 1, at 4. The Defendants' factual assertion regarding the make of item B7-220A does not address whether Xactimate nonetheless manufactured the item. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B7-220A, one (1) shower bench in the couples lounge that Xactimate manufactured and that costs $424.92.

fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[61].

30. C6-220A: one (1) WC in the couples lounge bath that costs $716.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[62].  The WC was not easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 10 (setting forth this fact); Response (not disputing this fact).

31. B8-220A: one (1) cabinetry and countertop in the couples lounge bath that costs $605.95.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[63].

32. C7-220A: one (1) oval sink and faucets in the couples lounge bath that costs $2,202.55.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[64].

---

[61]The Defendants do not dispute that Davide removed item C4-220A, nor do they "specifically controvert" the asserted cost of the item.  They dispute, however, ABQ Uptown's factual assertion that Ginger manufactured the toilet paper holder, instead maintaining that an LA artist made it.  See Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C4-220A, one (1) toilet paper holder in the couples lounge bath that costs $148.00.

[62]The Defendants do not dispute that Davide removed item C6-220A, nor do they "specifically controvert" the asserted cost of the item.  Further, in their Response, the Defendants do not dispute ABQ Uptown's factual assertion that Toto manufactured the WC.  At the Mark V hearing, however, Davide testified that Dornbracht manufactured item C6-220A.  See May 29 Tr. at 17:5-8 (discussing Fixture Table item C6-220A).  The Court concludes, therefore, that the parties remain in dispute regarding the make of item C6-220A.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C6-220A, one (1) WC in the couples lounge bath that costs $716.00.

[63]The Defendants do not dispute that Davide Enterprises removed item B8-220A, nor do they "specifically controvert" the asserted cost of the item.  They dispute, however, ABQ Uptown's factual assertion that Foxwood manufactured the item, instead maintaining that it was custom made by Randy Gallob.  See Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B8-220A, one (1) cabinetry and countertop in the couples lounge bath that costs $605.95.

[64]The Defendants do not dispute that Davide Enterprises removed item C7-220A, nor do they "specifically controvert" the asserted cost of the item.  The Defendants dispute, however, ABQ Uptown's factual assertion that there were three units of item C7-220A, instead asserting

33. C11-226: one (1) trough sink in the color bar that costs $2,769.15.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[65].  The trough sink in the color bar was built into a wall alcove and connected to plumbing.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 11 (setting forth this fact); Response (not disputing this fact).

34. B14-226: one (1) cabinetry and countertop in the color bar that Foxwood manufactured and that costs $10,794.59.  See MSJ ¶ 17, at 5 (citing Fixture

---

that it was "one custom stainless unit."  Defendants' Answer to Interrogatory No. 1, at 4.  Because there is a dispute as to the number of units removed, the Court has modified undisputed material fact number thirty-two to state that Davide Enterprises removed one (1) oval sink and faucet in the couples lounge bath.

Further, it is unclear whether the Defendants dispute that Ronbow/Hansgrohe manufactured item C7-220A.  Ronbow is a designer and manufacturer of decorative bathroom products, including sinks.  Ronbow's Goal, RONBOW, available at http://www.ronbow.com/home/about_us/ronbows-goal (last visited Oct. 17, 2015).  Hansgrohe is a designer and manufacturer of kitchen and bath products based in Germany.  About Us, HANSGROHE USA, available at http://www.hansgrohe-usa.com/134.htm (Oct. 17, 2015).  The Defendants state that item C7-220A was "a custom stainless unit."  See Defendants' Answer to Interrogatory No. 1, at 4.  The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  The Defendants' factual assertion regarding the make of item C7-220A does not address whether the Ronbow/Hansgrohe nonetheless manufactured the item.  In other words, the Defendants' Response does not specifically controvert ABQ Uptown's assertion that Ronbow/Hansgrohe made item C7-220A; the fact that the item was "a custom stainless unit" does not mean that Ronbow/Hansgrohe did not manufacture it.  Thus, the Court deems it undisputed that the Ronbow/Hansgrohe manufactured the three sinks at issue.  The Court, however, is unable to say whether the single sink that Davide Enterprises indisputably removed from the Premises was manufactured by either Ronbow or Hansgrohe.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item C7-220A, one (1) oval sink and faucets in the couples lounge bath that costs $2,202.55.

[65]The Defendants do not dispute that Davide Enterprises removed item C11-226, nor do they "specifically controvert" the asserted cost of the item.  They dispute, however, ABQ Uptown's factual assertion that Elkay & Kohler manufactured the item, instead maintaining that RMS made it.  See Defendants' Answer to Interrogatory No. 1, at 4.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C11-226, one (1) trough sink in the color bar that costs $2,769.15.

Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[66].

35. C4-235: one (1) toilet paper holder in the unisex bathroom that costs $148.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[67].

36. C6-235: one (1) WC in the unisex bathroom that Toto manufactured and that costs $716.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact). The WC was not easily demountable. See MSJ ¶ 17, at 5 (citing Alba Expert Report at 10 (setting forth this fact); Response (not disputing this fact).

37. C2-235: one (1) stainless steel sink and faucets in the unisex bathroom that costs $2,202.55. See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[68].

---

[66]The Defendants do not dispute that Davide Enterprises removed item B14-226, nor do they "specifically controvert" the asserted cost of the item. It is unclear, however, whether the Defendants dispute that Foxwood manufactured the item. They state that item B14-226 was "a custom piece." See Defendants' Answer to Interrogatory No. 1, at 4. The local rules regarding summary judgment, however, require the responding party to "specifically controvert[]" the fact, or else the fact is admitted. D.N.M.LR-Civ. 56.1(b). The Defendants' factual assertion regarding the make of item B14-226 does not address whether Foxwood nonetheless manufactured the item. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B14-226, one (1) cabinetry and countertop in the color bar that Foxwood manufactured and that costs $10,794.59.

[67]The Defendants do not dispute that Davide Enterprises removed item C4-235, nor do they dispute the asserted cost of the item. They dispute, however, ABQ Uptown's factual assertion that Ginger manufactured the item, instead maintaining that an LA artist made it. See Defendants' Answer to Interrogatory No. 1, at 4. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C4-235, one (1) toilet paper holder in the unisex bathroom that costs $148.00.

[68]The Defendants do not dispute that Davide Enterprises removed item C2-235, nor do they dispute the asserted cost of the item. It is unclear, however, whether the Defendants dispute that Kohler/Dornbracht manufactured it. The Court notes that Kohler is a designer and manufacturer of kitchen and bathroom products. See About Us, KOHLER, available at http://www.corporate.kohler.com/#family (last visited Oct. 17, 2015). The Defendants state that item C2-235 was "custom made." Defendants' Answer to Interrogatory No. 1, at 4. The local rules regarding summary judgment, however, require the responding party to "specifically controvert[]" the fact, or else the fact is admitted. D.N.M.LR-Civ. 56.1(b). The Defendants' factual assertion regarding the make of item C2-235 does not address whether

38. B9-235: one (1) cabinetry and countertop in the unisex bathroom that Foxwood manufactured and that costs $942.84.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[69].

39. D1-237: two (2) shower doors in the mens' lounge that cost $1,000.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[70].

40. D2-237: two (2) steam room doors in the mens' lounge that cost $680.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[71].

_____

Kohler/Dornbracht nonetheless manufactured the item.  In other words, the Defendants' Response does not specifically controvert ABQ Uptown's assertion that Kohler/Dornbracht manufactured item C2-235; the fact that the item was "custom made" does not mean that Kohler/Dornbracht did not manufacture it.  The Court, however, is unable to say whether Kohler or Dornbracht manufactured item C2-235; either manufacturer is a possibility.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item C2-235, one (1) stainless steel sink and faucets in the unisex bathroom that costs $2,202.55.

[69]The Defendants do not dispute that Davide Enterprises removed item B9-235, nor do they "specifically controvert" the asserted cost of the item.  It is unclear, however, whether the Defendants dispute that Foxwood manufactured the item.  They state that item B9-235 was "custom made."   Defendants' Answer to Interrogatory No. 1, at 4.  The local rules regarding summary judgment, however, require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  The Defendants' factual assertion regarding the make of item B9-235 does not address whether Foxwood nonetheless manufactured the item.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item B9-235, one (1) cabinetry and countertop in the unisex bathroom that Foxwood manufactured and that costs $942.84.

[70]The Defendants do not dispute that Davide Enterprises removed item D1-237, nor do they "specifically controvert" the asserted cost of the item.  They also do not dispute that two such items were removed.  The Defendants dispute, however, that CRL manufactured item D1-237, instead maintaining Southwest Glass made the item.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item D1-237, two (2) shower doors in the mens' lounge that cost $1,000.00 each.

[71]The Defendants do not dispute that Davide Enterprises removed item D2-237, nor do they "specifically controvert" that two such items were removed.  Further, the Defendants do not "specifically controvert" the asserted cost of item D2-237.  Accordingly, pursuant to D.N.M.LR-

41. D3-237: two (2) sauna room doors in the mens' lounge that a finish trip carpenter made and that cost $802.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[72].

42. Steam rocks, bowls, and other removable things from the sauna unit in the mens lounge.  See May 29 Tr. at 19:5-17 (discussing Fixture Table item E1-237)[73].

43. E2-237: one (1) steam unit in the mens' lounge that Mr. Steam[74] manufactured and that costs $11,250.00.  See MSJ ¶ 17, at 5 (citing Fixture

---

Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed item D2-237: two (2) steam room doors in mens' lounge that cost $680.00 each.  Neither ABQ Uptown nor the Defendants have offered factual assertions regarding the manufacturer of item D2-237.

[72]The Defendants do not dispute that Davide Enterprises removed item D3-237, nor do they "specifically controvert" that two such items were removed.  Additionally, the Defendants do not "specifically controvert" the asserted cost of item D3-237.  Further, in their Response, consistent with D.N.M.LR-Civ. 56.1(b), the Defendants assert that a finish trim carpenter made item D3-237.  ABQ Uptown did not dispute this factual assertion regarding the maker of item D3-237 in their Reply.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item D3-237, two (2) sauna room doors in the mens' lounge that a finish trip carpenter made and that cost $802.00 each.

[73]In the Fixture Table, ABQ Uptown asserts that Davide Enterprises removed E1-237, which is identified as one (1) sauna unit in the mens' lounge that costs $685.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)).  In their Response, the Defendants do not dispute that Davide Enterprises removed item E1-237.  At the Mark V hearing, however, Davide testified that she did not remove the sauna unit.  See May 29 Tr. at 19:5-17 (discussing Fixture Table item E1-237).  Davide later reiterated that the only things she would have removed from the unit would have been bowls with rocks and other removable things.  See May 29 Tr. at 19:5-17 (discussing Fixture Table item E1-237).  The parties, therefore, dispute whether Davide Enterprises removed the sauna unit in the mens' lounge, though the Defendants admit that Davide Enterprises removed the steam rocks, bowls, and other removable things from the sauna unit.

[74]Mr. Steam is a manufacturer and designer of residential and commercial towel warmers, and steam showers, generators, systems.  About Us: Our History, MR. STEAM, available at http://www.mrsteam.com/our-history (last visited Oct. 17, 2015).

Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 4 (not disputing this fact)[75].

44. C3-237: two (2) hydronic towel warmers in mens' lounge that Salmon manufactured.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[76].  The towel warmers were attached to the wall.  See Alba Expert Report at 10 (setting forth this fact); May 29 Tr. at 10:11-18 (not disputing this fact).

45. C4-237: two (2) toilet paper holders in mens' lounge that cost $148.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[77].

46. C5-237: two (2) shower fixtures in the mens' lounge that cost $983.40 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[78].

---

[75]At the Mark V hearing, the Defendants also did not dispute that Davide Enterprises removed item E2-237 from the Premises.

[76]The Defendants do not dispute that Davide Enterprises removed item C3-237.  They also do not "specifically controvert" that two such items were removed or that Salmon manufactured them.  Further, in their Response, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that item C3-237 costs $4,073.  At the Mark V hearing, however, Davide testified that the towel warmers that she removed from the Premises cost between $400.00 and $600.00.  See May 29 Tr. at 13:5-8 (discussing the hydronic towel warmers that she removed from the Premises).  The parties, therefore, remain in dispute regarding the cost of the hydronic towel warmers, including item C3-237.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C3-237, two (2) hydronic towel warmers in mens' lounge that Salmon manufactured.

[77]The Defendants do not dispute that Davide Enterprises removed item C4-237, nor do they "specifically controvert" the asserted cost of the item.  Further, they do not "specifically controvert" that two such items were removed.  The Defendants dispute, however, ABQ Uptown's factual assertion that Ginger manufactured the toilet paper holders, instead maintaining that they were custom made by an LA artist.  See Defendants' Answer to Interrogatory No. 1, at 5.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C4-237, two (2) toilet paper holders in the mens' lounge that cost $148.00 each.

[78]The Defendants do not dispute that Davide Enterprises removed item C5-237, and they do not "specifically controvert" that two such items were removed.  They also do not "specifically controvert" the asserted cost of item C5-237.  The Defendants dispute, however, ABQ Uptown's factual assertion that Hansgrohe/Krohler manufactured item C5-237, instead maintaining that Dornbracht made them.  See Defendants' Answer to Interrogatory No. 1, at 5.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide

47. C6-237: two (2) WC in the mens' lounge that Toto manufactured and that cost $716.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact).  The WCs were not easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 10 (setting forth this fact)); Response (not disputing this fact).

48. B10-237: one (1) locker in the mens' lounge that costs $10,400.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[79].  The locker was attached to the wall and was not easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 9 (setting forth this fact)); Response (not disputing this fact).

49. B11-237: one (1) cabinetry and countertop in the mens' lounge that costs $1,552.29.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[80].

50. C2-237: three (3) SS sink and faucet in the mens' lounge that cost $2,202.55 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[81].

---

Enterprises removed item C5-237, two (2) shower fixtures in the mens' lounge that cost $983.40 each.

[79]The parties dispute whether Foxwood or a finish trim carpenter manufactured item B10-237.

[80]The parties dispute whether the manufacturer of item B11-237.  ABQ Uptown asserts that Foxwood manufactured it, see MSJ ¶ 17, at 5 (citing Fixture Table at 21), while the Defendants maintain that Randy Gallop and RMS made it instead, see Defendants' Answer to Interrogatory No. 1, at 5.

[81]The parties dispute the manufacturer of item C2-237.  ABQ Uptown asserts that Kohler/Dornbracht manufactured it, see MSJ ¶ 17, at 5 (citing Fixture Table at 21), while the Defendants maintain that Randy Gallob made it, see Defendants' Answer to Interrogatory No. 1, at 5.  The Defendants do not "specifically controvert" the asserted cost of item C2-237.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item C2-237, three (3) SS sink and faucet in the mens' lounge that cost $2,202.55 each.

51. E1-207: one (1) vichy shower[82] in the vichy room that Salmon manufactured and that costs $5,276.43.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact).  The vichy shower was easily demountable.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 11 (setting forth this fact)); Response (not disputing this fact).

52. B12-232: four (4) hair wash stations in the salon (hair wash) that Foxwood manufactured.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[83].  The hair wash stations were demountable, although permanently plumbed.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 11 (setting forth this fact)); Response (not disputing this fact).

53. B13-233: four (4) hair cut stations in the salon (hair cut) that Foxwood manufactured and that cost $6,000.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact).

54. B16-(219-220): window coverings in the couples lounge room that cost $281.95 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[84].

---

[82]Typically found in a spa's wet room, "vichy showers" are therapeutic "lying down" showers in which a long metal arm with seven or more adjustable showerheads hit points from the head to the legs.  See Spa Guide and Glossary, SPA WEEK, available at http://www.spaweek.com/spa-guide/ (last visited Oct. 17, 2015).

[83]The Defendants do not dispute that they removed item B12-232, and they do not "specifically controvert" ABQ Uptown's factual assertion that Foxwood manufactured item B12-232.  The parties remain in dispute, however, regarding the cost of the four (4) hair wash stations in the salon that Foxwood manufactured.  Further, the Defendants do not dispute in their Response ABQ Uptown's factual assertion that each hair wash station costs $1,500.00.  At the Mark V hearing, however, Davide testified that each hair wash station costs approximately $2,500.00.  See May 29 Tr. at 21:3-7 (discussing Fixture Table item B12-323).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B12-232: four (4) hair wash stations in the salon (hair wash) that Foxwood manufactured.

[84]The parties remain in dispute over the manufacturer of item B16-(219-220).  ABQ Uptown asserts that Xactimate manufactured item B16-(219-220), see MSJ ¶ 17, at 5 (citing Fixture Table at 22), while the Defendants maintain that George Tack made them, see Defendants' Answer to Interrogatory No. 1, at 5.  Further, while ABQ Uptown refers to item B16-(219-220) six "window coverings," at the Mark V hearing, Davide testified that they were three (3) Roman shades.  The parties, therefore, dispute the number of window coverings.  The

55. B16-237: one (1) hanging art in the mens' lounge that costs $281.95.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[85].

56. H13-17ea.: seventeen (17) bowl wall sconces in the treatment rooms that cost $71.90 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[86].

--------

Court's legal analysis is unaffected by whether the items are classified as "window coverings" or "Roman shades."  The Court will, therefore, refer to item B16-(219-220) as "window coverings."  Finally, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that item B16-(219-220) cost $281.95 each.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B16-(219-220), window coverings in the couples lounge room that cost $281.95 each.

[85]The parties remain in dispute over the manufacturer of item B16-237.  ABQ Uptown asserts that Xactimate manufactured the item, see MSJ ¶ 17, at 5 (citing Fixture Table at 22), while the Defendants maintain that George Tack designed it, see Defendants' Answer to Interrogatory No. 1, at 5.  Further, while ABQ Uptown refers to item B16-237 as a window covering, the Defendants, in their response, state that it was hanging art.  ABQ Uptown, in its Reply, did not dispute that Item B16-237 was hanging art.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B16-237, one (1) hanging art in the mens' lounge that costs $281.95.

[86]In their Response, the Defendants did not "specifically controvert" that they removed item H13-17ea.  At the Mark V hearing, however, Davide testified when asked about item H13-17ea. that, "I don't know what that is."  See May 29 Tr. at 27:2-3 (discussing Fixture Table item H13-17ea.).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H13-17ea.  The Court, therefore, deems undisputed that Davide Enterprises removed item H13-17ea.  Further, the Defendants do not "specifically controvert" the asserted cost of the items, or that there were seventeen of them.  The parties, however, remain in dispute over the manufacturer of item H13-17ea.  ABQ Uptown asserts that Minka-Lavert manufactured the seventeen wall sconces, see MSJ ¶ 17, at 5 (citing Fixture Table at 22), while the Defendants maintain that they were handmade and brought from Italy, see Defendants' Answer to Interrogatory No. 1, at 5.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item H13-17ea., seventeen (17) bowl wall sconces in the treatment rooms that cost $71.90 each.

57. B18-210: one (1) ice maker in the dispensary that costs $1,372.82.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[87].

58. B19-210: refrigerator.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[88].

59. B21-W: one (1) washer and dryer that costs $14,980.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (not disputing this fact)[89].

60. B20-237: one (1) television that costs $658.40.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 6 (not disputing this fact)[90].

61. B20-201: one (1) television including brackets that Samsung manufactured and that costs $658.00.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); May 29 Tr. at 29:23-30:1 (discussing Fixture Table item B20-201)(not disputing this fact)[91].

---

[87]The parties remain in dispute over the manufacturer of the ice maker.  The Defendants, however, do not "specifically controvert" the asserted cost of the ice maker, as required by D.N.M.LR-Civ. 56.1(b).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B18-210, one (1) ice maker in the dispensary that costs $1,372.82.

[88]The parties remain in dispute over the manufacturer of the refrigerator.  Further, neither party has made any factual assertions regarding the cost of the refrigerator.

[89]The parties remain in dispute over the manufacturer of the washer and dryer.  The Defendants, however, do not "specifically controvert" the asserted cost of the washer and dryer, as required by  D.N.M.LR-Civ. 56.1(b).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B21-W, one (1) washer and dryer that costs $14,980.00.

[90]The parties remain in dispute over the manufacturer of the television.  The Defendants, however, do not "specifically controvert" the asserted cost of the television, as required by D.N.M.LR-Civ. 56.1(b).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed that Davide Enterprises removed item B20-237, one (1) television that costs $658.40.

[91]The parties remain in dispute over where the television was located on the Premises. ABQ Uptown asserts that it was located in the reception, see MSJ ¶ 17, at 5 (citing Fixture Table at 22), while the Defendants maintain that it was instead in the mens' lounge, see May 29 Tr. at 29:23-30:1 (discussing Fixture Table item B20-201).  The Defendants originally disputed that

62. B20-226: one (1) television including brackets in the color bar that Samsung manufactured and that costs $658.40.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); May 29 Tr. at 30:2-4 (discussing Fixture Table item B20-226)(not disputing this fact)[92].

63. Additional "Lease Provision Fixtures"[93]:

    a.  H1-101: four (4) vintage wall sconces in the ground floor entry that cost $532.02 each.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[94]

---

Davide Enterprises removed this television, although they later admitted to removing it at the <u>Mark V</u> hearing.

[92]The Defendants originally disputed that Davide Enterprises removed this television, although they later admitted to removing it at the <u>Mark V</u> hearing.

[93]The Court uses the phrase "Lease Provision Fixtures" to reference those articles or items that ABQ Uptown lists under that heading in the Fixture Table.  <u>See</u> Fixture Table at 21-22.  The Court's use of this phrase does has no bearing on whether such articles or items qualify as non-removable fixtures as a matter of law under Section 19.1 of the Second Lease.

[94]In their MSJ, ABQ Uptown asserts that Davide Enterprises removed many articles or items from the Premises, <u>see</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19-22).  Pages 21 and 22 specifically list a number of articles or items under the heading "Lease Provision Fixtures," which Davide Enterprises allegedly removed from the Premises.  Fixture Table at 21-22.  One item is "H1-101: vintage wall sconce." Fixture Table at 21.  In their Response, the Defendants do not directly address the list of articles or items that ABQ Uptown cites, but they attach Defendants' Answer to Interrogatory No. 1, in which they address each item allegedly removed from the Premises.  Regarding the items that ABQ Uptown lists under the heading "Lease Provision Fixtures," Defendants' Answer to Interrogatory No. 1 states in part, excluding those items already addressed:

    Lease Provision Fixtures Starting page 3 H1 [sic]
    Nothing taken from premises could be classified as a "lease provision fixture."
    The lighting items listed are not representative of what was on the premises.
    The list is COMPLETELY incorrect.
    All lighting was custom, some designed by me, others indicated below:
    Lighting by Swarovski crystal (Mary Malin)
    Hand made fixtures by Erin Adams
    . . .
    NOTHING was purchased from Lamp Plus or any other vendors listed
    Have no idea what / where this info came from?!

_____

Defendants' Answer to Interrogatory No. 1, at 5 (emphasis in original).  The Defendants' Response does not comply with the local court rules, see D.N.M.LR-Civ. 56.1(b), for it does not "specifically controvert[]" ABQ Uptown's assertion that Davide removed "H1-101: vintage wall sconce."  Fixture Table at 21.  Rather, the Defendants state generally that "[t]he list is COMPLETELY incorrect," that "[a]ll lighting was custom, some designed by me, others indicated below," and that at least some of the lighting included "[l]ighting by Swarovski crystal (Mary Malin)" and "[h]and made fixtures by Erin Adams."  Defendants' Answer to Interrogatory No. 1, at 5 (emphasis in original).  These statements do not "specifically controvert" the factual assertion that Davide removed the items listed under the heading "Lease Provision Fixtures" on pages 21 and 22 of the Fixture Table, including H1-101: four (4) vintage wall sconces from the ground floor entry.  See D.N.M.LR-Civ. 56.1(b).  The Court construes the Defendants' general denial as hyperbole because at the Mark V hearing, Davide in fact testified that Davide Enterprises removed several of the items listed under the heading "Lease Provision Fixtures," including wall sconce fixtures (16 total) see May 29 Tr. at 24:3-6; id. at 27:10-12 (discussing Fixture Table items H1-101; H1-101D; H1-201; H1-206, H1-226, see Fixture Table at 21), chandelier light fixture, see May 29 Tr. at 22:19-23:21 (discussing Fixture Table item H3-101, see Fixture Table at 21), and vertex 9" pendant (3 total), see May 29 Tr. at 24:10-15 (discussing Fixture Table item H5-201, see Fixture Table at 21).  The Court cannot take at face value the Defendants' general denial regarding Davide Enterprises' removal of items identified under the heading "Lease Provision Fixtures" in the Fixture Table.

Further, in their Response, regarding item H1-101, the Defendants do not "specifically controvert" that Hubbardton Forge manufactured the four (4) vintage wall sconces on the ground entry floor.  At the Mark V hearing, however, Davide testified regarding item H1-101 that she "handmade some glass sconces," which they removed.  See May 29 Tr. at 22:3-15 (discussing Fixture Table item H1-101).  The Court, therefore, concludes that the parties remain in dispute as to the manufacturer of item H1-101.  Regarding cost, however, in their Response, the Defendants do not "specifically controvert" ABQ Uptown's factual assertion that item H1-101 cost $532.02 each, as required by D.N.M.LR-Civ. 56.1(b).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H1-101, four (4) vintage wall sconces from the ground floor entry that cost $532.02 each.

Consistent with the Court's legal analysis set forth in this footnote and in footnote 32, the Court concludes that the Defendants' general denials as to the cost and brand of each Fixture Table item, see Davide Aff. ¶ 20, at 4; Defendants' Answer to Interrogatory No. 1, at 2, do not dispute the factual allegations set forth by ABQ Uptown.  These general denials do not comply with D.N.M.LR-Civ. 56.1(b), and the Court will deem all factual allegations regarding cost and brand, which are set forth in the Fixture Table, as undisputed unless such allegations are "specifically controverted" in the Defendants' line-by-line supplemental response or in the testimony from the Mark V hearing.  See Defendants' Answer to Interrogatory No. 1, at 2-6.  Under D.N.M.LR-Civ. 56.1(b), the Defendants also do not "specifically controvert" the manufacturer of a particular item by stating generally that it was "custom made."

    b. H3-101: three (3) large chandeliers in the ground floor entry that Xactimate manufactured. See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[95]

    c. H1-101D: three (3) vintage wall sconces in the stair that cost $532.02 each. See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[96]

    d. H4-201: one (1) 7pt. Swarovski[97] rail fixtures in the reception that Schonbek manufactured and that costs $2,086.00. See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[98]

_____

[95]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H3-101: large chandelier." See MSJ ¶ 17, at 5 (citing Fixture Table at 21). Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed H3-101, three (3) large chandeliers in the ground floor entry that Xactimate manufactured. The parties remain in dispute as to the cost of item H3-101. The Fixture Table alleges that item H3-101 costs $212.81, see Fixture Table at 21, while at the Mark V hearing, Davide testified that H3-101 is not a $212.00 fixture, see May 29 Tr. at 23:3-20 (discussing Fixture Table item H3-101).

[96]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H1-101D: vintage wall sconce." See MSJ ¶ 17, at 5 (citing Fixture Table at 21). In their Response, regarding item H1-101D, the Defendants do not "specifically controvert" that Hubbardton Forge manufactured the three (3) vintage wall sconces in the stair. At the Mark V hearing, however, Davide testified regarding the vintage wall sconces that she "handmade some glass sconces," which they removed. See May 29 Tr. at 22:3-15 (discussing the vintage wall sconces). The Court, therefore, concludes that the parties remain in dispute as to the manufacturer of item H1-101D. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H1-101D, three (3) vintage wall sconces in the stair that cost $532.02 each.

[97]Swarovski is an Austrian company that designs, creates, and markets high-quality crystal products. About Swarovski, SWAROVSKI, available at https://www.swarovski.com/Web_US/en/index (last visited Oc. 17, 2015). In 1965, Swarovski began producing crystal elements for chandeliers. Swarovski Lighting, LUMENS LIGHT AND LIVING, available at http://www.lumens.com/swarovski-lighting/ (last visited Oct. 17, 2015). They began by selling their crystals to other makers, but eventually began making their own luxury lighting fixtures. Swarovski Lighting, LUMENS LIGHT AND LIVING, available at http://www.lumens.com/swarovski-lighting/ (last visited Oct. 17, 2015). Swarovski currently produces modern crystal lighting through their own brand and Schonbek lighting, a maker of crystal chandeliers which Swarovski acquired in 2007. Swarovski Lighting, LUMENS LIGHT AND LIVING, available at http://www.lumens.com/swarovski-lighting/ (last visited Oct. 17, 2015).

e.   H5-201: three (3) vertex 9" pendants that cost $1,595.81.[99]  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[100]

f.   H1-201: three (3) vintage Wall sconces in the reception that cost $532.02 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[101]

---

[98]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H4-201: 7pt. swarovski rail fixture."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H4-201.  Further, at the Mark V hearing, regarding item H4-201, Davide testified that "I don't know what that is."  See May 29 Tr. at 24:7-9 (discussing Fixture Table item H4-201).  Davide's statement that she does not know what item H4-201 is also does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed the item.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H4-201: one (1) 7pt. swarovski rail fixtures in the reception that Schonbek manufactured and that cost $2,086.00.

[99]The Fixture Table states that there were four (4) vertex 9" pendants in the reception room.  See Fixture Table at 21.  At the Mark V hearing, however, in reference to Fixture Table item H5-201, Davide stated that she only removed three vertex 9" pendants.  See May 29 Tr. at 24:10-15 (discussing Fixture Table item H5-201).  Accordingly, a dispute exists as to whether Davide removed a fourth vertex 9"pendant from the reception room.

[100]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H5-201: vertex 9" pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, regarding item H5-201, the Defendants do not "specifically controvert" that Schonbek manufactured the three (3) vertex 9" pendants in the reception.  At the Mark V hearing, however, Davide testified regarding the vertex 9" pendants that they were "handmade."  See May 29 Tr. at 24:10-15 (discussing Fixture Table item H5-201).  Further, while ABQ Uptown asserted that the pendants were located in the reception, at the Mark V hearing, Davide testified that they were located directly over the shampoo section.  See May 29 Tr. at 24:10-15.  The Court, therefore, concludes that the parties remain in dispute as to the manufacturer of item H5-201, and their location within the Premises.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H5-201: three (3) vertex 9" pendants that cost $1,595.81.

[101]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H1-201: vintage Wall sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, regarding item H1-201, the Defendants do not "specifically controvert" that Hubbardton Forge manufactured the three (3) vintage wall sconces in the reception.  At the Mark V hearing, however, Davide

g.  H7-202: three (3) conico pendants in the pedicure room that ET2 manufactured and that cost $273.81 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[102]

h.  G4-203: one (1) wall covering in the reflection that Robert Allen manufactured and that costs $1,036.80.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[103]

i.  H8-203: one (1) square metal wall sconce in the reflection that Besa Moto manufactured and that costs $269.02.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[104]

---

testified regarding the vintage wall sconces that she "handmade some glass sconces," which they removed.  See May 29 Tr. at 22:3-15 (discussing the vintage wall sconces).  The Court, therefore, concludes that the parties remain in dispute as to the manufacturer of item H1-201.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H1-201, three (3) vintage Wall sconces in the reception that cost $532.02 each.

[102]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H7-202: conico pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H7-202.  At the Mark V hearing, however, Davide testified when asked about item H7-202 that, she did not recognize that item.  See May 29 Tr. at 24:24-25:1 (discussing Fixture Table item H7-202).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H7-202.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed H7-202, three (3) conico pendants in the pedicure room that ET2 manufactured and that cost $273.81 each.

[103]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "G4-203: wall covering."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item G4-203.  At the Mark V hearing, however, Davide testified when asked about item G4-203 that, she did not know what that item could be.  See May 29 Tr. at 25:8-11 (discussing Fixture Table item G4-203).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item G4-203.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed G4-203, one (1) wall covering in the reflection that Robert Allen manufactured and that costs $1,036.80.

[104]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H8-203: square metal wall

> j. G4-205: one (1) wall covering in the women's lounge that Robert Allen manufactured and that costs $1,036.80.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[105]
>
> k. B17-205: one (1) window covering in the women's lounge that Xactimate manufactured and that costs $281.95.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[106]
>
> l. H9-205: three (3) beaded crystal sconces in the women's lounge that James Modular Light manufactured and that cost $489.81 each.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[107]

---

sconce."  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H8-203.  At the <u>Mark V</u> hearing, however, Davide testified when asked about item H8-203 that, she could not distinguish that item from the vintage wall sconce.  <u>See</u> May 29 Tr. at 25:12-15 (discussing Fixture Table item H8-203).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H8-203.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed H8-203, one (1) square metal wall sconce in the reflection that Besa Moto manufactured and that costs $269.02.

[105]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "G4-205: wall covering." <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item G4-205.  At the <u>Mark V</u> hearing, however, Davide testified when asked about item G4-205 that, she did not know to what that refers.  <u>See</u> May 29 Tr. at 25:16-18 (discussing Fixture Table item G4-205).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item G4-205.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed G4-205, one (1) wall covering in the women's lounge that Robert Allen manufactured and that costs $1,036.80.

[106]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "B17-205: window covering."  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21).  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide removed B17-205, one (1) window covering in the women's lounge that Xactimate manufactured and that costs $281.95.

[107]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H9-205: beaded crystal sconce."  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H9-205.  At the <u>Mark V</u>

m. H10-205: one (1) triple swag pendant in the women's lounge that Vienna Full Spectrum manufactured and that costs $425.66.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[108]

n. H1-206: four (4) vintage wall sconces in the corridor that cost $532.02 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[109]

---

hearing, however, Davide testified when asked about item H9-205 that, she did not recognize that description.  See May 29 Tr. at 25:24-26:1 (discussing Fixture Table item H9-205). Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H9-205.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H9-205, three (3) beaded crystal sconces in the women's lounge that James Modular Light manufactured and that cost $489.81 each.

[108]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H10-205: triple swag pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H10-205.  At the Mark V hearing, however, Davide testified when asked about item H10-205 that, "I don't know what that is."  See May 29 Tr. at 26:1-4 (discussing Fixture Table item H10-205).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H10-205.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H10-205, one (1) triple swag pendant in the women's lounge that Vienna Full Spectrum manufactured and that costs $425.66.

[109]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H1-206: vintage wall sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, regarding item H1-206, the Defendants do not "specifically controvert" that Hubbardton Forge manufactured the four (4) vintage wall sconces in the corridor.  At the Mark V hearing, however, Davide testified regarding the vintage wall sconces that she "handmade some glass sconces," which they removed.  See May 29 Tr. at 22:3-15 (discussing the vintage wall sconces).  The Court, therefore, concludes that the parties remain in dispute as to the manufacturer of item H1-206. Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H1-206, four (4) vintage wall sconces in the corridor that cost $532.02 each.

o.  H11-(219-220): one (1) hanging light fixture in the couples lounge room that Cassini manufactured and that costs $793.81.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[110]

p.  H8-219-220: three (3) square mental wall sconces in the couples lounge room that Besa Moto manufactured and that cost $269.02 each. See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[111]

q.  H12-220A: two (2) cylindrical wall sconces in the couples lounge bath that Hubbardton Forge manufactured and that cost $830.91 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[112]

---

[110]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed item H11-219-220.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In the Fixture Table, ABQ Uptown identifies item H11-(219-220) as a pendant, while at the Mark V hearing, Davide testified that the item was a chandelier.  While the parties dispute the exact item that was removed, they agree that Davide Enterprises removed some kind of hanging light fixture from the couples lounge room.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H11-219-220, one (1) hanging light fixture in the couples lounge room that Cassini manufactured and that costs $793.81.

[111]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H8-219-220: square mental wall sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H8-219-220.  At the Mark V hearing, however, Davide testified when asked about item H8-219-220 that, "I don't know what that is."  See May 29 Tr. at 26:11-14 (discussing Fixture Table item H8-219-220).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H8-219-220.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H8-219-220, three (3) square mental wall sconces in the couples lounge room that Besa Moto manufactured and that cost $269.02 each.

[112]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H12-220A: cylindrical wall sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that they removed item H12-220A.  At the Mark V hearing, however, Davide testified when asked about item H12-220A that, "I don't know what that is."  See May 29 Tr. at 26:25-27:1 (discussing Fixture Table item H12-220A).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H12-220A.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H12-220A, two (2) cylindrical wall sconces in the couples lounge bath that Hubbardton Forge manufactured and that cost $830.91 each.

r.   H6-17ea.: seventeen (17) ceiling lights in the treatment rooms that Maximum Lighting manufactured and that cost $57.60 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[113]

s.   H1-226: two (2) vintage wall sconces in the color bar that Hubbardton Forge manufactured and that cost $506.00 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[114]

t.   H15-233: one (1) refrax pendant in the salon (hair cut) that Schonbek manufactured and that costs $3,390.81.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[115]

---

[113]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide removed "H6-17ea.: flush mount ceiling."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H6-17ea.  At the Mark V hearing, however, Davide testified when asked about item H6-17ea. that "[i]n the treatment rooms, again, there were fixtures that were over the massage table, custom, and those I removed."  See May 29 Tr. at 27:5-9 (discussing Fixture Table item H6-17ea.).  She further testified that these items over the massage tables were not flush mount.  See May 29 Tr. at 27:5-9 (discussing Fixture Table item H6-17ea.).  The parties, therefore, remain in dispute as to whether the ceiling lights in the massage rooms were "flush mount."   Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court has modified this material fact accordingly and deems undisputed ABQ Uptown's factual assertion that Davide removed H6-17ea., seventeen (17) ceiling lights in the treatment rooms that Maximum Lighting manufactured and that cost $57.60 each.

[114]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H1-226: vintage wall sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).   Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H1-226, two (2) vintage wall sconces in the color bar that Hubbardton Forge manufactured and that cost $506.00 each.

[115]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H15-233: refrax pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 22).  In their Response, the Defendants do not "specifically controvert" that they removed item H15-233.  At the Mark V hearing, however, Davide testified when asked about item H15-233 that, "I don't know what that is."  See May 29 Tr. at 27:15-16 (discussing Fixture Table item H15-233).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H15-233.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ

u. H7-233: one (1) conico pendant in the salon (hair cut) that ET2 manufactured and that costs $273.81.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[116]

v. I2-236: one (1) water hammer arrestor[117] in the laundry room that Xactimate manufactured and that costs $150.32.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[118]

w. H9-237: two (2) beaded crystal sconces in the mens' lounge that James Modular Light manufactured and that cost $489.81 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[119]

---

Uptown's factual assertion that Davide Enterprises removed H15-233, one (1) refrax pendant in the salon (hair cut) that Schonbek manufactured and that costs $3,390.81.

[116]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H7-233: conico pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 22).  In their Response, the Defendants do not "specifically controvert" that they removed item H7-233.  At the Mark V hearing, however, Davide testified when asked about item H7-233 that, "I don't know what that is."  See May 29 Tr. at 27:15-16 (discussing Fixture Table item H7-233).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H7-233.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H7-233, one (1) conico pendant in the salon (hair cut) that ET2 manufactured and that costs $273.81.

[117]A "water hammer arrestor" is a device installed in the piping system of a residential or commercial facility that prevents water shock caused by sudden stoppage of water flowing at a given pressure and velocity.  See WATER HAMMER ARRESTORS, WATTS (2010), available at media.wattswater.com/F-WHA.pdf.

[118]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "I2-236: water hammer arrestor."  See MSJ ¶ 17, at 5 (citing Fixture Table at 22).  In their Response, the Defendants do not "specifically controvert" that they removed item I2-236.  At the Mark V hearing, however, Davide testified when asked about item I2-236 that, "I don't know what that is."  See May 29 Tr. at 28:2-3 (discussing Fixture Table item I2-236).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item I2-236.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed I2-236, one (1) water hammer arrestor in the laundry room that Xactimate manufactured and that costs $150.32.

x.  H2-101: three (3) mini bullet pendants in the ground floor entry that Wac manufactured and that cost $212.81 each.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[120]

The parties, however, remain in dispute as to whether Davide Enterprises removed the following articles or items from the Premises at the Second Lease's termination:

1.  H6-201: two (2) flush mount[121] ceiling in the reception.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[122]

---

[119]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H9-237: beaded crystal sconce."  See MSJ ¶ 17, at 5 (citing Fixture Table at 22).  In their Response, the Defendants do not "specifically controvert" that they removed item H9-237.  At the Mark V hearing, however, Davide testified when asked about item H9-237 that, "Again, I don't know what that is."  See May 29 Tr. at 28:7-8 (discussing Fixture Table item H7-233).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H9-237.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H9-237, two (2) beaded crystal sconces in the mens' lounge that James Modular Light manufactured and that cost $489.81 each.

[120]The Court incorporates the legal analysis from footnotes 32 and 91 of this opinion and applies it to ABQ Uptown's factual statement that Davide Enterprises removed "H2-101: mini bullet pendant."  See MSJ ¶ 17, at 5 (citing Fixture Table at 21).  In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H2-101.  At the Mark V hearing, however, Davide testified regarding item H2-101 that, she did not recognize that description.  See May 29 Tr. at 22:16-18 (discussing Fixture Table item H2-101).  Davide's testimony, however, does not "specifically controvert" ABQ Uptown's factual assertion that Davide Enterprises removed item H2-101.  Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court deems undisputed ABQ Uptown's factual assertion that Davide Enterprises removed H2-101: three (3) mini bullet pendants in the ground floor entry that Wac manufactured and that cost $212.81 each.

[121]Flush mounts are "ceiling lights that attach to the ceiling with little to no gap between the light fixture and the ceiling."  Ceiling Lights, KICHLER, available at http://www.kichler.com/style-guide/learn-about-lighting/ceiling-lights.aspx (last visited Aug. 17, 2015).

[122]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H6-201.  At the Mark V hearing, however, Davide testified when asked whether she took a flush mount ceiling light: "No.  Over our reception were only high hats, like here in the courthouse."  See May 29 Tr. at 24:16-23 (discussing Fixture Table item

2.  G5-(219-220): one (1) cork wall covering in the couples lounge room.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[123]

3.  I1-236: one (1) washer mixing valves[124] in the laundry room.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[125]

4.  H10-237: one (1) triple swag pendant in the mens' lounge.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[126]

5.  H16-237: one (1) rectangular pendant in the mens' lounge.  <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[127]

---

H6-201).  Davide was subsequently asked whether there were any flush mounted lights in the building, to which Davide responded, "None that I took."   <u>See</u> May 29 Tr. at 24:16-23 (discussing Fixture Table item H6-201).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H6-201 from the Premises at the Second Lease's termination.

[123]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item G5-(219-220).  At the <u>Mark V</u> hearing, however, Davide testified that she did not remove any cork wall covering and that there was not any cork wall covering in La Bella.  <u>See</u> May 29 Tr. at 26:15-20 (discussing Fixture Table item G5-(219-220)).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item G5-(219-220) from the Premises at the Second Lease's termination.

[124]A washer mixing valve is a device inside of a washing machine that controls the entrance of water into the machine.  <u>See</u> George Retseck, <u>Replacing a Washing Machine Mixing Valve</u>, Popular Mechanics (2009), http://web.archive.org/web/20060210222700/http://www.popularmechanics.com/home_improvement/home_improvement/1276036.html.

[125]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item I1-236.  At the <u>Mark V</u> hearing, however, Davide testified that they left the washer mixing valves.  <u>See</u> May 29 Tr. at 27:21-25 (discussing Fixture Table item I1-236).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item I1-236 from the Premises at the Second Lease's termination.

[126]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H10-237.  At the <u>Mark V</u> hearing, however, when asked about the triple swap pendant, Davide testified that "I don't -- no, we haven't any triple swag pendants."  <u>See</u> May 29 Tr. at 28:4-6 (discussing Fixture Table item H10-237).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H10-237 or any triple swag pendants from the Premises at the Second Lease's termination.

6. H8-237: one (1) square metal wall sconce in the mens' lounge. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[128]

7. E1-205: one (1) sauna unit in the women's lounge. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)).[129]

8. E2-205: one (1) steam unit in the women's lounge. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)).[130]

9. E1-237: one (1) sauna unit in mens' lounge. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)).[131]

---

[127]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H16-237. At the <u>Mark V</u> hearing, however, when asked about whether they removed a rectangular pendant, Davide said no. <u>See</u> May 29 Tr. at 28:9-10 (discussing Fixture Table item H16-237). The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H16-237 from the Premises at the Second Lease's termination.

[128]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H8-237. At the <u>Mark V</u> hearing, however, when asked about whether they removed a square metal wall sconce, Davide said no. <u>See</u> May 29 Tr. at 28:11-12 (discussing Fixture Table item H8-237). The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H8-237 from the Premises at the Second Lease's termination.

[129]In the Fixture Table, ABQ Uptown factually asserts that Davide Enterprises removed E1-205, which is identified as one (1) sauna unit in the women' lounge that costs $685.00. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)). In their Response, the Defendants do not dispute that Davide Enterprises removed item E1-205. At the <u>Mark V</u> hearing, however, Davide testified that she did not remove the sauna unit. <u>See</u> May 29 Tr. at 9:6-25 (discussing Fixture Table item E1-205). The parties, therefore, are in dispute as to whether Davide Enterprises removed the sauna unit in the women's lounge.

[130]In the Fixture Table, ABQ Uptown factually asserts that Davide Enterprises removed E2-205, which is identified as one (1) steam unit in the women's' lounge that Mr. Steam manufactured and that costs $11,250.00. <u>See</u> MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)). In their Response, the Defendants do not dispute that Davide Enterprises removed item E2-205. At the <u>Mark V</u> hearing, however, Davide testified that she did not remove the steam unit. <u>See</u> May 29 Tr. at 10:1-3 (discussing Fixture Table item E2-205). The parties, therefore, are in dispute as to whether Davide Enterprises removed the steam unit in the women's lounge.

[131]In the Fixture Table, ABQ Uptown factually asserts that Davide Enterprises removed E1-237, which is identified as one (1) sauna unit in the mens' lounge that costs $685.00. <u>See</u>

10. H14-232: six (6) tiffany pendants in the salon (hair wash).  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[132]

11. H6-233: seven (7) flush mount ceiling in the salon (hair cut).  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[133]

12. G4-237: one (1) wall covering in the mens' lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)).[134]

13. B15-202: one (1) drapery in the pedicure room.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[135]

---

MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)).  In their Response, the Defendants do not dispute that Davide Enterprises removed item E1-237.  At the Mark V hearing, however, Davide testified that she did not remove the sauna unit.  See May 29 Tr. at 19:5-17 (discussing Fixture Table item E1-237).  The parties, therefore, are in dispute as to whether Davide Enterprises removed the sauna unit in the mens' lounge.

[132]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H14-232.  At the Mark V hearing, however, when asked about whether she had any Tiffany style pendants anywhere in La Bella, Davide responded "No, sir."  See May 29 Tr. at 30:16-20 (discussing Fixture Table item H14-232).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H14-232 or any Tiffany style pendants from the Premises at the Second Lease's termination.

[133]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H6-233.  At the Mark V hearing, however, when asked about item H6-233, Davide stated "[w]e had no flush mount in the salon."  See May 29 Tr. at 28:19-20 (discussing Fixture Table item H6-233).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H6-233 from the Premises at the Second Lease's termination.

[134]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item G4-237.  At the Mark V hearing, however, when asked about item G4-237, Davide stated "No, but that is where the quilted art hung, the one piece was in the men's lounge."  See May 29 Tr. at 28:13-15 (discussing Fixture Table item G4-237).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item G4-237, a wall covering, from the Premises at the Second Lease's termination.  Davide's reference to the "quilted art" appears to be a reference to item B16-237, one (1) hanging art in the mens' lounge. The Court deemed it undisputed that Davide Enterprises removed this item.  See Footnote 85.

[135]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item B15-202.  At the Mark V hearing, however, when asked about item B15-202, Davide stated that she did not take a drapery, though she did remove a drape piece of art in a frame that was a wall hanging.  See May 29 Tr. at 25:2-7 (discussing Fixture Table item

14. H8-205: one (1) square metal wall sconce in the women's lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 21 (setting forth this fact)).[136]

15. A1-101: magnetic entry system on the ground floor.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 2 (disputing this fact).

16. F1-205: steam unit disconnect in the women's lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (disputing this fact).

17. G1-205: baseboards in the women's lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 19 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 3 (disputing this fact).

18. F2-14ea.: GFCI'S in the treatment room.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); May 29 Tr. at 13:23-14:6.

19. F1-237: steam unit disconnect in the mens' lounge.  See MSJ ¶ 17, at 5 (citing Fixture Table at 20 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (disputing this fact).

20. B17-210: metal lockers in the dispensary.  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); Defendants' Answer to Interrogatory No. 1, at 5 (disputing this fact).

21. Six "unlocated fixtures."  See MSJ ¶ 17, at 5 (citing Fixture Table at 22 (setting forth this fact)); May 29 Tr. at 30:16-31:13.

---

B15-202).  The parties, therefore, remain in dispute as to whether item B15-202 was a "drapery" or a "piece of art in a frame."  The difference between a "drapery" and a "piece of art" is legally significant to whether Davide Enterprises was permitted to remove the item.

[136]In their Response, the Defendants do not "specifically controvert" that Davide Enterprises removed item H8-205.  At the Mark V hearing, however, when asked about whether Davide Enterprises removed a square metal wall sconce from the women's lounge, Davide said "No, sir."  See May 29 Tr. at 26:5-6 (discussing Fixture Table item H8-205).  The parties, therefore, remain in dispute as to whether Davide Enterprises removed item H8-205 from the Premises at the Second Lease's termination.

## PROCEDURAL BACKGROUND

ABQ Uptown filed their Amended Complaint on May 13, 2014, asserting five causes of action: (i) breach of contract, see Complaint ¶¶ 39-50, at 9-10 (Count I); (ii) breach of the implied covenant of good faith and fair dealing, see Complaint ¶¶ 51-58, at 10-11 (Count II); (iii) demand for accounting and audit, see Complaint ¶¶ 59-62, at 11-12 (Count III); (iv) unjust enrichment, see Complaint ¶¶ 63-72, at 12-13 (Count IV); and (v) debt and money due, see Complaint ¶¶ 73-82, at 13-14 (Count V). ABQ Uptown seeks the following relief: (i) damages from the Defendants for Davide Enterprise's "breaches and wrongful acts, including without limitation the amount of unpaid Gross Rent owed by Tenant to" ABQ Uptown, the cost of replacing permanent improvements, improvements, and/or fixtures that Davide Enterprises removed upon vacating the Premises, and the cost of restoring the Premises to a clean undamaged condition, see Complaint ¶ a, at 14-15; (ii) an accounting of all gross rent and other expenses that Davide Enterprises owes ABQ Uptown over the Second Lease's term, see Complaint ¶ b, at 15; (iii) an audit of ABQ Uptown's business and records "to settle in full the accurate amount of the Gross Rent" that Davide Enterprises owes ABQ Uptown over the effective term of the Second Lease, see Complaint ¶ c, at 15 (internal quotation marks omitted); (iv) a judgment against Davide Enterprises, and Christopher Luttrell and Davide as Guarantors, for ABQ Uptown's costs, expenses, and attorneys' fees, as the Second Lease provides, see Complaint ¶ d, at 15; (v) pre- and post-judgment interest, see Complaint ¶ e, at 15; and (vi) such other relief as the Court deems proper, see Complaint ¶ f, at 15. On June 16, 2014, the Defendants filed their Answer to the Amended Complaint, in which they asserted affirmative defenses of payment and offsets, and unclean hands. See Answer to Amended Complaint at 1-3, filed June 16, 2014 (Doc. 45)("Answer").

1.      **The MSJ.**

In the MSJ, ABQ Uptown LLC argues that it is "entitled to damages for permanent and lease provision fixtures Defendants removed from the leased property and the damage caused by Defendants['] removal of those fixtures."  MSJ at 6.  ABQ Uptown contests the Defendants' contention that "all of the items in the space that went 'above and beyond a typical buildout' were trade fixtures that they were entitled to remove."  MSJ at 6.  ABQ Uptown argues that, while New Mexico has recognized the existence of trade fixtures, it has never precisely defined them.  See MSJ at 6.  ABQ Uptown contends, however, that under New Mexico law, not every addition that goes beyond a typical buildout will qualify as a trade fixture.  See MSJ at 7.  According to ABQ Uptown, trade fixtures are limited to items that are "specifically tailored to the unique aspects of a tenant's business."  MSJ at 7.  ABQ Uptown states:

> For example, in Defendant's case, their haircut and hair washing stations would certainly be trade fixtures.  However, doors, electronics, cash wraps, door handles and the like have no relation to Defendant's specific business.  Thus, while Ms. Davide may have relied on the idea that her design was "branded" by choosing materials that were consistent with her other locations, that simply is not enough to demonstrate that all the items removed were trade fixtures.  A door is not integral to a specific business purpose, regardless of whether the door matches the design of other business locations.

MSJ at 7.

Further, ABQ Uptown argues that, unlike New Mexico's law on trade fixtures, its "law on regular fixtures is well established."  MSJ at 7.  ABQ Uptown contends that "intent, adaptation, and annexation are the three relevant factors which determine whether an article is a fixture to be treated as part of the realty."  MSJ at 7 (quoting Kerman v. Swafford, 1984-NMCA-030, 680 P.2d 622, 624).  ABQ Uptown cites to a decision from the Bankruptcy Court for the District of Kansas, which states, "The three parts of the test are: (1) annexation to the realty (how firmly the items are attached and how easily they can be removed); (2) the intent of the parties

(whether they intended the item to be permanently affixed to the real estate); and (3) how operation of the goods is related to the use of the realty (adaptability)."  MSJ at 7-8 (quoting In re Dalebout, 454 B.R. 158, 161 (Bankr. D. Kan. 2011)).  ABQ Uptown emphasizes, however, that, while "all three of the above factors are important to consider, it is intent that ultimately controls."  MSJ at 8 (citing Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, 512 P.2d 73, 76).  "Adaptation and annexation, by contrast, are principally relevant as indicators of intent."  MSJ at 8 (citing Kerman v. Swafford, 1984-NMCA-030, 680 P.2d at 624).

Regarding intent, ABQ Uptown advances two arguments.  First, according to ABQ Uptown, "where the parties' intent is expressed in their written agreement, the lease provision controls ownership of such articles."  MSJ at 8 (citing Boone v. Smith, 1968-NMSC-172, 447 P.2d 23).  ABQ Uptown contends that, in this case, there is clear language in Section 19.1 of the Second Lease governing what can and cannot be removed from the Premises:

> Tenant shall not remove permanent improvements that were provided by Landlord at the commencement of this Lease and shall not remove permanent improvements later installed by Tenant unless directed to do so by Landlord.  All fixtures or improvements constructed or installed by Tenant at the Premises except for Tenant's trade fixtures and equipment shall be the property of Landlord.  All light fixtures and HVAC equipment, plumbing equipment, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes and other fixtures . . . whether installed by Tenant or Landlord, shall remain at the Premises or termination of this Lease without compensation, allowance or credit to Tenant.

MSJ at 8 (quoting Second Lease ¶ 19.1, at 15).  Second, ABQ Uptown maintains that, even if the language in Section 19.2 of the Second Lease were not so clear, "it is evident from witness testimony that Ms. Davide's intent when making additions and remodeling the Premises was to remain in the space indefinitely."  MSJ at 8-9.  According to ABQ Uptown, Davide also stated in her deposition that she planned to be in the leased premises forever when she contributed to the space design, and that, therefore, "[h]er intent, by her own admission, was to remain in the space

permanently." MSJ at 9. ABQ Uptown concludes that, therefore, "under both the lease provisions themselves and the controlling test for intent, Defendants were required to leave many of the items they removed from the Premises." MSJ at 9. In ABQ Uptown's view, "[b]ecause intent is the driving factor in determining whether an items [sic] is a fixture or not, it speaks volumes that Ms. Davide designed the space with the intent to remain indefinitely." MSJ at 9.

The element of annexation to the realty, asks "how firmly the items are attached and how easily they can be removed," MSJ at 7-8 (quoting In re Dalebout, 454 B.R. at 161). ABQ Uptown asserts that "the items were not designed to be easily removable or to be transferred to another space," MSJ at 9. Instead, according to ABQ Uptown:

> the majority of items in dispute were designed to remain permanently in the leased space and fall under the category of fixtures. By Ms. Davide's testimony, around a quarter of these items removed were physically affixed to the lease property, UMF No. 15, meeting the textbook definition of a fixture. Examining similar circumstances, the New Mexico Supreme Court noted that property that had to be detached from the building was not the type of property generally contemplated to be "movable furniture" but was instead a fixture to leased property. *See Mitchell v. Lovato*, 1982-NMSC-018, 97 N.M. 425, 429, 640 P.2d 925, 929. Moreover, several items that Ms. Davide admits to removing are the categories of items specifically covered in the lease provision on surrender. *See* [Doc. No. 1-2] at 19.1. For example, light fixtures are clearly to remain in the space under the lease. In violation of the lease provision, Davide Enterprises removed several light fixtures, including a large chandelier, from the Premises while moving out.

MSJ at 9. ABQ Uptown contends that Christopher Alba's Expert Report further buttresses this position. See MSJ at 9. According to ABQ Uptown, Alba reviewed all of the relevant documentation, and "determined that a fair number of items removed by Defendants were indeed fixtures or were made fixtures by the express language of the lease." MSJ at 9-10. Alba concluded that a number of items should not have been removed, including "baseboards, door handles, sinks, light fixtures, plumbing equipment, wall coverings and drapes," and "[m]any of these items were listed specifically in the [Second Lease]." MSJ at 10 (citing Alba Expert

Report at 10-11 and Second Lease ¶ 19.1, at 15).  ABQ Uptown further asserts that those items that were not listed specifically in the Second Lease "are clearly the type of items that are so affixed to the property that they have become part of the Premises."  MSJ at 10.

> **2.      The Response.**

On February 19, 2015, the Defendants filed Defendants' Response to ABQ Uptown LLC's Motion for Partial Summary Judgment on Counts I, II, and IV of Plaintiff's Complaint, filed February 19, 2015 (Doc. 61)("Response").  In their Response, the Defendants begin by advancing two preliminary arguments.  See Response at 1.  They first contend that the Court should deny ABQ Uptown's motion for summary judgment for unjust enrichment -- Count IV -- because unjust enrichment "is an equitable remedy which has 'evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity.'"  Response at 1 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 695).  The Defendants assert that, because ABQ Uptown has "two remedies at law for breach of contract (Count I) and breach of implied covenant of good faith and fair dealing (Count II) the equitable relief it seeks is not available: 'equity will not act if there is a complete and adequate remedy at law.'"  Response at 1-2 (quoting Sims v. Sims, 1996-NMSC-78, ¶ 32, 930 P.2d 153, 159).  Second, the Defendants object to ABQ Uptown's submission of the Alba Expert Report.  See Response at 2.  The Defendants contend that the Alba Expert Report is based on hearsay, because Alba never saw any of the items in La Bella and his report is based on his report of photographs that are not part of the record.  See Response at 2.[137]  Further, they assert that Alba "put a price on items which he did not accurately identify, and which Defendants claim were never in La Bella."  Response at 2 (citing Defendants' Answer

---

[137]The Court addressed this evidentiary objection in footnote 31 of this opinion.

to Interrogatory No. 1).  In sum, the Defendants argue that Alba's report is "pure speculation."

Response at 2.

The Defendants next provide an overview of New Mexico case law concerning fixtures.

See Response at 4.  They assert that New Mexico has a long history of defining property as

either personalty or real estate, see Response at 4, citing Post v. Miles, 1893-NMSC-033, ¶ 4, 34

P. 586, 589, as the seminal case analyzing the difference:

> What constitutes a fixture has given rise to much discussion.  Mr. Ewell, in his
> work on Fixtures, gives us three tests: (1) Real or constructive annexation of the
> article in question to the realty; (2) appropriation or adaptation to the use or
> purpose of that part of the realty with which it is connected; (3) the intention of
> the party making the annexation to make it permanent.

Response at 4 (quoting Post v. Miles, 1893-NMSC-033, ¶ 4, 34 P. at 589).  The Defendants

contend, however, that courts have adopted intent as the controlling factor and that "the judicial

determination of the classification of property first gives pre-eminence to the intention of the

parties."  Response at 4.  They cite to the Supreme Court of New Mexico's decision in Sw. Pub.

Serv. Co. v. Chaves Cnty., 1973-NMSC-064, 512 P.2d at 76, in support of this position:

> It is settled that in disputes between private persons the intention of the parties is
> controlling in determining whether an article is a fixture and part of the realty or
> is personalty.  The rule thus expressed: This court has recognized the test of
> intention to make the article a permanent addition to the realty as manifested by
> the physical facts, and has accepted the character of the annexation and the use for
> which the article is designed as subsidiary elements employed for the purpose of
> testing the intention of permanency.  Thus whether an article is or was physically
> affixed to the building is only one of the criteria in determining whether there was
> an intention to make it a permanent accession to the real property.

> But:

> In no proper sense can equipment in small leased offices be held an improvement
> to and part of real property owned by another.  The mere attachment of switch
> board legs and equipment to floor or walls by screws or bolts does not have that
> affect.

Response at 5 (quoting Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶¶ 14-43, 512 P.2d at 76-80).   The Defendants contend that here, Davide Enterprises and Hunt Uptown, "agreed that all fixtures, equipment, furnishings and any item that La Bella installed was personality [sic]."   Response at 5.   According to the Defendants, that agreement is why Hunt Uptown permitted Davide Enterprises to remove all items when the First Lease was terminated. See Response at 5.   They contend that, when the items were placed there again under the Second Lease, "the understanding was that all items installed by La Bella were personalty and not part of the real estate."   Response at 5.

The Defendants next address the issue of contract interpretation under New Mexico law. See Response at 6-8.

> First, we view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions.   We will not interpret a contract such that our interpretation of a particular clause or provision will annul other parts of the document, unless there is no other reasonable interpretation.   Apparently conflicting provisions must be reconciled so as to give meaning to both, rather than nullifying any contractual provision, if reconciliation can be effected by any reasonable interpretation of the entire instrument in light of the surrounding circumstances.   Finally, we strictly construe a contract against the party who drafted the contract in order to protect the rights of the party who did not.

Response at 6 (quoting Pub. Serv. Co. of New Mexico v. Diamond D Const. Co., 2001-NMCA-082, ¶ 19, 33 P.3d 651, 659).   According to the Defendants, the circumstances surrounding the making of the contract include any "relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear."   Response at 6 (citing Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 11, 845 P.2d at 1235).   Further, they contend that any factual issues presented by any ambiguity must be resolved by the fact finder with a full evidentiary hearing before deciding breach and damages.   See Response at 6.

The Defendants maintain that when parties attach different meanings to the same terms, New Mexico courts defining the terms apply the test from the RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981), which states:

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

Response at 7 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981))(citing Farmington Police Officers Ass'n v. City of Farmington, 2006-NMCA-077, ¶ 17, 137 P.3d 1204, 1211). Without much explanation, they contend that ABQ Uptown did not review these rules of contract interpretation, and that they "ignored settled rules of contract interpretation and confused hopeful or wishful conclusions of law for undisputed facts." Response at 7. In sum, the Defendants assert that, when looking at the circumstances surrounding the nature of the beauty business, and the termination of the First Lease and the start of the Second Lease, "La Bella had every expectation that the items installed the first time, took out the first time and put in the second time could be taken out the second time." Response at 8.

The Defendants also attach the Davide Aff., in which Davide discusses her understanding of the Second Lease and the circumstances of the First Lease's termination. See Davide Aff. ¶¶ 1-20, at 1-4. Among other things, Davide states:

8.  As part of the termination agreement Hunt allowed me to remove everything that I had installed, including light fixtures and signature door handles.   No distinction was made between equipment, fixtures, furnishings, trade fixtures or personality.   [sic]   Hunt also allowed me to store some of my things on the premises of the vacated salon.

. . . .

10.  I signed the current lease on March 17, 2010 and moved all the things that I had taken out in 2009.   Between Hunt and La Bella there was no disagreement that everything I put into the space in 2010 belonged to La Bella.

11.  At no time during my involvement with La Bella Spa Salon Uptown did I intend to leave anything that was designed and/or selected by me behind.   La Bella competes in a very aggressive business and everything associated with the build out of La Bella was designed as part of a signature and brand oriented experience and atmosphere.   I designed and selected everything, to the smallest detail, to reflect and impress on our guests.

12.  I would never agree to let any other tenant, especially one in the beauty business, to coopt my brand. . . .

. . . .

14.  The tenant that moved into the La Bella space is a nationally, franchised, beauty school, Toni and Guy. . . . [T]hey have their own distinctive architectural style.    They describe it as ultra-modern, high tech.    It is an institutional, minimalist mix of high gloss, stainless steel and glass designed for teaching.

15.  La Bella's interior was an award winning, warm, European modern design of venetian plaster, silk wall coverings, custom carpet, hand hewed wood flooring, custom hand carved wood cabinets, gemstone counters, hand glass blown titles and crystal chandeliers.   It was recognized in Day Spa Magazine as one of the Top 10 Best Day Spas in the Southwest, which includes Texas.

16.  Toni and Guy's target demographic are kids going to beauty school.

17.  La Bella's target demographic is professional, women and men concerned with health, wellness and appearance.

18.  It is common sense that the interior branding of these two distinctly, business models [sic] would be completely different.

. . .

20. Mr. Alba's estimate of the value of things taken out of La Bella Uptown is grossly overstated. First, the value must be one of used items not new. Second, Mr. Alba does not correctly identify many items. Third, because Toni and Guy would never have used the items and things in La Bella, there would have been a cost of removal. Because La Bella took everything out, it saved either Toni and Guy or ABQ Uptown the cost of removal.

Davide Aff. ¶¶ 8-20, at 2-4.

### 3.    ABQ Uptown's Reply.

On March 5, 2015, ABQ Uptown filed Plaintiff ABQ Uptown, LLC's Reply to Defendants' Response to the Motion for Partial Summary Judgment on Counts I, II and III of Plaintiff's Complaint, filed March 5, 2015 (Doc. 62)("Reply"). In its Reply, ABQ Uptown first argues that the plain language of Section 19.1 of the Second Lease clearly states that all fixtures or improvements -- other than Defendants' trade fixtures and equipment -- are the landlord's property. See Reply at 1-2. ABQ Uptown maintains that the Davide Aff. "attempts to add an unreasonable interpretation to the plain language" of the Second Lease. Reply at 2. ABQ Uptown asserts that Davide's contention in her affidavit that she "understood everything installed by Defendants to be a trade fixture" is contrary to both Section 19.1 and accepted New Mexico law. Reply at 2. ABQ Uptown then provides an overview of New Mexico law concerning the interpretation of contractual agreements. See Reply at 3-4. According to ABQ Uptown, under New Mexico law, the goal of contract interpretation is to ascertain the parties' intentions, and that, absent ambiguity, the Court is to interpret the contract which the parties made without altering or fabricating a new agreement for them. See Reply at 3. Further, ABQ Uptown asserts that, under New Mexico law, the issue of ambiguity is a matter of law for the Court, and if the evidence is so plain that no reasonable person could hold any other way but one, then the Court may interpret the meaning as a matter of law. See Reply at 3. ABQ Uptown contends that there is no dispute what the Second Lease says, see Reply at 4; it states that "the

Tenant cannot remove any improvements without the permission of the Landlord, except for trade fixtures and equipment." Reply at 3.  Rather, ABQ Uptown argues that the dispute is one over the interpretation of what constitutes a trade fixture and that the Defendants' argument that everything installed by them was a trade fixture is incorrect.  See Reply at 4.

ABQ Uptown next addresses the Supreme Court of New Mexico's decision in Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, 512 P.2d 73, which the Defendants cite in their Response, for the proposition that "[i]t is settled in disputes between private persons the intention of the parties is controlling in determining whether an article is a fixture and part of the realty or is personalty." Reply at 4 (citing Response at 5).  According to the Defendants, under Sw. Pub. Serv. Co. v. Chaves Cnty., their understanding that "all items installed by La Bella were personalty and not part of the real estate" controls the Court's determination of the MSJ.  See Reply at 4.  In their Reply, ABQ Uptown contends that intent does not always control, citing Mitchell v. Lovato, 1982-NMSC-018, ¶ 18, 640 P.2d 925, 928.  In that case, according to ABQ Uptown, the Supreme Court of New Mexico held that evidence supported a trial court's finding that the defendants wrongfully removed certain fixtures.  See Reply at 4.  ABQ Uptown explains that the Supreme Court of New Mexico determined that the defendants had removed booths, stools, walk-in boxes, sinks, and refrigerators from the premises.  See Reply at 4-5.  Further, the Supreme Court of New Mexico found that, although the defendants installed the items, that fact did not conclusively establish ownership of them.  See Reply at 5.  ABQ Uptown explains:

> The Court then cited to its decision in Southwestern Public Service Co. v. Chaves County, 612 P.2d 73 (1973)(which is the same case relied upon by Defendants in this case), for the proposition that, "this Court stated that the intention of the parties is controlling in determining whether an article is a fixture and part of the realty or whether it remains personalty." Id.  However, the Court then added that in cases, "When, as here, the parties' intent is expressed in their written agreement, *the lease provision controls ownership of such articles*." Id. (emphasis added); citing Boone v. Smith, 447 P.2d 23, 26 (1968).  Given this

> body of law, the <u>Mitchell</u> court then turned its analysis to the provisions of the lease agreement, and ultimately held that under the language of the lease agreement, which provided that the Lovatos could remove only moveable furniture, the Lovatos had wrongfully removed the items at issue. <u>Id.</u> at 429 and 929.

Reply at 5.

Relying on <u>Mitchell v. Lovato</u>, 1982-NMSC-018, 640 P.2d 925, ABQ Uptown contends that the Defendants' argument that any improvement constitutes a trade fixture is contrary to the Second Lease's express language. <u>See</u> Reply at 5. According to ABQ Uptown, the Second Lease specifically provides that all fixtures or improvements that the tenant constructs or installs, including light fixtures, HVAC equipment, plumbing fixtures, hot water heaters, fire suppression, sprinkler systems, wall coverings, carpeting drapes, and other fixtures located or serving the premises, except trade fixtures and equipment, shall remain on the Premises. <u>See</u> Reply at 5-6. Further, ABQ Uptown asserts that the Defendants removed the majority of the items contrary to this specific provision, including the removal of "doors, door handles, GFCIs,[138] sinks, valves, toilets, toilet paper holders, wall coverings, drapes, fire extinguishers, light fixtures, and plumbing equipment." Reply at 6.

---

[138]Regarding ground-fault circuit interrupters ("GFICs"), the United States Department of Labor states the following:

> A ground-fault takes place when there is a break in the low-resistance grounding path from a tool or electrical system. The electrical current may then take an alternative path to the ground through the user, resulting in serious injuries or death. The ground-fault circuit interrupter, or GFCI, is a fast-acting circuit breaker designed to shut off electric power in the event of a ground-fault within as little as 1/40 of a second. It works by comparing the amount of current going to and returning from equipment along the circuit conductors.

GROUND-FAULT CIRCUIT INTERRUPTERS (GFCI), UNITED STATES DEPARTMENT OF LABOR, https://www.osha.gov/SLTC/etools/construction/electrical_incidents/gfci.html (last visited Oct. 16, 2015). GFCIs are often incorporated into outlets, although portable and cord-connected GFCIs do exist. GROUND-FAULT CIRCUIT INTERRUPTERS (GFCI), UNITED STATES DEPARTMENT

ABQ Uptown next asserts that the Defendants' interpretation of what constitutes a trade fixture is unreasonable and disfavored under New Mexico law.  See Reply at 6.  According to ABQ Uptown, Section 19.1 is not ambiguous, and the only dispute, therefore, is over the Defendants' interpretation of what constitutes a trade fixture.  See Reply at 6.  ABQ Uptown disputes the Defendants' assertion that, when Davide entered into the Second Lease, she intended everything she installed to be a trade fixture.  See Reply at 6.  ABQ Uptown states that "it is undisputed that when Ms. Davide designed and moved into the lease space . . . she intended to stay in the building for 'all time.'"  Reply at 6.  According to ABQ Uptown, that undisputed fact proves that, when Davide moved into the space, she designed it with items that would remain with the property forever.  See Reply at 6.  ABQ Uptown argues that the Defendants' definition of a trade fixture as being "everything that's above and beyond a standard buildout" is not reasonable and contrary to the definition of trade feature.  See Reply. at 7.  Further, according to ABQ Uptown, if that were indeed the definition of trade fixture, it would render Section 19.1 of the Second Agreement meaningless.  ABQ Uptown writes:

> In other words, if "anything that's above and beyond a standard buildout" constitutes a trade fixture as Defendants content, then why would there need to specifically make an exception for trade fixtures in the lease agreement?  There would be no need, because every improvement would be a trade fixture, and thus, § 19.1 is meaningless.  Contract interpretation under New Mexico law requires that the Court work to give meaning to every provision in the contract and not read a particular provision of a contract such that another provision is rendered meaningless.

Reply at 7 (citations omitted).

ABQ Uptown next argues that the Defendants' basis for objecting to the Alba Expert Report is contrary to rule 703 of the Federal Rules of Evidence.  See Reply at 7-8.  According to

---

OF  LABOR,  https://www.osha.gov/SLTC/etools/construction/electrical_incidents/gfci.html  (last visited Oct. 16, 2015).

ABQ Uptown, the Defendants argue in their Response that the report is "somehow improper because it is based on items that Mr. Alba never personally saw and are not part of the record." Reply at 8.  ABQ Uptown asserts, however, that under rule 703, Alba is permitted to rely on evidence that he has never personally seen and is not part of the record, as long as it is evidence that experts in his or her field reasonably rely on in forming opinions.  See Reply at 8.  First, ABQ Uptown contends that Alba can render such an opinion, consistent with rule 703, because "the move-out inventory was prepared by Daniel Bunch (Operations Supervisor for ABQ Uptown), was utilized during the on-site inspection by Mr. Alba, and is the type of information that a registered architect would reasonably rely upon in forming an opinion about the value of the items that were removed."  Reply at 9.  Second, ABQ Uptown asserts that the Defendants' objection to the admission of Mr. Alba's report is untimely and improper, as the deadline for the Defendants to file a Daubert motion or motion to strike under Rule 702 has already passed.  See Reply at 9-11.

Finally, ABQ Uptown argues that the Defendants improperly rely on an expert opinion in their Response.  See Reply at 11.  According to ABQ Uptown, the Davide Aff. attempts to dispute the opinions in the Alba Expert Report and argues that the subsequent tenant, Toni and Guy, would have never used the items and things in La Bella, which would have created a cost of removal.  See Reply at 11.  ABQ Uptown asserts that "is not fact based, and is nothing more than mere speculation which crosses the threshold into the realm of expert testimony."  Reply at 11. ABQ Uptown argues that Davide does not provide any affirmative evidence, other than her own speculation, to controvert the values that Alba assigns to the various items listed in his expert report.  See Reply at 11.  Further, ABQ Uptown asserts that the Defendants have not offered Davide as an expert witness in this case, as rules 16(a)(2)(A) and (B) of the Federal Rule of Civil

procedure require.  See Reply at 11-12.  ABQ Uptown maintains that, because of this failure to offer her as an expert, the Court should not consider the Davide Aff. in the MSJ.  See Reply at 12.

### 4.    The April 22, 2015, Hearing on the MSJ.

The Court held a hearing on the MSJ on April 22, 2015.  See Transcript of Hearing, (taken April 22, 2015)("April 22 Tr.").[139]  The parties re-asserted the arguments that they made in their briefs.  Both parties agreed, however, that the Court needed to hold a Mark V hearing before it could rule on the MSJ.  See April 22 Tr. at 19:7-23:23 (Court, Chisholm, Gardner).  The Court and the parties agreed that a Mark V hearing would assist the Court in deciding whether the Second Lease is unambiguous; in which case, it could construe its meaning as a matter of law.

> THE COURT: What do you want?  Do you want a Mark V hearing?
>
> MR. CHISHOLM: No, I'd just as soon do the whole thing at trial not grant the summary judgment and do everything at trial.
>
> THE COURT: But the thing that makes be [sic] a little uncomfortable with that is the plaintiff is entitled to a summary judgment if they filed a motion, it zoo [sic] else to me that maybe what we ought to do is if if you want is a Mark V hearing we have a Mark V hearing, people bring in their witnesses that hearing and then I give you before we go to trial, either say its ambiguous and that way everybody puts on what they want at trial or I say it's not ambiguous, and then give you an interpretation of it.
>
> MR. CHISHOLM: Okay if that's the way you want to do it I'd much rather have a Mark V it's kind of like a preliminary trial. . . .
>
> . . .
>
> THE COURT: Do you agree with Mr. Chisholm, that probably the first thing I need to do is before I can really tackle the issues in your motion is have that Mark

---

[139]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

- 76 -

V hearing?  I guess the way I put it is the way Mr. Chisholm put it, the first thing I
need to do is interpret this contract.

MR. GARDNER: Sure, yeah, I would agree with that.

April 22 Tr. at 19:7-23:23 (Court, Chisholm, Gardner).

### 5.      The May 29, 2015, Mark V Hearing.

The Court held a Mark V hearing on May 29, 2015.  See May 29 Tr. at 3:1-58:18.  At the

hearing, Davide was the only witness.  See May 29 Tr. at 4:14-46:17.  Davide presented direct

testimony, ABQ Uptown cross-examined her, and the Defendants redirected.  See May 29 Tr. at

4:14-46:17.  The Court made Findings of Fact based on the Mark V hearing in the first factual

section of this opinion.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the

initial burden of "show[ing] that there is an absence of evidence to support the nonmoving

party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.

1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate

specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477

U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.

1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248). Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 251 (quoting <u>Schuylkill & Dauphin Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

### NEW MEXICO LAW REGARDING BREACH OF CONTRACT CLAIMS[140]

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  See UJI 13-801 NMRA.  A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused.  See N.M.R.A., Civ. UJI 13-822.  Incomplete performance is a breach of contract.  See Cochrell v. Hiatt, 1981-NMCA-125, ¶ 6, 638 P.2d 1101, 1103-04 (holding that, where the contract called for the roof to be restored to a "healthy" state and guaranteed the work for twenty-five years, because the roof leaked within the twenty-five year period, the defendant's performance was incomplete, and the defendant was in breach of the contract).  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages."  Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

---

[140]The Second Lease includes a choice-of-law provision, which provides that "[the] Lease shall be construed in accordance with and governed by the laws of the State of New Mexico." 2010 Lease ¶ 26.10, at 20.  Choice-of-law agreements are generally enforceable under New Mexico law.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 2009 WL 3672452, at * 5 (D.N.M. 2009)(Browning, J.)("Like most states, however, 'New Mexico respects party autonomy; [therefore] the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision.'")(alteration in original)(quoting Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶¶ 6-7, 188 P.3d 1215, 1218)).  None of the parties argue that this choice-of-law provision is not enforceable.  Thus, the Court will apply, pursuant to the Second Lease, New Mexico substantive law.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338.

Applying these principles in Armijo v. N.M. Dep't of Transp., No. CIV. 08-0336 JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court found that a plaintiffs' allegations failed to state a claim for breach of contract.  In support of the breach-of-contract claim, the plaintiff asserted that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause."  2009 WL 1329192, at *7.  The Court noted that the plaintiff did not "indicate what contractual provisions or employment policies the Department breached," and did not say "to what his employment contract entitles him or of what the Department deprived him." 2009 WL 1329192, at *7.  The Court found that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations would support claims for breach of contract."  2009 WL 1329192, at *8.  On the other hand, the Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at **16-17 (D.N.M. Sept. 30, 2012)(Browning, J.).

"Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract."  Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.).  The Supreme Court of New Mexico stated in Romero v. Mervyn's, 1989-NMSC-081, 784 P.2d 991: "Our previous cases clearly establish that, in contract cases not

involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." 1989-NMSC-081, ¶ 23, 784 P.2d at 998. Punitive damages are not available when they are "predicated solely on gross negligence. In addition to, or in lieu of, such negligence there must be evidence of an evil motive or a culpable mental state." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d 300, 308 (internal quotation marks omitted). The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted). A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted). The New Mexico Civil Jury Instructions define the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (*name of party making claim for punitive damages*) should recover compensation for damages, and if you further find that the conduct of _____ (*name of party whose conduct gives rise to a claim for punitive damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award punitive damages.

UJI 13-861 NMRA.

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form

above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229).  "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'"  Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 129 N.M. 677, 12 P.3d 431 (citation omitted).  On the other hand, New Mexico has "adopted the contextual approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 10, 845 P.2d 1232, 1235 (citation and internal quotation marks omitted).  See Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0594 JB/RHS, 2013 WL 4446770, at *18 (D.N.M. Aug. 2, 2013)(Browning, J.).

"The question whether an agreement contains an ambiguity is a matter of law."  Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.).  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176).  When the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.  A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d 1111, 1113 (internal quotation marks omitted)(applying principle to insurance policy).  "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions.  The mere fact that the parties are in disagreement on the construction to be given does not necessarily

establish ambiguity." Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d 603,

606 (citation omitted).

"An ambiguity exists in an agreement when the parties' expressions of mutual assent lack

clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted).

If the Court finds that the contract is "reasonably and fairly susceptible of different constructions,

an ambiguity exists." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing

Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d at 606 (1980)).

> [I]n determining whether a term or expression to which the parties have agreed is
> unclear, a court may hear evidence of the circumstances surrounding the making
> of the contract and of any relevant usage of trade, course of dealing, and course of
> performance. . . .  It is important to bear in mind that the meaning the court seeks
> to determine is the meaning one party (or both parties, as the circumstances may
> require) attached to a particular term or expression at the time the parties agreed
> to those provisions.
>
> . . . .
>
> It may be that the evidence presented is so clear that no reasonable person would
> determine the issue before the court in any way but one.  In that case, to the extent
> the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶¶ 15-17, 817 P.2d 238, 242-44

(affirming the trial court because it "considered all evidence adduced in response to the motion

for summary judgment, including collateral or extrinsic evidence of the circumstances

surrounding the execution of the lease amendment, and quite properly found no

ambiguity")(citations and footnote omitted).  In addition, in determining whether an ambiguity

exists,

> [a] court may employ the many rules of contract interpretation that do not depend
> on evidence extrinsic to the contract. See, e.g., Smith v. Tinley, 100 N.M. 663,
> 665, 674 P.2d 1123, 1125 (1984)(reasonable interpretation of contract is favored);
> Schultz & Lindsay Constr. Co. v. State, 83 N.M. 534, 536, 494 P.2d 612, 614
> (1972)(uncertainties construed strictly against drafter); Id. at 535, 494 P.2d at 613

(each part of contract is to be given significance according to its place in the
contract so as to give effect to the intentions of the parties).

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17 n.5, 817 P.2d at 244 n.5.

Once the court finds that an ambiguity exists, the resolution of that ambiguity becomes a

question of fact.  See Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To

decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of

the language and conduct of the parties and the circumstances surrounding the agreement, as

well as oral evidence of the parties' intent."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13,

845 P.2d at 1236.  "[I]f the court finds ambiguity, the jury (or court as the fact finder in the

absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and

damages."  C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 11, 817 P.2d at 241.

As this Court stated in Great Am. Ins. Co. of New York v. W. States Fire Protection Co., 730 F.

Supp. 2d 1308 (D.N.M. 2009)(Browning, J.):

> In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico summarized the
> circumstances under which it is appropriate for a district court to construe a
> contract as a matter of law, and when a district court should find that a contract is
> ambiguous and leave construction of the contract to a jury.  According to the
> Supreme Court of New Mexico in Mark V, Inc. v. Mellekas, a district court may
> take extrinsic evidence to determine whether a contract is ambiguous, and "if the
> evidence presented is so plain that no reasonable person could hold any way but
> one, then the court may interpret the meaning as a matter of law.  If the court
> determines that the contract is reasonably and fairly susceptible of different
> conclusions, an ambiguity exists."

730 F. Supp. 2d at 1314 n.1.

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and

fair dealing in its performance and enforcement."  Watson Truck & Supply Co., Inc. v. Males,

1990-NMSC-105, ¶ 12, 801 P.2d 639, 642 (citations omitted).  "Broadly stated, the covenant

requires that neither party do anything which will deprive the other of the benefits of the agreement." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642 (internal quotation marks omitted). New Mexico has recognized that a cause of action for breach of the covenant of good faith and fair dealing sounds in contract. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 16, 872 P.2d 852, 857. This Court has previously held that a "claim for the breach of the covenant of good faith and fair dealing is derivative of the breach-of-contract claim." Back v. ConocoPhillips Co., 2012 WL 6846397, at * 22 (D.N.M. Aug. 31, 2012)(Browning, J.)(citing Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *7 (D.N.M. Apr. 6, 2009)(Browning, J.)). The Supreme Court of New Mexico has also explained that tort recovery for breach of the covenant of good faith and fair dealing is permissible only where a special relationship exists, such as between an insurer and its insured. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 16, 872 P.2d at 857. The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (citations omitted)(internal quotation marks omitted). Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists." Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127, ¶ 18, 144 P.3d 111, 117.

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly" which an implied covenant of good faith and fear dealing within a contract imposes "becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (discussing an

Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff can recover tort damages for breach of this implied covenant.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.  The Supreme Court of New Mexico has noted that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship."  Melnick v. State Farm Mut. Auto. Ins. Co., 1998-NMSC-012, ¶ 13, 749 P.2d 1105, 1109.  This limitation is because "there is no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing."  Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 13, 738 P.2d 1321, 1324 (emphasis in original).

As the Supreme Court of New Mexico explained in Continental Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, 858 P.2d 66:

> Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.  The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party.

1993-NMSC-039, ¶ 64, 858 P.2d at 82 (citing Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 10, 801 P.2d at 642).  See Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 188 P.2d 1200, 1203.

> However, the implied covenant of good faith and fair dealing protects only against bad faith -- wrongful and intentional affronts to the other party's rights, or at least affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party.  Simply put, in contract there is no implied covenant to exercise "ordinary care," or even "slight care," and the fact that the breaching party may not have acted with ordinary or slight care is immaterial to the questions whether the contract has been breached and if so, what damages should be awarded for the breach.

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d at 309-10 (footnote omitted).

The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of

good faith and fair dealing "under circumstances where . . . it may be argued that from the

covenant there is to be implied in fact a term or condition necessary to effect the purpose of a

contract." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642.

> Generally, in the absence of an express provision on the subject, a contract
> contains an implied covenant of good faith and fair dealing between the parties.
> Under the implied covenant of good faith and fair dealing, courts can award
> damages against a party to a contract whose actions undercut another party's
> rights or benefits under the contract. Our Supreme Court has nevertheless refused
> to apply this implied covenant to override an express at-will termination provision
> in an integrated, written contract.

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co, 407 F.3d 1091, 1114-15 (10th Cir. 2005)(quoting

Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶ 5, 33 P.3d 679, 681)(secondary

citations omitted)).

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"New Mexico has long recognized actions for unjust enrichment." Ontiveros Insulation

Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99 (citing Tom Growney Equip., Inc. v.

Ansley, 1994-NMCA-159, ¶¶ 5-6, 888 P.2d 992, 994).   To prevail on an unjust enrichment

claim, a party must demonstrate that: "[(i)] another has been knowingly benefitted at one's

expense [(ii)] in a manner such that allowance of the other to retain the benefit would be unjust."

Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99.  "The theory has

evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in

contract and instead must seek refuge in equity." Ontiveros Insulation Co. v. Sanchez, 2000-

NMCA-051, ¶ 11, 3 P.3d at 698-99.  See Credit Inst. v. Veterinary Nutrition Corp., 2003-

NMCA-010, ¶ 21, 62 P.3d 339, 344; Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, 793

P.2d 855, 857.  The Supreme Court of New Mexico has held that equitable relief should be denied where there is an available remedy at law, which includes recovery under a breach-of-contract theory.  See, e.g, Applied Capital, Inc. v. Gibson, 2207 WL 5685131, at *17 (D.N.M. 2007)(Browning, J.)(citing Lopez v. Kase, 1999-NMSC-001, ¶ 6, 975 P.2d at 348; Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 699); General Tel. Co. of Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 18, 367 P.2d 711, 715 ("[t]he general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had an adequate remedy at law."); Sims v. Sims, 1996-NMSC-078, ¶ 28, 930 P.2d at 159 (stating "equity will not act if there is a complete and adequate remedy at law"); Lopez v. Kase, 1999-NMSC-011, ¶ 6, 975 P.2d at 348 (stating that the Supreme Court of New Mexico "generally will not grant equitable relief by way of an extraordinary writ when there is an adequate remedy available to the petitioner at law, absent unusual and compelling circumstances").

Indeed, where a contractual relationship exists with applicable contractual provisions, unjust enrichment claims -- which arise in equity -- must be dismissed.  See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1270-72 (D.N.M. 2014)(Browning, J.)(citing Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d 1091, 1107-17 (10th Cir. 2005)(Murphy, J.)).  In Elliot Industries Ltd. Partnership v. BP America Production Co., 407 F.3d at 1091, for example, the Tenth Circuit interpreted New Mexico unjust enrichment law, as it relates to breach-of-contract claims.  See 407 F.3d at 1116-1117.  In that case, the plaintiff royalty owners sued ConocoPhillips Company, the working interest owner, to collect additional royalties; the plaintiffs alleged that ConocoPhillips was underpaying their royalties by reducing them with illegitimate post-production costs, including a thirty-nine percent assessment of natural gas liquids (NGLs), which ConocoPhillips Company retained as compensation for

processing the gas.  See 407 F.3d at 1100.  The plaintiffs did not assert "an unequivocal and straight-forward contract claim" for the royalty underpayments, and "steadfastly disclaim[ed] any cause of action for breach of an express contract."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1107.  The Tenth Circuit noted that Elliott Industries' decision not to pursue a breach-of-contract claim was likely strategic, because, "[p]resumably, pleading a breach of contract claim on behalf of approximately 10,000 royalty owners would have made class certification less likely."   407 F.3d at 1107 n.10 (citing Fed.R.Civ.P. 23(a)(2) (commonality)).  In lieu of a breach-of-contract claim, the plaintiffs asserted claims such as breach of implied covenants, conversion, fraud, and unjust enrichment.  See Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1108.

The district court, relying on Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 3 P.3d 695, granted summary judgment against the plaintiffs on the unjust enrichment claim, concluding that "because the [unjust enrichment] claim arises in equity it cannot exist where, as here, the parties are in privity of contract."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1116.  On appeal, the plaintiffs argued that Ontiveros Insulation Co. v. Sanchez does not automatically bar unjust enrichment claims when the parties are also in a contractual relationship, and that, even if it the law barred unjust enrichment claims, the contracts between the plaintiffs and the defendants in the case before the court did not govern the thirty-nine percent processing fee.  See 407 F.3d at 1117.  The Tenth Circuit affirmed the district court's judgment.  See 407 F.3d at 1117.  Quoting Ontiveros Insulation Co. v. Sanchez, the Tenth Circuit stated that "equity does not take the place of remedies at law, it augments them; in this regard, an action in contract would be preferred to one in quasi-contract."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (quoting Ontiveros Insulation Co. v. Sanchez,

3 P.3d at 699).  According to the Tenth Circuit:

> [T]he hornbook rule [is] that quasi-contractual remedies . . .  are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.  Courts have recognized this principle and have stated their unwillingness to resort to the doctrine of unjust enrichment to override a contractual [ ] provision.

Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (alterations in

original)(quoting Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa, 130

F.3d 950, 957 (10th Cir. 1997)).  In rejecting the plaintiff's arguments, the Tenth Circuit also

cited to WILLISTON ON CONTRACTS, which states: "Where the plaintiff has no alternative right on

an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the

defendant."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (quoting 26

RICHARD A. LORD, WILLISTON ON CONTRACTS § 68:5 (4th ed. 2004)).  In sum, the Tenth Circuit

affirmed the district court's summary judgment for the defendants on the unjust enrichment

claim, because "the claim for underpayment of royalties is grounded in the parties' contractual

relationship."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117.  While

the Tenth Circuit acknowledged that the governing contracts did not delineate any specific

deductions, it concluded that: "the contracts control[ed] how royalties are to be paid.

Indisputably, there are contracts between the parties, thus any claim for underpayment of

royalties, including a claim for unjust enrichment, must begin with those contracts."  407 F.3d at

1117.

## NEW MEXICO LAW REGARDING FIXTURES AND TRADE FIXTURES

The Court will first discuss New Mexico law regarding fixtures.  Second, the Court will

discuss New Mexico law regarding trade fixtures.

1.      **Fixtures.**

Generally, a fixture is an article of personal property that has become so attached to realty that it has become a part of the land and has lost its identity as personal property.  See, e.g., Washington Metro. Area Transit Auth. v. Precision Small Engines, 227 F.3d 224, 227 (4th Cir. 2000)(applying Maryland law).  To determine whether an article has become so identified with a piece of realty as to become a fixture, the courts generally apply a three-part test which considers: (1) annexation, (2) adaptation, and (3) intention.  See, e.g., In re Thomas, 362 B.R. 478, 485 (B.A.P. 10th Cir. 2007)(applying Kansas law); In re Williams, 381 B.R. 742, 745 (Bankr. W.D. Ark. 2008)(applying Arkansas law); In re Kerr, 383 B.R. 337, 342 (Bankr. N.D. Ohio)(applying Ohio law).  Intention, the third of the three factors, refers to the intent of the party making the annexation to make the article a permanent accession[141] to the realty.  See, e.g.,

---

[141]BLACK'S LAW DICTIONARY offers several applicable definitions for the word accession:

> **4.** The acquisition of title to personal property by one who in good faith bestows labor or materials on raw material owned by another to convert it to another thing, as where A inadvertently uses clay owned by B to create a valuable statute. -- Also termed (in Roman law) *accessio*.
>
> > "*Accessio* is the combination of two chattels belonging to different persons into a single article: as when A's cloth is used to patch B's coat, or a vehicle let on hire-purchase has new accessories fitted to it."  R.F.V. Heuston, *Salmond on the Law of Torts* 113 (17th ed. 1997).
>
> **5.** A property owner's right to all that is added to the property (esp. land) natural or by labor, including land left by floods and improvements made by others <the newly poured concrete driveway became the homeowner's property by accession>..
>
> . . . .
>
> **7.** The physical uniting of goods with other goods in such a manner that the identity of the original goods is not lost.  UCC § 9-102(a)(1).

Sears, Roebuck & Co. v. Bay Bank & Trust Co., 537 So. 2d 1041 (Fla. Dist. Ct. App. 1st Dist. 1989).  In many states, intention is "critical, primary, important, controlling, or the most important factor in the three-part test, and these jurisdictions therefore typically give the most weight to intention."  35 AM. JUR. 2D Fixtures § 12 (1967)(citing see, e.g., In re Williams, 381 B.R. at 742 (applying Arkansas law and finding intention to be the primary factor); In re Sand & Sage Farm & Ranch, Inc., 266 B.R. 507, 511-512 (Bankr. D. Kan. 2001)(applying Kansas law and finding intention to be the controlling factor); In re Vic Bernacchi & Sons, Inc., 170 B.R. 647 (Bankr. N.D. Ind. 1994)(applying Indiana law and finding intention to be the most important factor)).

The State of New Mexico also applies the three-part test to determine whether an article has become so identified with a piece of realty as to become a fixture.  Nearly one century ago, in Patterson v. Chaney, 1918-NMSC-077, 173 P. 859, the Supreme Court of New Mexico stated that the three relevant factors to be used in determining whether an article used in connection with realty is to be considered a fixture are (1) annexation, (2) adaptation, and (3) intention.  See 1918-NMSC-077, ¶ 5, 173 P. at 860.  The Supreme Court of New Mexico explained:

> There are three general [factors] applied by the courts in determining the question whether an article used in connection with realty is to be considered a fixture. First, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold.

Patterson v. Chaney, 1918-NMSC-077, ¶ 5, 173 P. at 860. See Garrison Gen. Tire Serv., Inc., 1965-NMSC-077, ¶ 10, 404 P.2d 143, 145 ("The Court has long subscribed to the three general tests to be applied in determining whether an article used in connection with realty is to be

Accession, BLACK'S LAW DICTIONARY (10th ed. 2014).

considered a fixture.  First, annexation. . . second, adaptation . . . and, third, intention."); Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d 622, 624 ("Intent, adaptation, and annexation are the three relevant factors which determine whether an article is a fixture to be treated as part of the realty.").  Annexation to the realty refers to "how firmly the items are attached and how easily they can be removed."  In re Dalebout, 454 B.R. at 161 (analyzing the same three elements under Kansas law).  Adaptation refers to how operation of the goods is related to the use of the realty.  In re Dalebout, 454 B.R. at 161.  There is very little New Mexico case law examining the definition of adaptation, but the United States Bankruptcy Court for the Western District of Missouri has explained: "Evidence that the land was used for a particular purpose -- and that the property in question was used to further that purpose -- is sufficient to show that the attached property is adapted to the use of the realty."  In re Farmland Industries, Inc., 298 B.R. 382, 389 (Bankr. W.D. Mo. 2003).  Regarding the element of adaptation, the Missouri Court of Appeals has stated:

> Of the three elements mentioned, that of adaptability appears to be the least discussed, and appears, in some respects, to overlap that of annexation.  As the word adaptable connotes, the characteristics of fitness or suitability for the building or premises in question are implied.  Thus an organ, placed in an expressly prepared niche in a church, and fastened to the floor with nails, was held to be a fixture.

State ex rel. State Highway Commission v. Wally Hutter Oil Co., 467 S.W.2d 279, 282 (Mo. Ct. App. 1971)(citations omitted).  In affirming a trial court's finding that various items had become fixtures, the Court of Appeals of Wisconsin explained, discussing, in part, the element of adaptation:

> The trial court discussed the pertinent factors.  It found that all of the items in dispute were physically attached to the building.  In fact, Bouraxis does not dispute this finding.  The trial court also found that each item was used as an integral part of the building allowing it to function as a restaurant.  It further found that removing these items would cause damage and result in a change of the

character and purpose of the building.  Finally, the trial court's findings show that the intention of the party installing these items was to make this building a functioning restaurant. In fact, there is no evidence showing that when these items were installed, whoever installed them intended for them to be removed at a later point in time.  The trial court acknowledged that each of these items could in fact be removed but that it would take a substantial amount of effort, would require hiring a restaurant installer to do so, and these items could not simply be picked up and carried out of the building.  The trial court's findings are not clearly erroneous.

Drexel Commercial Ltd. P'ship v. DeMarb, 2015 WL 5683982 at ¶13 (Wis. Ct. App. 2015).

Finally, the United States Bankruptcy Court for the Western District of Missouri has stated:

A distinction is drawn between those articles "placed in the building for the sole purpose of enabling the tenant to carry on his business" and those "so placed as to make *the building itself* peculiarly adapted and more usable for the type of business."  The former may remain personalty which the tenant may remove.  The latter becomes annexed to the realty and must be left behind.

In re Maria Jean, Inc., 25 B.R. 282, 284 (Bankr. W.D. Mo. 1982)(citations omitted)(emphasis in original).

While all three of the above factors must be considered under New Mexico law, as in other states, in determining whether personal property loses or retains its identity as a chattel by being placed on land, the general intention of the party making the annexation or installation is the controlling factor.  See, e.g., Garrison Gen. Tire Serv., Inc., 1965-NMSC-077, ¶ 10, 404 P.2d at 145 (citing Jones-Noland Drilling Co. v. Bixby, 1929-NMSC-091, 282 P. 382; Fairbanks v. Williams, 1918-NMSC-131, 177 P. 745).  See Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶ 15, 512 P.2d at 76 ("Thus our inquiry, though not disregarding annexation or adaptation, must center upon Southwestern's intentions in installing and maintaining the components of steam production in their present location."); Porter Lumber Co. v. Wade, 1934-NMSC-042, ¶ 11, 32 P.2d 819, 821 ("The intention of the party making the annexation, has been said by some

of the authorities to be a controlling consideration, and *generally it is held to be the chief test*.")(emphasis in original).

"Indeed, annexation and adaptation are chiefly important as indications of intention," Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶ 15, 512 P.2d at 76, which courts have recognized as the chief fixture test, see Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624. "Courts have historically been concerned with apparent or objective intent, rather than the actual state of mind of the owner or installer of the purported fixture." In re Flores De New Mexico, Inc., 151 B.R. 571, 582 (Bankr. D.N.M. 1993)(citing Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, 512 P.2d 73).

> Although the question of intent is typically a fact question for the jury, intent regarding fixture determination is a different question. Intent must affirmatively and plainly appear. *Boone v. Smith*. Where a court finds sufficient objectively manifested intent, however, a fixture may be presumed or inferred from the circumstances.

Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624-25 (citing Maxey v. Quintana, 1972-NMCA-069, 499 P.2d 356). See In re Flores De New Mexico, Inc., 151 B.R. at 582. In Kerman v. Swafford, for example, the Court of Appeals of New Mexico examined the Supreme Court of New Mexico's application of these principles in Patterson v. Chaney, 1918-NMSC-077, 173 P. at 860:

> In *Patterson v. Chaney*, the Supreme Court found that a dwelling house, windmill, garage, chicken house, and fencing erected by a predecessor in interest in compliance with homestead requirements were fixtures:
>
>> The nature of the property, the manner of its construction, and its intended use all go to show that it was the intention of the party who made the improvements that they should be permanent additions to the land. There is no evidence tending to show a contrary intent. Under such circumstances the articles, so attached, are presumed to have become a part of the realty * * *.

> 24 N.M. at 160, 173 P. 860 (emphasis added).  The house was set on a stone
> foundation, while the windmill and garage were bolted to foundations set in the
> earth.  Having found objectively manifested intent, the court sustained a directed
> verdict on the ground that fixtures property had been presumed.

Kerman v. Swafford, 1984-NMCA-030, ¶ 11, 680 P.2d at 625.  The Bankruptcy Court for the

District of New Mexico, in In re Flores De New Mexico, Inc., 151 B.R. at 582, had to make a

similar determination whether rose bushes, planted directly in the earth, became fixtures.  See

151 B.R. at 582.  No showing had been made that the tenant had the "subjective intent that the

rose bushes remain personal property." In re Flores De New Mexico, Inc., 151 B.R. at 582.  The

Bankruptcy Court concluded, however, that the tenant had objectively manifested an intent for

the rose bushes to become part of the realty, explaining:

> The evidence shows that the rose bushes were planted directly into the earth, and
> that each bush has a root system that extends three or four feet into the earth.
> Thus, the bushes were affixed to the realty.  The evidence further shows that
> Flores intended to produce successive crops of cut roses from these bushes for a
> period of seven to eight years, at which time the bushes would be in need of
> replacement and that Flores had gone to substantial expense to erect a series of
> greenhouses specifically designed for the production of cut roses.  Thus, the
> requirement of adaptation of the realty is met.  Finally, the evidence shows that
> Flores had no intent to sell or dispose of the rose bushes and that Flores planned
> to be a long term producer of cut roses.  This Court therefore finds that the rose
> bushes had become so attached to the real estate that an interest in them arose
> under real estate law, and that they became fixtures.

In re Flores De New Mexico, Inc., 151 B.R. at 582.

Finally, "[t]he fact that a particular improvement may otherwise be considered a

permanent fixture or personalty is not alone determinative; the status of an improvement may be

varied by the terms of an agreement between lessor and lessee."  35 Am. Jur. 2d, Fixtures, §

12, at 208.  In other words, "[t]he parties to a lease may agree that an improvement be considered

a fixture or personalty."  35 Am. Jur. 2d, Fixtures, § 12, at 208 (citing see, e.g., Paulina Lake

Historic Cabin Owners Ass'n v. USDA Forest Serv., 577 F. Supp. 1188, 1194 (D. Or. 1983)).

Where "the parties' intent is expressed in their written agreement, the lease provision controls ownership of such articles." Mitchell v. Lovato, 1982-NMSC-018, ¶ 18, 640 P.2d at 928 (citing Boone v. Smith, 1968-NMSC-172, 447 P.2d 23). In Mitchell v. Lovato, 1982-NMSC-018, 640 P.2d 925, for example, the Lovatos leased premises in Albuquerque from Mitchell, and later removed various items from the premises, which they had purchased, including "booths and stools, walk-in boxes, sinks and refrigerators that were behind the bar." 1982-NMSC-018, ¶¶ 2, 4, 18, 640 P.2d at 926-28. The Supreme Court of New Mexico began by looking to the written lease, which according to the Supreme Court, "control[led] ownership of such articles." Mitchell v. Lovato, 1982-NMSC-018, ¶ 18, 640 P.2d 928. The lease provided in pertinent part:

> [A]ny and all alterations, additions, and improvements, except shelving and moveable furniture, made at Lessee's own expense after having first obtained the written consent of Lessor therefor, in accordance with the provisions contained in Paragraph VII, hereof, whether attached to the walls, floors, premises, or not, shall immediately merge and become a permanent part of the realty, and any and all interest of the Lessee therein shall immediately vest in Lessor, and all such alterations, additions, and improvements shall remain on the said premises and shall not be removed by Lessee at the termination of this lease.

Mitchell v. Lovato, 1982-NMSC-018, ¶ 19, 640 P.2d at 928. In analyzing this provision, the Supreme Court of New Mexico explained:

> Thus, the question becomes whether the above-mentioned items fall within the "movable furniture" exception. We follow the reasoning several courts have taken in interpreting such "movable furniture" provisions:
>
> > The provision is that any additions, alterations and improvements except movable furniture * * * shall attach to the realty. In other words, the parties unquestionably were assuming to except something which, without the exception, would have been included in the phrase, "additions, alterations or improvements." Such "furniture" as tables, chairs, etc., could never be considered to be an "addition, alteration or improvement" and therefore would not have to be excepted from the broader term in order to allow removal by the tenant. * * * It is extremely unlikely that this expression would be used to refer to chattels owned by the lessee, which were not affixed in some manner to the premises.

Schultz v. England, 106 F.2d 764, 768-69 (9th Cir. 1939).

> "It seems to us that the word 'furniture' must be given a meaning broad enough to embrace any movable equipment installed in the office to facilitate the transaction of the tenant's business, and that the words 'movable office furniture' shall be deemed as synonymous with the words 'movable fixtures,' as distinguished from fixtures which are so affixed to the realty that their removal would deface or injure the walls, ceilings, or floors."

> Id. (emphasis added), quoting Century Holding Co. v. Pathe Exchange, 200 App. Div. 62, 192 N.Y.S. 380, 382 (1922).

> Although Lovato testified that he removed anything that "wasn't nailed down," other testimony showed that there were "gaps in the tile where the big coolers had been pulled out"; "the office had been completely torn out and was just dangling wires"; "it was a shell of a building"; all of the breakers and electrical equipment associated with coolers and walk-in boxes were removed.  Photographs in evidence showed defacement and injury to certain floors and walls, caused by removal of these items.

The Supreme Court of New Mexico affirmed, concluding that the trial court's conclusion that the articles "should have remained on the premises and that the Lovatos were liable for their removal [was] supported by the evidence."  Mitchell v. Lovato, 1982-NMSC-018, ¶ 22, 640 P.2d at 929. In sum, commercial leases can supplement the common-law rules, which will otherwise determine whether an article of personal property has become so attached to realty that it has become a part of the land and has lost its identity as personal property.  See, e.g., Washington Metro. Area Transit Auth. v. Precision Small Engines, 227 F.3d at 228.

**2.      Trade Fixtures.**

A trade fixture, generally, "is defined as an article or group of articles of personal property, irrespective of its form or size, brought upon the premises by a tenant and that is necessary to conduct the trade or business for which the leasehold is intended."  William M. Howard, Annotation, What Constitutes Trade Fixtures–Modern Cases, 107 A.L.R. 5th 311, § 1

(2003). A trade fixture is considered to be the tenant's personal property and retains its character as personal property. See, e.g., William M. Howard, supra at § 2; Sw. Bank of St. Louis v. Poulokefalos, 931 N.E.2d 285, 290 (Ill. App. Ct. 2010). This rule rests on the notion that lessees install trade fixtures for their own benefit and do not intend them to become part of the realty. See, e.g., In re Tri-State Fabricators, Inc., 32 B.R. 260, 262 (Bankr. W.D. Okla. 1983)(applying Oklahoma law). Trade fixtures are a separate class of articles or goods from normal fixtures. See In re Reese, 194 B.R. 782, 788 n.2 (Bankr. D. Md. 1996). "In distinguishing between trade fixtures and (realty) fixtures, courts consider the three-part test employed to determine whether an article or group is a fixture or retains its character as personal property: annexation, adaptation, and intent." William M. Howard, supra at § 2 (citing Griffiths v. Office of State Fire Marshall, 704 N.E.2d 934, 936 (Ill. App. Ct. 1998); Pfeifle v. Tanabe, 2000 ND 219, ¶ 24-15, 620 N.W.2d 167, 174). This distinction between trade and ordinary fixtures is rooted in the public policy of encouraging trade and manufacturing. See, e.g., Dickerman v. Town of Pittsford, 80 A.2d 529, 531 (Vt. 1951).

New Mexico recognizes "the existence of trade fixtures, [but] has never specifically defined them." In re Flores De New Mexico, Inc., 151 B.R. at 581 (referencing Boone v. Smith, 1968-NMSC-172, ¶ 3, 447 P.2d at 25). In Porter Lumber Co. v. Wade, 1934-NMSC-042, 32 P.2d 819, one of the few New Mexico cases referencing trade fixtures, the Supreme Court of New Mexico held that a bowling alley constructed on a premises was a trade fixture, because it was used for a specific trade purpose only and did not constitute an "integral part of the realty." Porter Lumber Co. v. Wade, 1934-NMSC-042, ¶¶ 11-12, 32 P.2d at 819. Turning to other jurisdictions for guidance on the meaning of trade fixture, the Bankruptcy Court for the District of New Mexico stated: "In J.K.S.P. Restaurant v. County of Nassau, 127 A.D.2d 121, 513

N.Y.S.2d 716, 720 (2nd Dept. 1987), the court defined trade fixtures as 'articles of personal property which a tenant places upon or annexes to the leased realty for the purpose of carrying on its trade or business during the term of its lease.'" In re Flores De New Mexico, Inc., 151 B.R. at 581. In sum, under New Mexico law, a trade fixture is an item of personal property which is used for a specific trade purpose only, and is necessary to adapt a particular space to the needs of the tenant's business.

## ANALYSIS

The Court concludes that Section 19.1 of the Second Lease is unambiguous based on: (i) the text of Section 19.1 of the Second Lease, and (ii) the extrinsic factual evidence that the Defendants submitted in their briefing and at the Mark V hearing. The Court, therefore, will construe the meaning of Section 19.1 of the Second Lease as a matter of law. Based on that construction, the Court will grant in part and deny in part the MSJ.

## I.      CONCLUSIONS OF LAW BASED ON THE MARK V HEARING.

1.      The Court must determine whether Section 19.1 of Second Lease, entered into between Hunt Uptown and Davide Enterprises, is ambiguous regarding what articles of personal property Davide Enterprises was permitted to remove from the Premises.

2.      The question whether the Second Lease contains an ambiguity is a matter of law for the Court to decide. See Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.); Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. If the Court finds that the contract is "reasonably and fairly susceptible of different constructions, an

ambiguity exists."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing

Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d at 606).

3.       Section 19.1 of the Second Lease states, in pertinent parts:

19.1 Surrender.  Upon the expiration or termination of this Lease or of Tenant's
right to possession, Tenant shall surrender the Premises in a clean undamaged
condition.  Tenant shall not remove permanent improvements that were provided
by Landlord at the commencement of this Lease and shall not remove permanent
improvements later installed by Tenant unless directed to do so by Landlord.  All
fixtures or improvements constructed or installed by Tenant at the Premises
except Tenant's trade fixtures and equipment shall be the property of the
Landlord.  All light fixtures and HVAC equipment, plumbing fixtures, hot water
heaters, fire suppression and sprinkler systems, wall coverings, carpeting and
drapes and other fixtures located in or serving the Premises, except Tenant's trade
fixtures and equipment whether installed by Tenant or Landlord, shall remain at
the Premises, at the expiration or termination of this Lease without compensation,
allowance or credit to Tenant.  Tenant shall promptly remove Tenant's trade
fixtures and equipment and repair any damage to the Premises caused by such
removal.  If Tenant fails to perform any repairs or restoration or fails to remove
any items from the Premises as required hereunder, Landlord may do so, and
Tenant shall pay Landlord the cost thereof upon demand. . . .

Second Lease ¶ 19.1, at 15 (emphasis added).

4.       Under a plain reading of the Second Lease, the parties agreed specifically that

"[a]ll light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression

and sprinkler systems, wall coverings, carpeting and drapes . . . [would] remain at the Premises

at the expiration of the" Second Lease.  Second Lease ¶ 19.1, at 15.  The parties further agreed

that other "fixtures located in or serving the Premises, except Tenant's trade fixtures and

equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the

expiration or termination of" the Second Lease.  Second Lease ¶ 19.1, at 15.

5.       Section 19.1's language does not evidence expressions of mutual assent that lack

clarity, see Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235, and the

provision is not "reasonably and fairly susceptible of different constructions,"  Mark V, Inc. v.

Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.  A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111 (internal quotation marks omitted).

6.      The Second Lease does not define the terms "light fixtures, HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes," but the Court concludes that they are not ambiguous, for they can be interpreted in their "usual, ordinary, and popular sense."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111.  The Second Lease also does not define the words fixtures, trade fixtures, and equipment, which are central to Section 19.1's meaning.  See Second Lease at ¶ 19.1.  The Supreme Court of New Mexico has explained, however, that "words and expressions in lawyer-prepared instruments are to be given their legal connotations."  Levenson v. Mobley, 1987-NMSC-102, ¶ 13, 744 P.2d 174, 178 (citing Miller v. Weller, 288 F.2d 438, 440 (3d Cir. 1961)).  "When terms having a definite legal meaning are knowingly used in a written instrument, the parties will be presumed to have intended such terms to have their proper legal meaning and significance, at least in the absence of any contrary intention appearing in the instrument."  Levenson v. Mobley, 1987-NMSC-102, ¶ 13, 744 P.2d at 178.  The words "fixtures" and "trade fixtures" have definite legal meaning under New Mexico law, and can, therefore, be applied to these terms.  Additionally, the ordinary meaning of the word "equipment" is "[t]he articles or implements used for a specific purpose or activity (especially a business operation)."  Equipment, BLACK'S LAW DICTIONARY (10th ed. 2014).  The Court concludes, therefore, that Section 19.1 of the Second Lease is unambiguous on its face.

7.       In many states, the contracting parties' intent is measured solely by the language of the contract unless the language is ambiguous.  See, e.g., Carey Canada, Inc. v. Columbia Cas. Co., 940 F.2d 1548, 1555 (D.C. Cir. 1991)(discussing contract construction under the laws of Florida and Illinois).  In those states, a trial court can resort only to usage or other surrounding circumstances existing at the time the contract was made to divine the parties' intent where the language used in the contract is ambiguous.  See Carey Canada, Inc. v. Columbia Cas. Co., 940 F.2d at 1555-56.   Under New Mexico law, by contrast, a trial court may "hear evidence surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance" even where the express language of the contract is unambiguous.  C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43.  Courts are not

> restricted to the bare words of [an] agreement in interpreting the intent of the parties to . . . contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous.  New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity.

Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶¶ 11-12, 845 P.2d at 1235.

8.       The Defendants presented extrinsic course of dealing and course of performance evidence in their briefing and at the Mark V evidentiary hearing.  The first piece of evidence comes from the Mark V hearing, at which Davide testified about her course of dealing or course of performance with Hunt Uptown before the Second Lease's execution.  See May 29 Tr. at 4:6-46:17.  Specifically, before the Second Lease, Hunt Uptown and Davide Enterprises entered into the First Lease, and Davide Enterprises thereafter operated a retail salon and spa at the Premises.  See May 29 Tr. at 37:13-18.  Davide Enterprises subsequently terminated the First Lease after Davide gave birth to twins, one of whom had health challenges.  See May 29 Tr. at 31:21-25.

9.      After Davide terminated the First Lease because of her child, she was preoccupied with her child's health and did not focus on the removal of her fixtures and other things from the Premises.  See May 29 Tr. at 32:20-33:3.  Hunt Uptown was understanding of Davide's family situation, and permitted her to keep some of her fixtures and other things at the Premises, while one of Davide's family members kept a key to the space.  See May 29 Tr. at 32:22-33:11.  Some items, including rolled-up carpet, were never removed from the Premises.  See May 29 Tr. at 32:20-33:11.  Further, when she did not bring some of the items which she had removed after termination of the First Lease into the Premises to begin operating under the Second Lease, Hunt Uptown did not make an issue about the items belonging to them.  See May 29 Tr. at 333:24-34:5.

10.      As a second piece of extrinsic evidence concerning course of dealing and course of performance, the Defendants attached the Davide Aff. to their Response.  See Davide Aff. ¶¶ 1-20, at 1-4.  In the Davide Aff., Davide states:

> As part of the termination agreement[142] [under the First Lease] Hunt allowed me to remove everything that I had installed, including light fixtures and signature door handles.  No distinction was made between equipment, fixtures, furnishings, trade fixtures or personality.  Hunt also allowed me to store some of my things on the premises of the vacated salon.

Davide Aff. ¶ 8, at 2.  Further, Davide states in the affidavit, in reference to the Second Lease, that: "I signed the current lease on March 17, 2010 and moved all the things that I had taken out in 2009.  Between Hunt and La Bella there was no disagreement that everything I put into the space in 2010 belonged to La Bella."  Davide Aff. ¶ 10, at 2.

---

[142]The Defendants have not provided the Court with a copy of any such "termination agreement."  The Court does not know whether there was a separate written agreement, an oral agreement, or whether the alleged agreement merely consisted of Davide Enterprises giving notice of the termination of the First Lease.  The Court, therefore, does not draw any inferences from Davide's use of the term "termination agreement" in the Davide Aff.

11.     The question under <u>Mark V</u> is whether the extrinsic evidence submitted by the Defendants renders Section 19.1 of the Second Lease reasonably and fairly susceptible to two different meanings -- in other words, ambiguous.  <u>See</u> <u>City of Sunland Park v. Harris News, Inc.</u>, 2005-NMCA-128, ¶ 18, 124 P.3d 566, 572 (citing <u>Sitterly v. Matthews</u>, 2000-NMCA-037, ¶ 16, 2 P.3d 871, 874-75).  The Defendants maintain that this extrinsic evidence proves that Hunt Uptown and Davide Enterprises agreed that under the First Lease, all fixtures, equipment, furnishings and any items that Davide Enterprises installed were personalty.  <u>See</u> Response at 5.  According to the Defendants, that interpretation is why Hunt Uptown permitted Davide to remove all of the items that she had installed when the First Lease was terminated.  <u>See</u> Response at 5.  The Defendants contend that, when Hunt Uptown and Davide Enterprises entered into the Second Lease on March 17, 2010, they understood that "all items installed by La Bella were personalty and not part of the [Premises]" based on their prior interactions.  Response at 5.  Section 19.1 of the Second Lease states that "[a]ll fixtures or improvements constructed or installed by Tenant at the Premises except Tenant's trade fixtures and equipment shall be the property of the Landlord," and the Court construes the Defendants' argument as being that, when Hunt Uptown and Davide Enterprises used the word "trade fixtures" in Section 19.1 of the Second Lease, they understood it to mean anything Davide Enterprises installed, and not merely those items that would quality as "trade fixtures" under New Mexico law.

12.     Pursuant to <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, 845 P.2d 1232, the Court must consider "evidence surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance," <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43, in determining whether Section 19.1 of the Second Lease is ambiguous.  The Court does not, however, conclude that the extrinsic evidence

submitted by the Defendants shows ambiguity in Section 19.1 of the Second Lease, which -- as described above -- is otherwise unambiguous on its face.

13.     When ABQ Uptown bought the Premises from Hunt Uptown on July 15, 2011, and succeeded in interest to Hunt Uptown as the new landlord and owner of the Premises under the Second Lease, see Complaint ¶ 11, at 3, ABQ Uptown stepped into Hunt Uptown's shoes.  In considering the extrinsic evidence that the Defendants submitted in determining whether Section 19.1 of the Second Lease is ambiguous, the relevant inquiry is the intention of Hunt Uptown -- the original landlord -- and Davide Enterprises at the time they entered into the Second Lease. See Krieger v. Wilson Corp., 2006-NMCA-034, ¶ 17, 131 P.3d 661, 667 (examining the intentions of the original parties to a commercial lease where the lessee had been succeeded in interest, on the basis of the Supreme Court of New Mexico's decision in C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d at 241-42).

14.     The extrinsic evidence submitted by the Defendants concerns Davide Enterprises' previous interactions with Hunt Uptown under the First Lease and the circumstances surrounding Hunt Uptown and Davide Enterprises' signing of the Second Lease on March 17, 2010.  Such evidence is relevant to the Court's determination whether Section 19.1 of the Second Lease is ambiguous.  When ABQ Uptown purchased the Premises on July 15, 2011, it did not step into Hunt Uptown's shoes in a better position than Hunt Uptown found itself.  If the plain language of Section 19.1 of the Second Lease would have bound Hunt Uptown and Davide Enterprises, then ABQ Uptown and Davide Enterprises will be bound as well.  The question, therefore, is whether the Defendants' understanding of the term "trade fixtures" to mean anything installed by Davide Enterprises makes Section 19.1 of the Second Lease ambiguous.  The Court concludes that it does not.

15.     Section 19.1 of the Second Lease states in pertinent part:

All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes and other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of this Lease without compensation, allowance or credit to Tenant.

Second Lease ¶ 19.1, at 15.  "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions.  The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity."  Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 607 P.2d at 606.  The Court concludes that Section 19.1 is not reasonably and fairly susceptible to the Defendants' interpretation.  If the term "trade fixtures" means anything that Davide Enterprises installed, it would render almost all of Section 19.1 superfluous.  If the parties intended for anything that Davide Enterprises installed to remain personalty, they could have drafted Section 19.1 to state that "any item installed by Tenant shall remain Tenant's personal property."   Instead, Section 19.1 states that "all light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression systems, wall covering, carpeting and drapes and other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment . . . shall remain at the Premises."  See Second Lease ¶ 19.1, at 15.  It then lists "trade fixtures and equipment" as an exception to that blanket rule.  Second Lease ¶ 19.1, at 15.  There would be no reason to phrase the exception as for "trade fixtures and equipment" if the parties meant "trade fixtures" to include anything that Davide Enterprises installed.  They could have chosen much simpler and plainer language to express themselves than purposefully choosing a term like "trade fixtures and equipment" which has legal meaning and is a term of art in the commercial real estate industry, and is understood by courts and people to be more limited than everything the tenant installs.  There would be no need for the separate

- 108 -

category of "trade fixtures" if all they meant was what the tenant installed.  The Defendants' argument is not so much that the terms in Section 19.1 are ambiguous, but that they should be ignored entirely.  The Court declines to ignore the terms set forth in Section 19.1 of the Second Lease, and concludes that the extrinsic evidence offered by the Defendants does not make Section 19.1 of the Second Lease reasonably and fairly susceptible of different constructions such that an ambiguity exists.  See City of Sunland Park v. Harris News, Inc., 2005-NMCA-128, ¶ 18, 124 P.3d at 572 (citing Sitterly v. Matthews, 2000-NMCA-037, ¶ 16, 2 P.3d at 874-75).  The evidence may raise or support another legal doctrine, but not ambiguity.  Mark V remains about what the parties meant -- not whether the words should be enforced -- and these two inquiries should be kept distinct; there is no evidence that either ABQ Uptown or Davide Enterprises thought that the phrase "trade fixture" meant anything but the normal meaning, which is narrower than everything the tenant installed.

16.    The Defendants' evidence goes more to enforcement than it does to Section 19.1's meaning.  While the Defendants did not explicitly raise the issue, their position might be construed as an argument that, once Hunt Uptown permitted Davide Enterprises to remove all of its items at the First Lease's termination; it permanently waived its right to enforce any fixtures provision against Davide Enterprises, including Section 19.1 of the Second Lease.  The Court declines to adopt this argument for two reasons.  First, the Second Lease contains a "No waiver or Amendment" clause, which states: "The waiver by Landlord of any breach of any term, covenant or condition contained in this Lease shall not be deemed to be a waiver thereof on any subsequent occasion. . . . Landlord shall not be deemed to have waived any term, covenant, or condition of this Lease unless Landlord has signed a written waiver waiving the term, covenant, or condition."  Second Lease ¶ 26.2, at 19.  There, therefore, can be no waiver argument based

upon the Second Lease.  Second, the parties have not submitted a copy of the First Lease between Hunt Uptown and Davide Enterprises.  It may be that the First Lease contained a "no waiver" clause identical to the Second Lease, Second Lease ¶ 26.2, at 19, in which case, there would be no waiver argument based upon the First Lease.  Even if, however, the First Lease did not contain a "No Waiver or Amendment" clause, the Court would conclude that Hunt Uptown's one-time forbearance of the First Lease's fixture provision did not mean that Hunt Uptown gave up all of its rights concerning the removal of fixtures.  It particularly did not give up or waive its rights under a newly negotiated contract -- the Second Lease that contained a no waiver clause. If the Court construed the First Lease otherwise, it would make landlords shy away from accommodating their tenants, to avoid giving up their rights that they had bargained for.  Also, Hunt Uptown would not want to help a mother struggling with a sick child.  An alternative interpretation would introduce instability into the commercial real estate market.  Purchasers like ABQ Uptown would not know what they were purchasing.  They could not rely on the lease's plain language.  They would have to extend their due diligence into, not just the lease they were assessing and assuming, but prior leases between prior landlords and the tenant.  This burden would unduly increase transaction costs with no concomitant benefit to tenants or to society. There is no sound basis in New Mexico law or public policy to find waiver or a relinquishment of rights under the circumstances of this case.

17.     In sum, the Court concludes, based on the text of Section 19.1 of the Second Lease and the extrinsic factual evidence that the Defendants submitted regarding the contract's formation, that Section 19.1 of the Second Lease is unambiguous.  The plain language of Section 19.1 of the Second Lease, therefore, governs this lawsuit, and the Court will construe that provision as a matter of law.

II.     **THE COURT WILL GRANT IN PART AND DENY IN PART THE PARTIAL MOTION FOR SUMMARY JUDGMENT.**

After reviewing the record, the parties' briefs, and the controlling law, the Court will grant in part and deny in part ABQ Uptown's motion for partial summary judgment. The Court grants in part and denies in part ABQ Uptown's MSJ on their breach-of-contract claim (Count I). The Court denies the MSJ on ABQ Uptown's implied covenant of good-faith-and-fair-dealing claim (Count II) against the Defendants. Finally, the Court will deny the MSJ on ABQ Uptown's unjust enrichment claim (Count IV) against the Defendants.

A.     **THE COURT GRANTS IN PART AND DENIES IN PART ABQ UPTOWN'S MOTION FOR SUMMARY JUDGMENT ON THE BREACH-OF-CONTRACT CLAIM (COUNT I).**

To recover on a claim for breach of contract under New Mexico law, a plaintiff must establish: (i) the existence of a valid and binding contract; (ii) the plaintiff's compliance with the contract and its performance of the obligations under the contract; (iii) the performance of any condition precedent; and (iv) damages suffered as a result of defendant's breach. See McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d at 338. Here, the issue is whether the Defendants breached Section 19.1, which states, in pertinent parts:

> 19.1 Surrender.  Upon the expiration or termination of this Lease or of Tenant's right to possession, Tenant shall surrender the Premises in a clean undamaged condition.  Tenant shall not remove permanent improvements that were provided by Landlord at the commencement of this Lease and shall not remove permanent improvements later installed by Tenant unless directed to do so by Landlord.  All fixtures or improvements constructed or installed by Tenant at the Premises except Tenant's trade fixtures and equipment shall be the property of the Landlord.  All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes and other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of this Lease without compensation, allowance or credit to Tenant.  Tenant shall promptly remove Tenant's trade fixtures and equipment and repair any damage to the Premises caused by such removal.  If Tenant fails to perform any repairs or restoration or fails to remove

any items from the Premises as required hereunder, Landlord may do so, and Tenant shall pay Landlord the cost thereof upon demand. . . .

Second Lease ¶ 19.1, at 15 (emphasis added).  The Court has concluded that Section 19.1 is unambiguous, and it now interprets the provision as a matter of law.

Under New Mexico law, the default rule is that legal fixtures belong to the landlord, while trade fixtures belong to the tenant and may be removed at the termination of a lease.  See, e.g., Patterson v. Chaney, 1918-NMSC-077, 173 P. at 860 (explaining that New Mexico applies a three-part test, looking to annexation, adaptation, and intent, to determine whether an article used in conjunction with realty is a fixture); Porter Lumber Co. v. Wade, 1934-NMSC-042, ¶¶ 11-12, 32 P.2d at 819 (recognizing the existence of trade fixtures under New Mexico law and explaining that they are items of personal property used for a specific trade purpose).  Parties, of course, may and often do contract around the default rules.  Indeed, "[t]he fact that a particular improvement may otherwise be considered a permanent fixture or personalty is not alone determinative; the status of an improvement may be varied by the terms of an agreement between lessor and lessee."  35 AM. JUR. 2D, FIXTURES, § 12, at 208.  In other words, "[t]he parties to a lease may agree that an improvement be considered a fixture or personalty."  35 AM. JUR. 2D, FIXTURES, § 12, at 208 (citing Paulina Lake Historic Cabin Owners Ass'n v. USDA Forest Service, 577 F. Supp. at 1194).  Where "the parties' intent is expressed in their written agreement, the lease provision controls ownership of such articles."  Mitchell v. Lovato, 1982-NMSC-018, ¶ 18, 640 P.2d at 928 (citing Boone v. Smith, 1968-NMSC-172, 447 P.2d 23).

In this case, the parties agreed in Section 19.1 that a number of items would be considered fixtures, stating: "All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes . . . whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or

termination of" the Second Lease.  Second Lease ¶ 19.1, at 15.  The Second Lease does not

define any of these terms, <u>see</u> Second Lease ¶ 19.1, at 15, but they can be interpreted in their

"usual, ordinary, and popular sense . . . and may be ascertained from a dictionary," <u>Battishill v.</u>

<u>Farmers Alliance Ins. Co.</u>, 2006-NMSC-004, ¶ 8, 127 P.3d at 1111 (internal quotation marks

omitted).

The parties also agreed in Section 19.1 that "other fixtures located in or serving the

Premises, except Tenant's trade fixtures and equipment . . . shall remain at the Premises" after

the Second Lease's termination.  Second Lease ¶ 19.1, at 15.  The Second Lease does not define

the terms "fixtures" and "trade fixtures," which are central to Section 19.1's meaning.  Second

Lease ¶ 19.1, at 15.  The Supreme Court of New Mexico has explained, however, that "words

and expressions in lawyer-prepared instruments are to be given their legal connotations."

<u>Levenson v. Mobley</u>, 1987-NMSC-102, ¶ 13, 744 P.2d at 178 (citing <u>Miller v. Weller</u>, 288 F.2d

at 440).  "When terms having a definite legal meaning are knowingly used in a written

instrument, the parties will be presumed to have intended such terms to have their proper legal

meaning and significance, at least in the absence of any contrary intention appearing in the

instrument."   <u>Levenson v. Mobley</u>, 1987-NMSC-102, ¶ 13, 744 P.2d at 178.   The words

"fixtures" and "trade fixtures" have definite legal meaning under New Mexico law, and the

Court will interpret them in accord with their legal meaning.

In sum, the Court interprets Section 19.1 of the Second Lease to mean that the parties

intended for New Mexico fixtures law to determine which articles or items Davide Enterprises

was permitted to remove from the Premises.  The parties, however, made one deviation from the

default fixtures rules.  They agreed that "[a]ll light fixtures and HVAC equipment, plumbing

fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and

drapes . . . whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of" the Second Lease, Second Lease ¶ 19.1, at 15, regardless whether such items would be legal fixtures under New Mexico law.  The Court refers to these specifically enumerated terms as "lease provision fixtures."

The Court will conduct its analysis in six parts.  First, the Court will determine which articles or items that Davide Enterprises removed qualify as "lease provision fixtures", i.e., those items specifically enumerated in Section 19.1.  The Court will next determine which articles or items that Davide Enterprises removed qualify as "fixtures" under New Mexico law.  Third, the Court will analyze items for which there is insufficient evidence regarding the element of annexation, which the Court must consider under New Mexico law.  Fourth, the Court will determine whether any of the articles or items that Davide Enterprises removed qualify as "trade fixtures" under New Mexico law.  Fifth, the Court will analyze whether any of the articles or items that Davide Enterprises removed would be classified as non-fixtures under New Mexico law.  Finally, the Court will identify a number of items where there is a material dispute as to whether Davide Enterprises removed them from the Premises.

> **1.      Davide Enterprises Wrongfully Removed Many Articles or Items From the Premises Because of their Status as Lease Provision Fixtures Under Section 19.1.**

The Court must determine whether Davide Enterprises wrongfully removed any articles or items that qualify as "light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes."  Second Lease ¶ 19.1, at 15.  As previously stated, the Second Lease does not define these terms, but they can be interpreted in their "usual, ordinary, and popular sense."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111.  Based on its review of the Fixture Table, the

Court cannot find any article or item that Davide removed which could be classified as HVAC equipment, hot water heaters, carpeting, or fire suppression and sprinkler systems.  The question, thus, is whether Davide removed any "light fixtures," "plumbing fixtures," "wall coverings," or "drapes" in violation of Section 19.1 of the Second Lease.  Second Lease ¶ 19.1, at 15.

The NEW OXFORD AMERICAN DICTIONARY defines "wall covering" as "material such as wallpaper or textured fabric used as a decorative covering for interior walls."  Wall Covering, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).   There is no indication that Davide removed any wallpaper; the question is whether she removed any kind of "textured fabric or decorative covering for interior walls."  Wall Covering, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).  Further, the NEW OXFORD AMERICAN DICTIONARY defines "drapes" as "long curtains."  Drape(s), NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).  The Court concludes that Davide wrongfully removed the following "wall coverings" or "drapes" in violation of Section 19.1 of the Second Lease:

1. B16-(219-220): window coverings in the couples lounge room that cost $281.95 each;

2. G4-203: one (1) wall covering in the reflection that Robert Allen manufactured and that costs $1,036.80;

3. G4-205: one (1) wall covering in the women's lounge that Robert Allen manufactured and that costs $1,036.80; and

4. B17-205: one (1) window covering in the women's lounge that Xactimate manufactured and that costs $281.95.

The Court next considers whether Davide wrongfully removed any "light fixtures" in violation of Section 19.1 of the Second Lease.  Second Lease ¶ 19.1, at 15.  First, the Court must interpret the meaning of this term as Section 19.1 uses it.  As previously stated, the Court interprets Section 19.1 of the Second Lease to mean that the parties intended for New Mexico law to determine which articles or items Davide Enterprises was permitted to remove from the

Premises.  The parties made one deviation, however, from the default fixtures rules under New Mexico law, agreeing that "[a]ll light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes . . . whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of" the Second Lease, regardless whether such items would constitute legal fixtures under New Mexico law.  Second Lease ¶ 19.1, at 15.

There are two possible interpretations of the phrase "light fixtures" as Section 19.1 uses those words.  On the one hand, it could mean "fixtures" -- as New Mexico law defines that term -- that are related to lights.  If the Court were to adopt that interpretation, it would apply New Mexico's three-pronged test -- looking to annexation, adaptation, and intent -- to determine whether Davide removed any articles related to lights, that would qualify as legal "fixtures."  See e.g., Patterson v. Chaney, 1918-NMSC-077, 173 P. at 860.  On the other hand, the term "light fixtures" could be interpreted in its "usual, ordinary, and popular sense," Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111, in which case, the category of items covered would be much broader.  The Court concludes that the latter interpretation is the correct one.  Under New Mexico law, at a lease's termination, all fixtures belong to the landlord, and Section 19.1 reiterates this rule by stating: "Other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of this Lease[.]"  Second Lease ¶ 19.1, at 15.  The parties deviated, however, from this rule by specifically agreeing that a number of categories of items would be considered fixtures, stating: "All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes . . . whether installed by Tenant or Landlord, shall remain at the

Premises, at the expiration or termination of" the Second Lease.  Second Lease ¶ 19.1, at 15.  If the term "light fixtures" were encompassed within, and were merely a specific subset of, the legal definition of "fixtures" according to New Mexico law, the parties would have had no reason to specifically enumerate "light fixtures" as belonging to the landlord in Section 19.1.  Naming or including "light fixtures," along with a catalogue of other items, indicates the parties' intent to encompass articles or items that might not legally qualify as "fixtures" under New Mexico law.

The Court will, therefore, interpret the term "light fixtures" as Section 19.1 of the Second Lease uses that phrase in its "usual, ordinary, and popular sense."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111.  The MACMILLIAN ENGLISH DICTIONARY defines "light fixtures" as "the part of a light that is attached to the wall or ceiling, where you put the light bulb."  Light Fixtures, MACMILLIAN ENGLISH DICTIONARY (2015).  If the Court were to walk into Lowe's and ask where the "light fixtures" were, an employee would direct it to a particular department or aisle.  The items or objects that would be found in that department or aisle are what the Court considers to be "light fixtures" in the "usual, ordinary, and popular sense."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111.  The Court concludes that Davide Enterprises wrongfully removed the following "light fixtures" in violation of Section 19.1 of the Second Lease:

1. H13-17ea.: seventeen (17) bowl wall sconces in the treatment rooms that cost $71.90 each;

2. H1-101: four (4) vintage wall sconces in the ground floor entry that cost $532.02 each;

3. H2-101: three (3) mini bullet pendants in the ground floor entry that Wac manufactured and that cost $212.81 each;

4.  H3-101: three (3) large chandeliers in the ground floor entry that Xactimate manufactured;

5.  H1-101D: three (3) vintage wall sconces in the stair that cost $532.02 each;

6.  H4-201: one (1) 7pt. Swarovski rail fixtures in the reception that Schonbek manufactured and that costs $2,086.00;

7.  H5-201: three (3) vertex 9" pendants that cost $1,595.81;

8.  H1-201: three (3) vintage Wall sconces in the reception that cost $532.02 each;

9.  H7-202: three (3) conico pendants in the pedicure room that ET2 manufactured and that cost $273.81 each;

10. H8-203: one (1) square metal wall sconce in the reflection that Besa Moto manufactured and that costs $269.02;

11. H9-205: three (3) beaded crystal sconces in the women's lounge that James Modular Light manufactured and that cost $489.81 each;

12. H10-205: one (1) triple swag pendant in the women's lounge that Vienna Full Spectrum manufactured and that costs $425.66;

13. H1-206: four (4) vintage wall sconces in the corridor that cost $532.02 each;

14. H11-(219-220): one (1) hanging light fixture in the couples lounge room that Cassini manufactured and that costs $793.81;

15. H8-219-220: three (3) square mental wall sconces in the couples lounge room that Besa Moto manufactured and that cost $269.02 each;

16. H12-220A: two (2) cylindrical wall sconces in the couples lounge bath that Hubbardton Forge manufactured and that cost $830.91 each;

17. H6-17ea.: seventeen (17) ceiling lights in the treatment rooms that Maximum Lighting manufactured and that cost $57.60 each;

18. H1-226: two (2) vintage wall sconces in the color bar that Hubbardton Forge manufactured and that cost $506.00 each;

19. H15-233: one (1) refrax pendant in the salon (hair cut) that Schonbek manufactured and that costs $3,390.81;

20. H7-233: one (1) conico pendant in the salon (hair cut) that ET2 manufactured and that costs $273.81; and

21. H9-237: two (2) beaded crystal sconces in the mens' lounge that James Modular Light manufactured and that cost $489.81 each.

The Court next considers whether Davide wrongfully removed any "plumbing fixtures" in violation of Section 19.1.  Second Lease ¶ 19.1, at 15.  The Court must first interpret the meaning of "plumbing fixtures."  As with the term "light fixtures," there are two possible meanings of the phrase "plumbing fixtures" as Section 19.1 of the Second Lease uses that phrase.  On the one hand, it could mean "fixtures" -- as New Mexico law defines that word -- which are related to plumbing.  On the other hand, the term "plumbing fixtures" could be interpreted in its "usual, ordinary, and popular sense," Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111, in which case, the category of items covered would be broader than the legal definition of "fixtures."  The Court again concludes that the latter interpretation is the correct one.  The default rule under New Mexico law is that, at the lease's termination, all fixtures belong to the landlord.  The parties deviated from this default rule, however, by specifically agreeing that a number of categories of items, including "plumbing fixtures," would be considered fixtures, stating: "All light fixtures and HVAC equipment, plumbing fixtures, hot water heaters, fire suppression and sprinkler systems, wall coverings, carpeting and drapes . . . whether installed by Tenant or Landlord, shall remain at the Premises, at the expiration or termination of" the Second Lease.  Second Lease ¶ 19.1, at 15.  If the term "plumbing fixtures" were encompassed within, and were merely a specific subset of, the legal definition of "fixtures" according to New Mexico law, the parties would have had no reason to specifically enumerate "plumbing fixtures" as belonging to the landlord in Section 19.1.  Moreover, specifically identifying the term "plumbing fixtures" indicates that the parties

intended for it to encompass articles or items that might not normally qualify as "fixtures" under New Mexico law.

The Court will, therefore, interpret the term "plumbing fixtures" as Section 19.1 of the Second Lease uses that phrase, in its "usual, ordinary, and popular sense." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111. The INTERNATIONAL PLUMBING CODE defines "plumbing fixture" as: "A receptacle or device that is either permanently or temporarily connected to the water distribution system of the premises and demands a supply of water there-from." INTERNATIONAL CODE COUNCIL, INTERNATIONAL PLUMBING CODE 12 (2009), available at https://law.resource.org/pub/us/code/ibr/icc.ipc.2009.html. If one were to walk into a Home Depot, and ask an employee for "plumbing fixtures," the employee would point to a particular aisle, containing various items. The Court believes the term "plumbing fixtures" would include any items found in that aisle using that normal, everyday definition of "plumbing fixtures." The Court concludes that Davide Enterprises wrongfully removed the following "plumbing fixtures" in violation of Section 19.1:

1. C2-205: three (3) SS sinks and faucets in the women's lounge that Dornbracht manufactured and that cost $2,202.55 each;

2. C6-205: two (2) WCs in the women's lounge;

3. C7-17ea.: seventeen (17) oval sinks and faucets in the treatment rooms that cost $795.43 each;

4. C8-210: one (1) sink and faucet in the dispensary that costs $413.45;

5. C6-220A: one (1) WC in the couples lounge bath that costs $716.00;

6. C7-220A: one (1) oval sink and faucets in the couples lounge bath that costs $2,202.55;

7. C6-235: one (1) WC in the unisex bathroom that Toto manufactured and that costs $716.00;

8.  C2-235: one (1) stainless steel sink and faucets in the unisex bathroom that costs $2,202.55;

9.  C6-237: two (2) WC in the mens' lounge that Toto manufactured and that cost $716.00 each;

10. C2-237: three (3) SS sink and faucet in the mens' lounge that cost $2,202.55 each;

11. C5-237: two (2) shower fixtures in the mens' lounge that cost $983.40 each;

12. C5-205: two (2) shower fixtures in the women's lounge that cost $983.40 each;

13. C10-(219-220): one (1) shower fixtures in the couples lounge room that cost $4,882.00; and

14. I2-236: one (1) water hammer arrestor in the laundry room that Xactimate manufactured and that costs $150.32.

### 2.  Davide Enterprises Wrongfully Removed a Number of Items from the Premises that are Fixtures under New Mexico Law.

Beyond the specifically enumerated lease provision fixtures, the parties agreed in Section 19.1 of the Second Lease: "Other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment . . . shall remain at the Premises" at the Second Lease's termination. Second Lease ¶ 19.1, at 15.  As previously stated, the Second Lease does not define the terms "fixtures" and "trade fixtures."  Second Lease ¶ 19.1, at 15.  The Supreme Court of New Mexico has explained, however, that "words and expressions in lawyer-prepared instruments are to be given their legal connotations."  Levenson v. Mobley, 1987-NMSC-102, ¶ 13, 744 P.2d at 178 (citing Miller v. Weller, 288 F.2d at 440).   The words "fixtures" and "trade fixtures" have definite legal meaning under New Mexico law, and the Court will interpret them in accord their legal meanings.  The Court interprets Section 19.1 as prohibiting Davide Enterprises from removing any legal "fixtures" from the Premises, other than its "trade fixtures and equipment," as New Mexico law defines these terms.  In this part of the opinion, the Court will determine

whether Davide Enterprises wrongfully removed any fixtures that do not qualify as "trade fixtures or equipment."

The State of New Mexico applies the widely used three-part test to determine whether an article has become so identified with a piece of realty as to become a fixture.  In Patterson v. Chaney, 1918-NMSC-077, 173 P. 859, the Supreme Court of New Mexico stated that the three relevant factors to be considered in determining whether an article used in connection with realty is a fixture are: (i) annexation, (ii) adaptation, and (iii) intention.  See 1918-NMSC-077, ¶ 5, 173 P. at 860.  The Supreme Court of New Mexico explained:

> There are three general [factors] applied by the courts in determining the question whether an article used in connection with realty is to be considered a fixture. First, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold.

Patterson v. Chaney, 1918-NMSC-077, ¶ 5, 173 P. at 860.  See Garrison Gen. Tire Serv., Inc., 1965-NMSC-077, ¶ 10, 404 P.2d at 145 ("The Court has long subscribed to the three general tests to be applied in determining whether an article used in connection with realty is to be considered a fixture.  First, annexation. . . second, adaptation . . . and, third, intention.").  Annexation to the realty refers to "how firmly the items are attached and how easily they can be removed," and adaptability refers to how operation of the goods is related to the use of the realty. In re Dalebout, 454 B.R. at 161 (analyzing the same three elements under Kansas law).

While all three of the above factors must be considered, as in other states, in determining whether personal property loses or retains its identity as a chattel by being placed on land, the general intention of the party making the annexation or installation is the controlling factor.  See, e.g., Garrison Gen. Tire Serv., Inc., 1965-NMSC-077, ¶ 10, 404 P.2d at 145 (citing Jones-Noland Drilling Co. v. Bixby, 1929-NMSC-091, 282 P. 382; Fairbanks v. Williams, 1918-NMSC-131,

177 P. 745).  See Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶ 15, 512 P.2d at 76

("Thus our inquiry, though not disregarding annexation or adaptation, must center upon

Southwestern's intentions in installing and maintaining the components of steam production in

their present location.").  "Indeed, annexation and adaptation are chiefly important as indications

of intention," Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶ 15, 512 P.2d at 76, which

courts have recognized as the chief fixture test, see Kerman v. Swafford, 1984-NMCA-030, ¶ 10,

680 P.2d at 624.  "Courts have historically been concerned with apparent or objective intent,

rather than the actual state of mind of the owner or installer of the purported fixture."  In re

Flores De New Mexico, Inc., 151 B.R. 571, 582 (Bankr. D.N.M. 1993)(citing Sw. Pub. Serv. Co.

v. Chaves Cnty., 1973-NMSC-064, 512 P.2d 73).

> Although the question of intent is typically a fact question for the jury, intent
> regarding fixture determination is a different question.  Intent must affirmatively
> and plainly appear.  *Boone v. Smith*.  Where a court finds sufficient objectively
> manifested intent, however, a fixture may be presumed or inferred from the
> circumstances.

Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624-25 (citing Maxey v. Quintana,

1972-NMCA-069, 499 P.2d 356).  See In re Flores De New Mexico, Inc., 151 B.R. at 582.  The

Court concludes that there is sufficient objectively manifested intent regarding the following

items such that they can be inferred to be fixtures under New Mexico law:

1. A2-101: four (4) door entry handles in the ground floor entry that SF Metal Design manufactured and that cost $350.00 each;

2. C4-205: two (2) toilet paper holders in the women's lounge that Ginger manufactured and that cost $148.00 each;

3. C4-220A: one (1) toilet paper holder in the couples lounge bath that costs $148.00;

4. C4-235: one (1) toilet paper holder in the unisex bathroom that costs $148.00;

5. C4-237: two (2) toilet paper holders in mens' lounge that cost $148.00 each;

6.  G2-212: two (2) pieces of glass in the office that cost $644.18 each;

7.  D1-205: two (2) shower doors in the women's lounge that cost $1,000.00 each; and

8.  D1-237: two (2) shower doors in the mens' lounge that cost $1,000.00 each.

As explained above, to demonstrate that an item of personal property has become a common law fixture, a party must show that the item has been annexed to the real property, that it has been adapted to the use of the real property, and that the annexor intended that it become a fixture.  Patterson v. Chaney, 1918-NMSC-077, ¶ 5, 173 P. at 860.  The undisputed facts demonstrate a manifested intent on the part of Davide Enterprises for these items to become part of the realty.  In determining whether the personal property has been annexed sufficiently to be classified as a fixture, New Mexico looks to whether the item has been physically or constructively affixed to the realty.  See Kerman v. Swafford, 1984-NMCA-030, ¶ 16, 680 P.2d at 925.  Here, the shower doors, door entry handles, pieces of glass,[143] and the toilet paper holders were physically affixed to the Premises.  These articles or items were also adapted to the use or purpose to which the Premises was appropriated.  See Patterson v. Chaney, 1918-NMSC-077, ¶ 5, 173 P. at 860.  All of these items were used as integral parts of the building allowing the Premises to function as a commercial space.  See Drexel Commercial Ltd. P'ship v. DeMarb, 2015 WL 5683982 at ¶13 (Wis. Ct. App. 2015).  In her deposition, Davide stated that she planned to be in the Premises forever and to operate her business there when she contributed to the space.  See MSJ at 9.  While under New Mexico law, Davide Enterprises was entitled to remove its trade fixtures from the Premises, the items identified above were not "placed in the building for the sole purpose of enabling [Davide Enterprises] to carry on [spa] business," but

---

[143]ABQ Uptown offers evidence that the glass was part of a wall partition.  See MSJ ¶ 17, at 5 (citing Alba Expert Report at 9 (setting forth this fact)); Response (not disputing this fact).

were "so placed as to *make the building itself* peculiarly adapted and more usable" as a commercial space.  In re Maria Jean, Inc., 25 B.R. at 284 (Bankr. W.D. Mo. 1982)(citations omitted)(emphasis in original).  The Supreme Court of New Mexico has explained that trade fixtures must be used for a specific trade purpose only and do not constitute an "integral part of the realty."  Porter Lumber Co. v. Wade, 1934-NMSC-042, ¶¶ 11-12, 32 P.2d at 819.

"Annexation and adaptation, [however,] are chiefly important as indications of intention," Sw. Pub. Serv. Co. v. Chaves Cnty., 1973-NMSC-064, ¶ 15, 512 P.2d at 76, which is the chief fixture test, see Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624.  Davide Enterprises' annexation of these items to the Premises and the placement of them in the Premises to make it more usable as a commercial space, objectively manifest Davide Enterprises' intent, and the items can be presumed to be fixtures.  See Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624-25.  The Court, therefore, grants the MSJ on liability for the Defendants' breach of Section 19.1 of the Second Lease as to these items.

> ### 3. ABQ Uptown Has Not Put Forth Sufficient Evidence Regarding Annexation for a Number of the Items that Davide Enterprises Removed from the Premises.

As previously explained, in determining whether personal property loses or retains its identity as a chattel by being placed on land, the general intention of the party making the annexation or installation is the controlling factor.  See, e.g., Garrison Gen. Tire Serv., Inc., 1965-NMSC-077, ¶ 10, 404 P.2d at 145 (citing Jones-Noland Drilling Co. v. Bixby, 1929-NMSC-091, 282 P. 382; Fairbanks v. Williams, 1918-NMSC-131, 177 P. 745).

> Although the question of intent is typically a fact question for the jury, intent regarding fixture determination is a different question.  Intent must affirmatively and plainly appear.  *Boone v. Smith*.  Where a court finds sufficient objectively manifested intent, however, a fixture may be presumed or inferred from the circumstances.

Kerman v. Swafford, 1984-NMCA-030, ¶ 10, 680 P.2d at 624-25 (citing Maxey v. Quintana, 1972-NMCA-069, 499 P.2d 356).  See In re Flores De New Mexico, Inc., 151 B.R. at 582.  The Court concludes that there is not sufficiently manifested intent to infer from the circumstances that the following items are fixtures or trade fixtures under New Mexico law:

1. B1-101: one (1) cashwrap and countertop in the ground floor entry that costs $5,772.50.

2. B2-201: one (1) boutique cashwrap and countertop in the reception that Foxwood manufactured and that costs $11,511.90.

3. B4-205: one (1) cabinetry and countertop in the women's lounge that costs $1,516.00.

4. B5-17ea.: seventeen (17) cabinetry and countertops in the treatment rooms that cost $836.89.

5. B6-210: one (1) cabinetry and countertop in the dispensary that costs $5,181.75.

6. B8-220A: one (1) cabinetry and countertop in the couples lounge bath that costs $605.95.

7. B14-226: one (1) cabinetry and countertop in the color bar that Foxwood manufactured and that costs $10,794.59.

8. B9-235: one (1) cabinetry and countertop in the unisex bathroom that Foxwood manufactured and that costs $942.84.

9. B11-237: one (1) cabinetry and countertop in the mens' lounge that costs $1,552.29.

10. G3-(219-220): one (1) shower surround in the couples lounge room that costs $1,166.45.

ABQ Uptown does not offer any evidence specifically addressing the degree of annexation of the cabinetry or the shower surround.  Further, regarding the cashwraps and countertops, ABQ Uptown produces the Alba Expert Report, in which Alba states that the cashwraps and countertops were "not easily demountable."  See Alba Expert Report at 8.  At the Mark V hearing, however, Davide testified that, the cashwraps and countertops were not affixed to the floor and that they only contained custom holes through which the electronics, computer, telephone, and POS system could be hooked up.  See May 29 Tr. at 6:22-7:4.  Because the Court

does not conclude that there is sufficient objectively manifested intent as to the above items, the question of intent becomes a fact question. The Court, therefore, denies the MSJ on the breach-of-contract claim (Count I) as to these articles.

### 4. Davide Permissibly Removed a Number of Articles or Items from the Premises because they are Trade Fixtures under New Mexico law.

The parties agreed that "other fixtures located in or serving the Premises, except Tenant's trade fixtures and equipment . . . shall remain at the Premises" at the Second Lease's termination. Second Lease ¶ 19.1, at 15. The Court has already discussed which articles or items it has concluded are fixtures under New Mexico law. The phrase "trade fixtures" has definite legal meaning under New Mexico law. A trade fixture, generally, "is defined as an article or group of articles of personal property, irrespective of its form or size, brought upon the premises by a tenant and that is necessary to conduct the trade or business for which the leasehold is intended." William M. Howard, Annotation, What Constitutes Trade Fixtures–Modern Cases, 107 A.L.R. 5th 311, § 1 (2003). New Mexico recognizes "the existence of trade fixtures, [but] has never specifically defined them." In re Flores De New Mexico, Inc., 151 B.R. at 581 (referencing Boone v. Smith, 1968-NMSC-172, ¶ 3, 447 P.2d at 25). In Porter Lumber Co. v. Wade, 1934-NMSC-042, 32 P.2d 819, one of the few New Mexico cases referencing trade fixtures, the Supreme Court of New Mexico held that a bowling alley constructed on a premises was a trade fixture, because it was used for a specific trade purpose only and did not constitute an "integral part of the realty." Porter Lumber Co. v. Wade, 1934-NMSC-042, ¶¶ 11-12, 32 P.2d at 819. Turning to other jurisdictions for guidance on the meaning of trade fixture, the Bankruptcy Court for the District of New Mexico stated: "In J.K.S.P. Restaurant v. County of Nassau, 127 A.D.2d 121, 513 N.Y.S.2d 716, 720 (2nd Dept. 1987), the court defined trade fixtures as 'articles of personal property which a tenant places upon or annexes to the leased realty for the purpose of

carrying on its trade or business during the term of its lease.'"   In re Flores De New Mexico, Inc.,

151 B.R. at 581.  The Court concludes that Davide Enterprises permissibly removed a number of

"trade fixtures" from the Premises.  Davide Enterprises placed all of these items on the Premises

for a specific trade purpose only, of operating a retail salon and spa at the Premises, under the

trade name of "La Bella."  The Court, therefore, denies the MSJ as to these articles or items:

1. B12-232: four (4) hair wash stations in the salon (hair wash) that Foxwood manufactured;

2. B13-233: four (4) hair cut stations in the salon (hair cut) that Foxwood manufactured and that cost $6,000.00 each;

3. B21-W: one (1) washer and dryer that costs $14,980.00;

4. C1-202: three (3) pedicure sinks in the pedicure room that cost $1,903.41 each;

5. C9-(219-220): one (1) spa tub in the couples lounge room that costs $14,960.65;

6. C3-237: two (2) hydronic towel warmers in the mens' lounge that Salmon manufactured;

7. B3-205: one (1) locker in the women's lounge that costs $17,000.00;

8. D2-205: one (1) steam room door in the women's lounge that costs $680.00;

9. D3-205: one (1) sauna room door in the women's lounge that a framer made in hand-picked cedar and that costs $802.00;

10. C3-205: two (2) hydronic towel warmers in the women's lounge that Salmon manufactured;

11. C3-220A: one (1) hydronic towel warmer in the couples lounge bath;

12. C3-207: one (1) hydronic towel warmer in the vichy room that Salmon manufactured;

13. B10-237: one (1) locker in the mens' lounge that costs $10,400.00;

14. D2-237: two (2) steam room doors in the mens' lounge that cost $680.00 each;

15. D3-237: two (2) sauna room doors in the mens' lounge that a finish trip carpenter made and that cost $802.00 each;

16. E2-237: one (1) steam unit in the mens' lounge that Mr. Steam manufactured and that costs $11,250.00;

17. E1-207: one (1) vichy shower in the vichy room that Salmon manufactured and that costs $5,276.43;

18. C11-226: one (1) trough sink in the color bar that costs $2,769.15;

19. E3-216: one (1) therapy shower in the therapy room that costs $11,068.63;

20. Steam rocks and custom buckets in the women's lounge sauna unit;

21. Steam rocks and custom buckets in the women's lounge steam unit; and

22. Steam rocks, bowls, and other removable things from the sauna unit in the mens lounge.

### 5.    Articles or Items that Davide Permissibly Removed Due to Their Status as Non-Fixtures under New Mexico Law.

Finally, there are several articles or items that Davide Enterprises removed, which the Court concludes are non-fixtures under New Mexico law.  The Defendants properly removed these items from the Premises at the Second Lease's termination.  As stated above, New Mexico applies the widely used three-part test to determine whether an article has become so identified with a piece of realty as to become a fixture: annexation, adaptation, and intent.  See Patterson v. Chaney, 1918-NMSC-077, ¶ 5, 173 P. at 860.  The Court concludes that Davide Enterprises properly removed the following non-fixtures from the Premises at the Second Lease's termination.  Considering the three factors of intent, annexation, and adaptation, the Court denies the MSJ on liability for the Defendants' breach of Section 19.1 of the Second Lease as to the following items:

1. B18-210: one (1) ice maker in the dispensary that costs $1,372.82;

2. B19-210: refrigerator;

3. B20-237: one (1) television that costs $658.40;

4. B16-237: one (1) hanging art in the mens' lounge that costs $281.95;

5. B20-201: one (1) television including brackets that Samsung manufactured and that costs $658.00;

6. B20-226: one (1) television including brackets in the color bar that Samsung manufactured and that costs $658.40; and

7. B7-220A: one (1) shower bench in the couples lounge bath that Xactimate manufactured and that costs $424.92;

**6. A Material Dispute Exists as to Whether Davide Enterprises Removed a Number of Articles from the Premises at the Second Lease's Termination.**

As described in the second factual section of this opinion, the parties remain in dispute as to whether Davide Enterprises removed a number of articles at the Second Lease's termination:

1. H6-201: two (2) flush Mount ceiling in the reception;

2. G5-(219-220): one (1) cork wall covering in the couples lounge room;

3. H10-237: one (1) triple swag pendant in the mens' lounge;

4. H16-237: one (1) rectangular pendant in the mens' lounge;

5. H8-237: one (1) square metal wall sconce in the mens' lounge;

6. H14-232: six (6) tiffany pendants in the salon (hair wash);

7. H6-233: seven (7) flush mount ceiling in the salon (hair cut);

8. H8-205: one (1) square metal wall sconce in the women's lounge;

9. G4-237: one (1) wall covering in the mens' lounge;

10. B15-202: one (1) drapery in the pedicure room;

11. I1-236: one (1) washer mixing valves in the laundry room;

12. E1-205: one (1) sauna unit in the women's lounge;

13. E2-205: one (1) steam unit in the women's lounge;

14. E1-237: one (1) sauna unit in mens' lounge;

15. A1-101: magnetic entry system on the ground floor;

16. F1-205: steam unit disconnect in the women's lounge;

17. G1-205: baseboards in the women's lounge;

18. F2-14ea.: GFCI'S in the treatment room;

19. F1-237: steam unit disconnect in the mens' lounge;

20. B17-210: metal lockers in the dispensary; and

21. Six "unlocated fixtures."

The Court, therefore, denies ABQ Uptown's MSJ as to these articles or items.

**B.    THE COURT DENIES ABQ UPTOWN'S MOTION FOR SUMMARY JUDGMENT ON THE COVENANT-OF-GOOD-FAITH-AND-FAIR DEALING CLAIM (COUNT II).**

The second issue before the Court is whether Davide Enterprises breached any duty of good faith and fair dealing owed to ABQ Uptown under Second Lease.  The Court has previously held that a "claim for breach of the covenant of good faith and fair dealing is derivative of the breach-of-contract claim."  Back v. ConocoPhillips Co., 2012 WL 6846397, at *22 (citing Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *7).  Here, ABQ Uptown and Davide Enterprises entered into a valid and binding contract -- the Second Lease -- which could form the basis of a covenant-of-good-faith-and-fair-dealing claim.

"Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642 (internal quotation marks omitted).  As the Supreme Court of New

Mexico explained in Continental Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, 858

P.2d 66:

> Whether express or not, every contract in New Mexico imposes the duty of good
> faith and fair dealing upon the parties in the performance and enforcement of the
> contract.  The breach of this covenant requires a showing of bad faith or that one
> party wrongfully and intentionally used the contract to the detriment of the other
> party.

1993-NMSC-039, ¶ 64, 858 P.2d at 82 (citing Watson Truck & Supply Co. v. Males, 1990-

NMSC-105, ¶ 10, 801 P.2d at 642).  See Sanders v. FedEx Ground Package Sys., 2008-NMSC-

040, ¶ 7, 188 P.2d at 1203.

> However, the implied covenant of good faith and fair dealing protects only
> against bad faith -- wrongful and intentional affronts to the other party's rights, or
> at least affronts where the breaching party is consciously aware of, and proceeds
> with deliberate disregard for, the potential of harm to the other party.  Simply put,
> in contract there is no implied covenant to exercise "ordinary care," or even
> "slight care," and the fact that the breaching party may not have acted with
> ordinary or slight care is immaterial to the questions whether the contract has
> been breached and if so, what damages should be awarded for the breach.

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d at 309-10 (footnote omitted).

ABQ Uptown's MSJ, however, has not made a sufficient showing that the Defendants

violated the Second Lease in in bad faith or in an intentional and wrongful way.  See Paiz v.

State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d at 309-10 ("[T]he implied covenant of

good faith and fair dealing protects only against bad faith -- wrongful and intentional affronts to

the other party's rights, or at least efforts where the breaching party is consciously aware of, and

proceeds with deliberate disregard for, the potential of harm to the other party." (footnote

omitted)).  The actions that ABQ Uptown identifies as the basis for its implied-covenant-of-

good-faith-and-fair-dealing are the same as those made in the underlying breach of contract

claim (Count I), and ABQ Uptown does not point to any evidence in its motion to show that

Davide Enterprises acted in bad faith in breaching the Second Lease.  The Court, therefore, denies the MSJ on ABQ Uptown's implied-covenant-of-good-faith-and-fair-dealing claim.

### C.    THE COURT DENIES ABQ UPTOWN'S MOTION FOR SUMMARY JUDGMENT ON THE UNJUST ENRICHMENT CLAIM (COUNT IV).

The Court denies the MSJ on the unjust enrichment claim (Count IV).  To prevail on an unjust enrichment claim, ABQ Uptown needs to show that "(i) [Davide Enterprises has] knowingly benefitted at [ABQ Uptown's] expense (ii) in a manner such that allowance of [Davide Enterprises] to retain the benefit would be unjust."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698.  The Court need not, however, grant ABQ Uptown's MSJ on its unjust enrichment claim (Count IV), for it has found that the Defendants are liable for breach-of-contract under Count I.  The Supreme Court of New Mexico has held that equitable relief should be denied where there is an available remedy at law, which includes recovery under a breach-of-contract theory.  See Applied Capital, Inc. v. Gibson, 2207 WL 5685131, at *17 (D.N.M. 2007)(Browning, J.)(citing Lopez v. Kase, 1999-NMSC-001, ¶ 6, 975 P.2d at 348; Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 699).  Indeed, where a contractual relationship exists with applicable contractual provisions, unjust enrichment claims -- which arise in equity -- must be dismissed.  See Abraham v. WPX Energy Production, LLC, 20 F. Supp. 3d 1244, 1270-72 (D.N.M. 2014)(Browning, J.)(citing Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d 1091, 1107-17 (10th Cir. 2005)(Murphy, J.)).

In Elliot Industries Ltd. Partnership v. BP America Production Co., 407 F.3d at 1091, for example, the Tenth Circuit interpreted New Mexico unjust enrichment law, as it relates to breach-of-contract claims.  See 407 F.3d at 1116-1117.  In that case, the plaintiff royalty owners sued ConocoPhillips Company, the working interest owner, to collect additional royalties; the plaintiffs alleged that ConocoPhillips was underpaying their royalties by reducing them with

illegitimate post-production costs, including a thirty-nine percent assessment of natural gas liquids (NGLs), which the defendants retained as compensation for processing the gas.  See Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1100.  The plaintiffs did not assert "an unequivocal and straight-forward contract claim" for the royalty underpayments, and "steadfastly disclaim[ed] any cause of action for breach of an express contract."  Elliot Industries Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1107.  The Tenth Circuit noted that Elliott Industries' decision not to pursue a breach-of-contract claim was likely strategic, because, "[p]resumably, pleading a breach of contract claim on behalf of approximately 10,000 royalty owners would have made class certification less likely."  407 F.3d at 1107 n.10 (citing Fed.R.Civ.P. 23(a)(2) (commonality)).   In lieu of a breach-of-contract claim, the plaintiffs asserted claims such as breach of implied covenants, conversion, fraud, and unjust enrichment. See Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1108.

The district court, relying on Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 3 P.3d 695, granted summary judgment against the plaintiffs on the unjust enrichment claim, concluding that "because the [unjust enrichment] claim arises in equity it cannot exist where, as here, the parties are in privity of contract."  Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1116.  On appeal, the plaintiffs argued that Ontiveros Insulation Co. v. Sanchez does not automatically bar unjust enrichment claims when the parties are also in a contractual relationship, and that, even if the law barred unjust enrichment claims, the contracts between the plaintiffs and the defendants in the case before the court did not govern the thirty-nine percent processing fee.  See 407 F.3d at 1117.  The Tenth Circuit affirmed the district court's judgment.  See 407 F.3d at 1117.  Quoting Ontiveros Insulation Co. v. Sanchez, the Tenth Circuit stated that "equity does not take the place of remedies at law, it augments them; in this

regard, an action in contract would be preferred to one in quasi-contract." Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (quoting Ontiveros Insulation Co. v. Sanchez, 3 P.3d at 699). According to the Tenth Circuit:

> [T]he hornbook rule [is] that quasi-contractual remedies . . .  are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.  Courts have recognized this principle and have stated their unwillingness to resort to the doctrine of unjust enrichment to override a contractual [ ] provision.

Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (alterations in original)(quoting Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)). In rejecting the plaintiff's arguments, the Tenth Circuit also cited to WILLISTON ON CONTRACTS, which states: "Where the plaintiff has no alternative right on an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the defendant." Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117 (quoting 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 68:5 (4th ed. 2004)). In sum, the Tenth Circuit affirmed the district court's summary judgment for the defendants on the unjust enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationship." Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117. While the Tenth Circuit acknowledged that the governing contracts did not delineate any specific deductions, it concluded that: "the contracts control[ed] how royalties are to be paid. Indisputably, there are contracts between the parties, thus any claim for underpayment of royalties, including a claim for unjust enrichment, must begin with those contracts." 407 F.3d at 1117.

The Tenth Circuit's interpretation of New Mexico unjust enrichment law is binding on this Court: "When a panel of [the Tenth Circuit] has rendered a decision interpreting state law,

that interpretation is binding on district courts in [the Tenth Circuit], and on subsequent panels of [the Tenth Circuit], unless an intervening decision of the state's highest court has resolved the issue." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003). See Williams v. Bd. of Regents of the University of New Mexico, 2014 WL 4351533, at * 22 n.13 (D.N.M. Aug. 18, 2014)(Browning, J.).   Here, the Second Lease created a valid and binding contractual relationship between ABQ Uptown and Davide Enterprises.  The Court has concluded that ABQ Uptown prevails on its breach-of-contract claim (Count I) for the Defendants' breach of Section 19.1 and granted summary judgment in part in its favor.  Because ABQ Uptown has an available remedy at law -- here, on a breach-of-contract claim -- the Court will deny equitable relief. Consistent with the precedent of the Court of Appeals of New Mexico set forth in Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, 3 P.3d at 699, and the Tenth Circuit set forth in Elliot Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d at 1117, the Court, therefore, denies ABQ Uptown's motion for partial summary judgment on its unjust enrichment claim (Count IV).

### D. THE COURT WILL DENY ABQ UPTOWN'S REQUEST FOR COSTS AND ATTORNEY'S FEES AT THIS TIME.

ABQ Uptown also asks for costs and attorney's fees in connection with its motion.  See MSJ at 10.  It appears to base its request on the Guaranty, which states: "Attorney's fees.  If Landlord enforces Guarantor's obligations hereunder by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including without limitation reasonable attorney's fees and litigation expenses."  Guaranty ¶ 13, at 3.  As the Court has noted in an earlier case, a request for attorney's fees is usually premature until the Court enters final judgment.  See Mountain Highlands, LLC v. Hendricks, 2009 WL 2426197, at * 14 n.7 (D.N.M. July 14, 2009)(Browning, J.); D.N.M.LR-Civ. 54.5(a) (providing that a motion for attorney's fees must be filed within thirty days of judgment).  An application for fees should also accompany a motion for attorney's

fees with supporting affidavits and time records.  See D.N.M.LR-Civ. 54.5(a).  In any case, after the Court has entered final judgment, should ABQ Uptown continue to maintain that it has a contractual or other basis for fees -- and, on the basis of the results of this motion, it appears that ABQ Uptown will be entitled to at least some of the fees and expenses that is has incurred litigating with the Defendants -- it may file a motion in accordance with D.N.M.LR-Civ. 54.5.

**IT IS ORDERED** that Plaintiff ABQ Uptown, LLC's Motion for Partial Summary Judgment on Counts I, II, and IV of Plaintiff's Complaint, filed February 5, 2015 (Doc. 60)("MSJ"), is granted in part and denied in part.  The Court grants Plaintiff ABQ Uptown, LLC's motion for partial summary judgment on its breach-of-contract claim (Count I) against the Defendants as to the articles or items identified in this Memorandum Opinion as being wrongfully removed from the Premises.  ABQ Uptown's motion for partial summary judgment on Count II and Count IV, and on Count I except where it is specifically granted otherwise herein, is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Marcus J. Rael, Jr.
Douglas E. Gardner
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Alex Chisholm
Albuquerque, New Mexico

  *Attorney for the Defendants*